1212-15

ORIGINAL

No. PD-1212-15

IN THE COURT OF CRIMINAL APPEALS

OF THE STATE OF TEXAS

RECEIVED IN
COURT OF CRIMINAL APPEALS

DEC 23 2015

Abel Acosta, Clerk

ZACK G. ELDRED. JR PETTIONER PRO-SE

Vs.

THE STATE OF TEXAS RESPONDENT

PETITION IN CAUSE NO.11F0762-102

FROM THE 102nd DISTRICT COURT OF

BOWIE COUNTY TEXAS

AND

THE COURT OF APPEALS FOR THE

SIXTH JUDICIAL DISTRICT OF TEXAS

TEXARKANA

CASE NO.06-1300128-CR

DECIDED MARCH 5 2014

HABEAS CORPUS

PETITION FOR OUT-OF-TIME PDR

CAUSE No. WR-79,560-03

PETITION SEEKING DISCRETIONARY REVIEW

Mr. Abel Acosta, Clerk
Office of The Court Of
Criminal Appeals Of
Texas.
P.O. Box 12308
Capitol Station
Austin, Texas 78711


Dear Mr, Acosto:

Please Find in this Writ Envelope my Petition For

Discretionary Review and file it with the Court. I also as

to the Inactment of Tex.R.APP.P. Rule 2,to SUSPENION of the

Amount of Copies requird to be Filed. Also Please inform me

as to you receining of my Petition For Discretionary Review.

Thank you for your time and service..


Respectfull Submitted

Zack G. Eldred,Jr. PRO-Se

TDCJ #1812117

Clements Unit

9601 Spur 591

Amarillo, Tx 79107-9606

Zack G. Eldred,Jr

Petitioner Pro-Se

TDCJ #1812117

William P. Clements Unit

9601 Spur 591

Amarillo, Tx 79107-9606

## TABLE OF CONTENTS

Table of Contents...........................................I

Index of Authorities..................................III IV

Statement Regarding Oral Argumnets.........................1

Statement of the Case......................................2

Statement of Procedural History............................4

Ground for Review..........................................4

Reason for Granting Review.................................5

Statement of Facts.........................................6

Arguments and Authorities.................................14

Ground For Review.........................................14

    Ground One: The Court of Appeals, Affirming
Judgment,Erred by misappling Article 38.072 of Texas Code
Of Criminal Procedure by allowing Missy Davison to be
designated as the proper Outcry witness as applied by the
Trail Court in a Artical 38.072 Hearing...................14

    Ground Two: The Court of Appeals,By affirming
Judgment,Erred by finding Karrah Dickeson admissible
Testimony relevant where in Fact her testimony was inadmissable
Under Texas Rule of Evidence 401 and 403 was well as the
Science Dickeson applied unrelied........................21

    Ground Three: The Court Of Appeals, By Affirming Judg-
ment,Erred by concluding Eldred did not preserve the medical
exception argument argument for appellate review.........28

I

# INDEX OF AUTHORITIES

## CASES

Brown V. State,189S.W.3d 382,385(Tex.App.Texarkana 2009).18,16,19

Broderrick V. State, 35 S.W.3d 67,73 (Tex.App.Texarkana 2000

pet, ref'd..........................................18,19.20

Brumit V. State,296 S.W.3d639 Tex.Crim.App.2006).........22,28

Cantu V. State,842 S.W.2d 667,682,(Tex.Crim.App(1992)....22

Daubert V. Merrell Dow Pharm.,INC.509,595 (1993).........26

Fuentes V. State,991 S.W.2d(Tex.Crim.App.1999)...........30

Garcia V. State,792 S.W.2d88,92(Tex.Crim.App.1990).......15,22

Ibarra V. State,11 S.W.3d 189,197(Tex.Crim.App.1999).....31

Jonson V. State,517 S.W.2d 170,173(Tex.Crim.App.1978.....29

Kelly V. State,824 S.W.2d568,572(Tex.Crim.App.1992)......26

Josy V. State,97S.W.3d687,692(Tex.App.Texarkana 2003,n0 pet)19

Lankston V. State,827,S.W.2d907,909(Tex.Crim.App(1992)...31

Love V. State,861S.W.2d 899,903(Tex,Crim,App.1993).......22

Lopez V. State,200 S.w.3d246,251(Tex,App,Houston[14 dist.]

20006,pet.fef'd).......................................23

Masly V. State,983S.W.2d249,265(Tex.Crim.App.1998(op.on reh'g)

cert.denied 526 U.S.1070,199 S.Ct.1466,143 L. Ed.2d500(1999)33

Mendez V. State,138S.W.3d334,341(Tex.Crim.App.2004).......17

Miles V. State,61S.W.3d 682,686(Tex.App-Houston[Dist]

2001,pet.ref'd).......................................29

Mirelse V,State,413S.W.3d 98,104(Tex.App.San Antonio 2013)19

Moreno V. State,858 S.W.2d 453,463(Tex.Crim.App.1993) Cert,denied 510 U.S. 96,144 S.Ct 445,126 L.Ed378 (1993)........................................22

Mosley V. State 983 S.W.2d 249,265(Tex.Crim.App.1998)..................17

Rodgers V. State,205 S.W.3d(Tex.Crim.App.2006)..........................26

Sulazar V. State,385 S.W.3d 144,153(Tex.Crim.App.2001)..............18,22

Smith V. State,131 S.W.3D 921,928(Tex.App.-Eastland 2004..............22

Tennison V. State,969 S.W.2d 578,580(Tex.App.Texarkana 1998 No.pet)...23

Thomas V. State,1 S.W.3d 138.140=41(Tex.App.Texarkana 1999,pet.ref'd..18

Thomas V. State,408 S.W.3d 877,884(Tex.Crim.App.2013).................31

Tillman V. State 254 S.W.3d 439........................................25

Turro V. State,867 S.W.2 43,47(Tex.Crim.App.1993).....................30

Vela V. State,209 S.W.3d 128(Tex.Crim.App.2006).......................26

## STATUES ~~STATUTES~~

Articial 38.072 Of The Tex.Code.Crim.Pro      4,5,10,12,13,15,16,17,18, 19,20,33

## RULE

Tex.R.Evid.401...........................................14,21,25,33
Tex.R.Of Evid.403...............................10,14,21,23,25,26,27,33
Tex.R.of Evid(c).................................................26
Tex.R. Evid 702..................................................27
Tex.R. Evid 703..................................................27
Tex.R.App.Ann 66.3(a)..........................................5
Tex.R.App.Ann 66.3(b)..........................................5
Tex.R.App.Ann 66.3(c)..........................................5
Tex.R.App.Ann 66.3(d)..........................................55
Tex.R.App.Ann 66.3(f)
Tex.R.App.P 33.1(a)..........................................17,33
Tex.R.App.P 33,1(a)(2).........................................17

NO. PD-1212-15

| | | |
|---|---|---|
| ZACK G. ELDRED, JR | § | IN THE COURT OF |
| PETITIONER PRO-Se | § | |
| | § | CRIMINAL APPEALS |
| Vs. | § | |
| THE STATE OF TEXAS | § | AUSTIN, TEXAS |

TO THE HONORABLE COURT OF CRIMINAL APPEALS:

Now Comes Zack G. Eldred Jr, PETITIONER PRO-SE and Defendant in the Trail Court, and Respectfully Submits This His Petition For Discretionary Review Complaing Of The Ruling And Opinion By The Court Of Appeals For The SIXTH SUPREME JUDICIAL DISTRICT AT TEXARKANA, TEXAS And Would Show The Court As Follows:

## STATEMENT REGARDING ORAL ARGUMENT

The Petitioner Request Oral Argument As The Issue Are Complex And Oral Argument Would Be Helpful In Desiding The Merites Of The Case..

1

## STATEMENT OF THE CASE

Appellant ZACK G. ELDRED,JY. Was indicted for Continuous Sexual Abuse of a Child Under 14 Years of Age, Alleged to have been committed in Bowie County Texas , on or about September 1,2010 Though May 9,2010, On September 22,2011 by the Grand Jury of Bowie County Texas, In Cause No. 11F0762-102 (C.R.P.)

The Trial Court granted a Motion to Ammend the Indictment on June 21,2012 Which allegel the offence occurred July 1,2010 Though December 7,2010. (C.R.P. 81)..

Continouse Sexual Abuse of a Child Under 14 Years of Age is an Aggravated First Degree Felony, Punishablr by not less than Twenty-Five (25) years and not more than Ninety-Nine (99) years or life in the Institutional Division of the DEpartment of Criminal Justice, in addition a fine not to exceed Ten-Thousand (10,000) dollares maybe imposed. Petitione was tried before  a jury in the 102nd District Court in Bowie County Texas, On September 12th,2012 to determine his guilt. The jury returned a guilty verdrict on September 12th,2012. (R.R.Vol.#p.177,178). On September 13th 2012 The jury returned a verdict on punishment, Life in the Insitiutonal Division of the Texas Department of Criminal Justice in Cause No.11F0762-102, The judge then sentenced the Petitoner to Life in the Institutional Divsion of the Texas Department of Criminal Justice in Cause No.11F0762-102 for Continuouse Sexual Abuse of A Child Under 14 Years of Age (R.R.Vol.5p.45) upon conviction Mr.Eldred made it known to his attorney Jeff

2

Harrelson that he wanted to appeal, The Order appointing appellate counsel Ms Kristian Young was not signed untill October 25,2012. Kristian Young received the Oder appointing her to repersent ZACK G ELDRED Jr on October 29,2012. Ms. Young filed a notice a Appeal and a Motion for Exension to File notice of Appeal on November 5,2012. However the Thirty Day deadline to file Eldred's Notice of Appeal was October 11,2012. Therefore the Sixth Court of Appeals entered Judgment dismissing Zack G Eldred Jr Appeal for want of Jurisdiction. Pursuant to Eldred's request appellate Counsel was appointing although Fourteen (14) days after the deadline to file notice of Appeal had passed and the order appointing appellant counsel was not recevied untill Eighteen(18) days after the deadline to file notice of Appeal had passed. Zack G Eldred,Jr requested that a Habeas Corpus be filed according seeking an Out-Of-Time Appeal. Case No. 11F0762-102-A on March 22,2013. On July 8,2013 The Court of Criminal Appeal Granted Eldred an Out-OF-Time Appeal WR-79,560-01. The Appellant filed his brief in Cause Numbers 06-12-0079-CR and 06-1200180-CR with the Three issues on appeal to the Court of Appeals for the SIXTH SUPREME JUDICIAL DISTRICT AT TEXARKANA TEXAS. 6th District Court of Appeals affirmed the conviction.....

3

## STATEMENT OF PROCEDURAL HISTORY

The Sixth Supreme Judicial Court Of Appeals At Texarkana Texas Affirmed the conviction by Opinion on March 5,2014 in 06-13-00128-CR. No Motion for rehearing was filed. Petitioner was never notifyed by his Appellant Counsel of his rights to file for hearhearing or that his Appeal had been Affirmed or that Petioner had 30 days to file for Discretionary Review. Petitioner did not file a secound application for Writ of Habeas Corpus in Cause No. 11F0762-102-B contending his appeal attorney did NOT notify him that his rights to file for Discretionary Review and causing him to miss the 30 day deadline. Petitioners Writ of Habeas Corpuse WR-79,560-03 was Granted by the Court of CRiminal Appeal and its mandate was issued on September 21,2015. On September 15,2015 Petition For Discretionary Review. Court of Criminal Appeals Granted his Motion for Extension of Time untill December 21.2015 to file his Petition for Discretionary Review..

## GROUNDS FOR REVIEW

Appellant's Petition For Discretionary Review Is Based On The

Following Ground(S)

Ground One; The Court of Appeals, By affirming judgment ERRED by misappling Article 38.072 of the Texas Code Of Criminal Procedure by allowing Missy Davison to be designated as the Outcry witnes as applied by the Trail Court Article 38'072 hearing...

~~~~~ ~ ~~~

Ground two; The Court of Appeals, by Affirming Judgment ERRED by finding Karrah Dickeson testimony relevant where in fact her testimony was INADMISSIBLE Under Texas Rule of Evidence 401 and 403 and the science Dickerson Applied is unreliable Falling under Junk Science...

Ground three; The Court of Appeal, by affirming Judgment Erred by concluding Eldred did not perserve the Medical exception argument for appeallate review...

## REASON FOR GRANTING REVIEW

(1). The Court of Appeals decision Conflicts with the decision of another Court of Appeals on the same matter.Tex.R.App.p.Ann. 66.3(a)

(2). The Court of Appeals decided an important question of State or Federal Law in conflict with the Appicable decisions of the Court of Criminal Appeals or the United State Supreme Court. Tex.R.App.Ann. 66.3(b)

(3). The court of Appeals decision conflicts with an applicable decision of the Court of Criminal Appeals on and important question of State Laws Tex.R.App.P.66.3(c)

(4). The Court of Appeals decision appearsd to have misconstrued a statute, Rule,Regulation,or Odinance. Tex.R.App.P.66.3(d).

(5). The Court of Appeals decision depared so far from the accepted and usual course of Judicial proceeding, or sanctioned such a departure by a lower Court, as to call for the exercise of the Court of Criminal Appeals power of Supervision. Tex..R.App.P.Ann. 66.3(f)...

5

## STATEMENT OF FACTS

Prior the trail on merits, The Court held a Hearing outside the presence of the Jury to hear defense Attorneys Objection to the State calling of Missy Davison as their Outcry witnes under Article 38.078. Defense contins that Missy Davison is Not the first person over the age of 18 to which the alleged victim made statements about the offence, as well As well as at the time of the statement she was not under 14 she was over 14 at the time of the Declaration.(R.R.Vol3.P5)

The Court then called on the State (R.R.Vol 3.P5) Ms. OGLESBY and had a discussion on the matter of who is a proper Outcry witness. The Court the states: Well I Think I asked you and my able assistant yesterdat to find me a line of cases, (R.R.Vol 3.P6). The word that they seem to use in each and everyone of those cases is the word Discernable, and I think they used that basically in describing the HOW,WHEN and Where that you just mentioned. And several of those cases did touch on the fact that the Outcry witness was not the first person that was told basically a general statement,but not somthing that was In-Depth. And that the Court ask the State Do you have your CAC interviewer here this morning, MS.CRISP? MS Crisp, Judge, I DO. The Court do you want to put her on the stanmd ? Ms CRISP; YES SIR. The State would call Missy Davison.. (R.R.Vol 3.P7)./ MS.CRISP:: Just to speed this process up, JUDGE, It's my understanding that we're going to designate her as an Outcry. Ofcourse, WE do indend to designate her as an expert. IF Mr. Harrelson has no onjection, Im

6

not going to prove her up as a forensic interviewer if we just are going to talk about details of the ....MR HARRELSON; I don't think that's necessary for the purpose of this hearing, But at Trail, Obviously I DO.. (R.R.Vol3.P8). The State called Missy Davison who testified under Direct Examination as to being an employ with the Texarkana Children's Advocacy Center and as to how things where done there. She testified as to what the victim Holly Keliburg had told her at the center. (R.R.Vol3.P8,9,10,11,12,13).. Cross-Examination BY MR.HARRELSON: Ms. Davison so you were at least awear generally of the allegations that Ms. Sandoval had made before your interview ? YES, SIR, Did you look at any medical records before you spoke with her ? (R.R.Vol.3P.14).. NO SIR. (R.R.Vol.3.P15). RECROSS EXAMINATION BY Mr.HARRLSON; While she is on the stand, YOUR HONOR, THIS may touch a different issue.. But, Ms Davison, Did Ms. Sandoval make any allagtions against other indiviluals other than Zack Eldred when she was being interviewed by you ? SHE told me about two other incidents that happened when she was at a younger age in life. If I recall She said they had already been investigated, So we didn't go into detail over those. Okay. BUT she did specifically mention her dad and stepfather? YES SIR, (R.R.VOL3.p17) Witness Dismissed.. MS CRISP; JUDGE, MR. HARRELSON and I have agreed, I think we have, the victim is here. I Do intend to call her and ask her a couple of questions, and just my questions, and just my questioning is going to be very brief. basically who did you tell,What did you tell them. I'm not sure, I think Mr Harrelson has some medical that you want

7

to go though ? MR. HARRELSON., I was going to Ask Ms.Sandoval about what prople at the hospital. Depending on the depth of her Testimony, I may need to introduce it, and I may not. THE COURT: When did you want to call her, Right Now? MS.CRISP: YEAH,, THE COURT sure.. MS.CRISP: Carolyn Sandoval (R.R.Vol-3.P 18(. THE STATE then called Carolyn Sandoval (victim) she testified that she was fixing to be 16 in December and that from July 1st,2010 to December 7th,2010 She was 13 during that time frame. Carolyn testified that her Mom took her to the hospital and asked you if you were pregnant. And you told her you were having a sexual affair with Zack Eldred; (R.R.Vol 3.P20) She testified she did not tell her Mon the details of what happened between you and Mr.Eldred ? NO,MA'AM Sge futher testified that she talked to some nurses at the Hospital.Do you remember giving them any details about everything that happened; No,Ma'am. When carolyn was ask, I'm Telling you'I'm repersenting to you that this is a peice of paper that came straight from your Medical records. Basically here at the bottom of the page it says that you and Zack have been having sex for months. Do you remember saying that? Yes Ma'am. Do you remember telling the nurse that he used a condom? Yes,Ma'am. Beyond giving some of this,you tell any- body there that day all that sort of different ways that you and him had your relationship? Did you tell anybody the details there at the Hospital, or did you give it to the CAC person that interviewed you? The person who interviewed me. (R.R.Vol 3.p21,22).. ON CROSS-EXAMINATION by Carolyn testified

8

that she remembered what month and it was she went to the Hospital maybe not exact day, But was around close to the middle of May. And she did not have any problem with the day May 9th. She testified to talking to the people at the Hospital before talking to Missy Davison at CAC. (R.R.Vol3.p22). Witness was Dismissed,STATE and DEFENCE jointly offered the medical as a record exhibit,(R.R.Vol 3.p23).. The State offered Missy Davison as the witness number One, and ask the Court if he wanted her to proceed as if she is the Outcry.. THE COURT: I tell you what,Let's just---,Iunderstand the point you're trying to make.. she's a qualified outcry witness and I'M going to rule that she is such..(R.R.Vol3.p25)..Mr. HARRELSON just for purposes of the record, Your Honor, in the Medical records as I've submitted as Defence Exhibit(1) for this hearing, the Note from the nurses at the Hospital states that she addmitted to regular intercourse with the man, She says Zack had put his penis in her mouth..At least from our position she did make a detailed statements to the persons at the Hospital,And they would be the correct Outcry witness.. But I understand the court's ruling.(R.R.Vol3.p26) The Court futher stated that her testimony to an interviewer would still be admissible and it appears to the Court in this cawe that's what's happened. Did she give a general statement, to Law Enforcement about what happened, YES, Did she make a little bit more general statment to the nurse, Perhaps so. But I don't think she got down to, and the word they constamtly

9

use was Discernable.. And I don't think thats she made a statement that clear as to all the all allegation, especially in this case where it's a Continouse Sexual assult. Other than just elements of the Sexual Assault case,the State has other thing to prove and I think her statement to the CAC interviewer is by far the first clear Outcry that she made of all the incident's,(R.R.Vol3.p27).. MR. HARRELSON Noted his objection and stated obviously I'll OBJECT at the time of the testimony, THE COURT I'm sure you want to carry that Objection each and ever time,, (R.RVol3.p27).. BEFORE the jury Missy Davison testified that Carolyn told her about the relation- ship with the defended Zack Eldred,, MR. HARRELSON Objected Under 38.072... The Court Overrule It,, (R.R.Vol3.p41).. Ms.Davison stated she was told by the victim as far as the allegations,, That Zack Eldred put his dick in her provate area. She said that happened several times. She said that he rubbed on her chest and private area his hi hand he also sucked on her chest and private area with his mouth. She said that she also put her mouth on his dick and sucked his dick,, MR.HARRELSON made a 403 Rule Objection to the line of testimony the COURT OVERRULED IT,. (R.R.Vol3.p42).The state called Kim Basinger from Christus St.Michel's Hospital who is a SANE nurse she testified that the victim told her the defendant just rubbed on her and I had a strong orgasm..(R.R.Vol3.p96) She said that after that he would used his fingures inside her and told her it would be sore for a few days.After the sorness went away they had sex..

10

He allwavs used a condom (R.R.Vol3p.96,99) Carla,RN goes on to state that when she collected the saliva swabs, she ask the patient if Zack put his penis into her mouth and she said YES..(.R.R.Vol3.p97... MR. ELLIOTT: We'd pass the witness, your Honor.. MR.HARRELSON: Your HONOR,, If we could approach the bench Based on this witness"s testimony and reading the Medical records that I had previsously sumitted in the Outcry hearing, I would makea motion for a Mistrail,, stateing that Missy Davison never should have been allowed to testify as the outcry witness as she did,, because obviously this is the same information that was related though Missy Davison,. (R.R.Vol3P.98). THE Court OVERRULED him.. MR.HARRELSON then ask for a cautionary instruction to the Jury not to listen to Missy Davison has told the Court,again the Court Overruled him. MR.HARRELSON states lastly I think that the testimony by this witnes that the alleged hymen was not intact opens the door to prior sexual contacts under the State's in Limine. (R.R.Vol3.p98). The Jury is going to be left with the thought that Zack Eldred was the one that caused her hyman not to be intact, where as she has had at least two prior molestions by two different men.(R.R.Vol3.p99). Carolyn Sandova (victim) testified before the Jury that her legal pseuonym,is Holly Keilburg but its ok to use her name Carolyn, She testified about the truth and what is to lie. (R,R,Vol3.p103).She testified that she knew zack Eldred from her stepdad and that at some point they become friends in 2010.She was 13 at the time and she turned 14 in December (R.R.Vol3.pl04), she

11

testified she had a sexual relationship with him and at this time she lived in DeKalb, Bowie County Texas (R.R.Vol3.p105). MR.HARRELSON Crossexamened Carolyn an she testified that she was victimized by hy her father and her Stepfather(R.R.Vol3 .p188)..

MR.HARRELSON ask to remove the jury so he could examen victim on the Dad and Stepfather, She testified both did sexaul abused her and there was touching but no intercourse. (R.R.Vol 3.p 120,121,122,) MR HARRELSON at least I would perfer the hearing we've outside the presence of the jury as what I would have asked her in the presence of the jury..THE COURT; Yeah,I'm not going to let you go there (R.R.Vol3.p127). Karrah Dicken was called to testifiy she was examined as to her qualification and training and she was a director at the Texarkana Children's Adocaey Center (R.R.Vol3.p 103). MR. HARRELSON made an Objection as to general relevance and under 403, that this cumulative to the previous testimony. (R.R.Vol 3.p313). MS.DICKESON testified to the process of grooming a child in a sexual offence and that there are six staged to the grooming proces.. MR.HARRELSON Objected under genarel relevance and cumulative Rule 403,, Court Overruled him(R.R.Vol3.p.132, MS DICKESON was allowedd to go though the 6 stages(R.R.Vol3.p132,133,134) MS Dickeson testified she did not know anything about the case and was ask to answer so hypothetical situation questons,She talked about the vulnerablity of the victim (R.R.Vol3.p132) She testified to all these hypothical perpetrations that have no scientific

12

Facts (R.R.Vol 3.p136-140). MR HARRELSON on cross-Examination of Ms Dickeson. Ms. Dickeson testified she had not talked to Carolyn Sandoval the victim or any of the other witnesses (R.R.Vol3.p140 witness was dismissed...

MR.HARRELSON moved for a driected verdict of acquittal based on insufficient evidence for the underlying offenses that would constitute the elements of Continuous Sexual Abuse of Child Under 14, as well as all lesser included offenses, as well as the in question. I think there's insufficient evidence to prove those elements and would ask the court for a verdict of acquittal. The Court OVERRULE the motion(R.R.Vol3.p143)..

On direct appeal, the Petitioner raised three(3) issues.

(1) That the trail cour Erred in admitting the testimony of Davison as outcry witness testimony under Article 38.072 of the Texas Code of Criminal Procedure as not be the proper outcry witness.

(2). The Trail Court erred in allowing Karrh Dickeson to testifiy, her testimony was Inadmissible under Texas Rule of Evidence 401and 403..

(3) The Trail Court ERRED in not allowing testimony of the victim of past sexual experiences to rebut medical evidence presented by the State..

The Sixth Court of Appeals affirmed, finding Davison was a Proper Outcry witness, A fourteen year old can make an outcry. The Trail Court did not err in admitting Dickeson's testimony, that Dickeson's testimony was relevant. The Prejudicial Effects of Dickeson's testimony did not substantially outweigh the Probative Value. Eldred failed to perserve error related to Exclusio

13

related to exclusion of prior sexual abuse evidence the error argued on appeal is not the same as the objection ruled upon by the Trail Court, Elder's third point of error has not been preserved for appellate review. This petition is due on or before December 21, 2015, Following a proper extension granted by this Court pursuant to Tex.R.App.p.66.2(c)..

## ARGUMENTS AND AUTHORITIES

Petitioner raises (3) three grounds of review for this Court. That is, the Court of Appeal by missapping Article 38.072 of the Texas Code of Criminal Procedure bv allowing Missv Davison to be designated as the proper outcry witnes as applied bv the Trial Court in a Artical 38.072 Hearing and the Trail Court ERRED by allowing the hearsay Testimony of the victim though Missy Davison.,

THE TRAIL COURT ERRED IN ALLOWING, KARRAH DICKESON TO TESTIFIY, Her testimony was inadmissible under Texas Rule of Evidence 401 and 403..

The Trail Court ERRED in not allowing testimony of the victim of past sexual experiences to rebut the medical evidence presented by the state..

## GROUND ONE RESTATED

The forensic interviewer was not the proper outcry witness pursuant to Texas Code of Criminal Procedure 38.072, and the Trail Court ERED by allowing the hearsay testimony of the victim though Missy Davison

## A. STANDARD OF REVIEW

A Trail Court has broad discretion to determine the admissibiliv of outcry evidence,and we will not disturb its determination absent a showing in the record that the Trail Court clealy abused it's discretion, Garcia V. State 792 S.W. 2d@ 88,92(Tex.Crim.App. 1990) : Smith V. State 131 S.W. 3d@ 921,928 (Tex.App-Eastland 2004)...

## B. LAW ON OUTCRY WITNESS TESTIMONY

"Sec.2(a) This article applies only to Statements that descrbe the alleged offence that:

(1) were made by the child or person with a disability against whom the offense was allegedly committed;and

(2). were made to the first persom, 18 years of age or older ,other than the defendant, to whom the child or person with a cisability made a statement about the offense.

(a) A statement that meet the requirement of subsection (a) is not inadmissiable because of the hearsay rule if:

(1) on or before the 14th day before the date the proceeding begins, the party intending to offer the statement;

(a) notifies the aderse party of its intention to do so;

(B) Provides the adverse party with the name of the witness though whom it intends to offer the statement:and

(C) Provides the aderse party with a written summary of the statement.

(2). The trail court finds,in a hearing conducted out

15

outside the presence of the jury, that the statement is reliable based on the time, content, and circumstance of the statement; and

(3) The child or person with a disability testifies or is available to testify at the proceding in Court or in any other mannar provided by Law.

Article 38.072, Texas Code of Criminal Procedure.

The Outcry witness is the "First" person, 18 years or older, to whom the child makes a statement that is some Discernible manner describes the alleged offencse, Brown V. State 189 S.W. 3D@382,385 (Tex.App.-Texarkana 2006), Brown contends that the Trail Court Erred in allowing Smedly to testify about her interview. He asserts Smedly was not the proper outcry witness" under Article 38.072 of the Texas Code of Criminal Procedure.

The only issue at the hearing was if Missy Davison was the was the proper outcry witness and what methods she used in talking to the Childs Victim as a forensic interviewer..

The only issue at the hearsay was if Missy Davison was the proper Outcry witness and what metheds she used in talking to the child victim as a Forensic interview...

C. ANALYISI AT THE TRAIL LEVEL

The Yrail Court Erred in Allowing the forensic interviewer Missy Davison to testify as the Outcry witness as she was not the proper Outcry witness pursuant to Texas Code of

16

Criminal Procedure 38.072 , and the Trial Court Erred by allowing the Hearsay testimony of the victim through Missy Davison..

To perserve a complaint for appellate review, a party must generally have presented to the Trail Court a timely request, objection, or motion that State the specific grounds for the desired ruling, if they are not apparent from the context of the request, objection, or motion, See Tex.r.App. .P.33.1(a); Mosley V. State,983 S.W. 2d@249,265 (Tex.Crim. App.1998) (op.on reh'g) Court denied.. 526 U.S. 1070,119 S, CT,1466,143 L.Ed. 2d 500(1999). Further, The Trail Court must have ruled on the request, Objection,or motion, either expressly or Implcitly, or the complaining party must have Objected to the trail Courts refusal to Rule Tex.R.APP.P.- 33.1(a)(2); Mendez V. State 138 S.W.3d@ 334, 341 (Tex.Crim- App. 2004)..

Appellant's Trail Counsel, prior to testimony, stated "The State filed a notice of intent to call Missy Davison as their Outcry witness under 38.072, and it is our poition ,that under the ststute she does not qualify as the outcry witness. We have really one main issue, is that Missy Davison is not the frist person over the age 18 to which the alleged victim made ststements about the offense,as well as at the time of the statement she was not under 14 She was over 14 at the time of the declaration (R.R.Vol3 ₱5). It was uncontested that Carolyn Sandoval made statement about her alleged sexual activity toher Mother,and more specifically

17

at the Hospital. The state contended that the initial statement by the victim to her Mother,and to nurses or other individual at the Hosiptal was only a very general allegation that she had sexual activity with Eldred.

In Brown V. State this Court Concluded that a "Statement about the offense" more than a general allusion to Sexual abuse, it must describe the aleeged offense in some discernible manner. 189 S.W. 3D@ 382 (Tex.App. Texarkana 2006 pet.ref'd) (citing Thomas V. State,1 S.W. 3d@ 138,140-41 (Tex.App.-Texarkana 1999,pet.ref'd).. However, the proper outcry witness is not to be determind by comparing determined by comparing statements the child gave to different and then deciding which person received the most detailed statement about the offense.. Brown V. State,189 S.W. 3d@382 (Tex.App-Texarkana 2006, pet,ref'd  (citing Broderrick V. State 35 S.W.3d@67,73 (Tex.App.-Texarkana 2000, pet,ref'd...

Davison was not the first adult to whom the victem made an outcry ststement of the offense, Accordingly, Davison's testimony as to the victim's hearsay ststement should have been excluded

Tex.Code.Crim.poc.  art 38.072. Thus, when a defendant is charged with certin offenses against a child under the age of 14, Art. 38.072 allows into evidence the complainant's out-of-court statement so long as that statment is a decription of the offense and is offered into evidence by the complainant told the offense. Sanchz V. State PD-0086-11 (Tex.Crim.App. Dec.14,2011)

18

The Court of Appeal anaysis compriesd (3) three page of the Court opinion. In actually adderssing why it would not follow the holding in the case being cited by Petitioner as a reason why the trail court did not abuse it's discretion in finding the Stste's proposed outcry witness testimony addmissiable as in Tex.Code.Crim.Proc. act. 38.072 an the Court used the reasoning that it, The Court has observed that "an outcry witness is not person-specifi, but event-specific Brodcrick 35 S.W.#d@73.. Mireles V. State,413 S.W.3d @98,104 (Tex.App.-San Antoin 2013,pet.ref'd; Josey 97S.W.3d@687,692- (Tex.App-Texarkana 2003,no pet),, The Stste Examened the victim through Direct Testimony as shown in the Sixth Appeal- Court opinion, page two of the opinion during the 38.072 hearing by the State: When amanda nad [DR. FORENBERY] inrerviewed PT alone admitted to regular intercourse with the man. When it first happened he just rubbed on me and I had a strong Orgasm" She said that after that he used his fingers inside of her and told her she woulf be sore for a few day..We/the appeal Court stated review a Trail Courts decision to admit testimony form an outcry witness for an abuse of discretion. Brown V. State 189 S.W. 3d@382,385 (Tex. App-Texarkana 2006 pet.ref'd). But the Appeal Court over look the refrences and exhibts of the medical records which clearly shows that the proper outcry witness where the nurses at the

Hospital, And then the Court equivocly ignored Broderick 35S.W.
3d@73 its is well established that the proper outcry witness
is not to be determined by comparing the statements the child
gave to different indivduals and then decide which person
received. the most detailed statement about the offence. But
this is exactly what the Trail Court and the Court of Court
of appeal did, bottom of page three of the Sixth Court of
appeals opinion.. The Court even states the record in this
case does contain some rebuttal evidence relating to the
propriety of Davison as ab outcry witness. The record
established that Keilburg talked sbout the abuse to numerous
adults prior to being interviewed by Davison on May 17,2011.
the medicle records from her May 9 hospital visit contain
several quotes attributed to Keilbury concerning abous,and
these notes were entered by "four" different hospital
employew- Powell,Fortenberry, Amanda Kelly,and Matthew Hull,
odia russette. The Appeals Court on page 4 of their opnion
states clearly second paragraph, nonetheless, the medical
records alone are sufficient to rebut the Stat'e evidence
that Davison was the outcry witness concerning three events-
The two initial events of abuse and the abuse that occurred
the night before the May 9th hospital visit. The Ciurt
clearly state Powell was the proper outcry witness for those
three events, So the Sixth Court Of Appeal know that Missy
Davison was not the first person over 18 that the victim made
her first outcry to as presribed by Art 38072 Tex.Code.
Crim. Proc..the appeal Court then state Eldred objected Very
Broadly to Davison's qualifiction as an outcry witness generally

20

Eldred did not object on the basis that Davison did not qualify as the outcry witness for those specifid event, and he has raised no issue on this basis on Appeal. The Court futher stated because Davison was a proper outcry witness for some of the events of sexual abuse, the Trial Court did not abous its dicretion in admitting her testimony and in overruleing Eldred's overly-broad objections.

For this reason the Sixth Court Of Appeals overuled Eldred's first point of Error.

## GROUND TWO RESTATED

Ground two, The Court Of Appeals, By Affirming Judgement Erred by, finding Karrah Dickeson's testimony relevant and addmissible where her testimony was inadmissiable under Texas Rule Of Evidence 401, and 403, The science Dickeson applied is unreliable falling under "Junk Science"..

Karrah Dickeson's testimony was not relevent to where Carolyn Sandoval was sexually assaulted by Appellant, Ms. Dickeson did not interview the victim nodid she know anything about Appellant's case any relevance the testimony of Karrah Dickeson had was substantially by the unfair prejudice to the jury by allowing her testify as to the process of "Grooming" child victimes in sexual abuse by perpetrators.

Ms. Dickeson's testimony only encouraged the jury to convict Appellant of continuous sexual abuse of a child, although Ms. Dickeson had no knowlege of the victim or Appellant..

21

## A. STANDARD OF REVIEW

Ruling on relevanc e are left to the Trail Court, relying on it's own observations and experience, and will not be reversed absent an abuse of discretion. Salazar V. State 38-S.W. 3d@ 144,153 (Tex.Crim.App.2001) , Moreno V. State, 858 S.W. 2d@ 453,463 (Tex.Crim.App.2993), cert, denied, 510 U.S. 96,144 S.CT. 445,126 L.Ed.2d 378(1993). if the trail courts ruling is with in the "ZONE of reasonable disagreement"' then there is no abouse of discretion.and the appeallate court uphold the Trail court's ruling. Moreno V. State, 858 S.S. 2D 453,463 (Tex.Crim.App.1993), cert.denied, 510 U.S., 966,114 S.Ct. 445,126 L:Ed 2d 378 (1993).

A trail court's decision to afmit or exclude evidence is reviewed under the standard of abouse of discretion. Love V. State, 861 S.W. 2d 899,903, (Tex.Crim.App.1993). An abouse of discretion is shown when the trail court's determination is co clearly wrong lie outside the Zone of reasonable disagreement,, Cantu V. State 842 S.W. 2d 667,682 (Tex.Crim App.1992).. Absent a clear showing of "bias", A trail actions will be presumed to have been correct.. Brumit V. State, 206 S.W.3d@ 639 (Tex.Crim.App.2006:) Garcia V State, 792S.W.2d@ 88,92 (Tex.Crim.App.1990); Smith V. State, 131 S.W.3d@ 921, 928 (Tex.App.-Eastland 2004).

Evidence is relevant if it has any tendency to make the existence of any consequential fact more or less probable than it would be without the evidence. Tex

22

it would be without the evidence. Tex.R.Evid.401.. To be revant,evidence must be both material-that is, it must be offered for a proposition that is of xonsequence to determination of the case-and probative, such that it makes the existance of fact more or less probably than it would otherwise be without the evidence. Tennison V. State 969 S.W. 2d 578,580(Tex.App-Texarkana 1998,no.pet.).

## B. LAW AND APPLICATION

The Trail Court admitted the testimony of Karrah Dickeson, finding it was relevant and more probative than prejudicial over objection by appeallant's trail counsel(R.R.Vol-3.P 132).. Evidence is relevant if it has ant Testimony to make the existense of any consequential fact more or less probable than it would ne without the evidence, SEE Tex.R.-Evid 401; Lopez v. State,200S.W.3d@ 246,251 (Tex.App.-Houston [14th dist.] 2006,pet.ref'd).. To be relevant. evidence be both material-- that is,it must be offered for a proposition that is of consequence to the determination of the case-and probutive,such that it makes the existence of the fact more or less probable than it would otherwise be without the evidence..SEE: Tennison V. State,969 S.W.2d@578,580 (Tex.App Texarkana 1998,No.pet.).. Tex.R.Evid.403.. EXCLUSION OF RELEVANT EVIDENCE ON SPECIAL GROUNDS.. Allthough relevant evidence may be excluded if its probatin value is substantially outweighed by the damage of unfair prejudice,

23

Confusion of the issues,or misleading the jury,or by consideration of undue delay,or neddless presentation of cumulative Evidence...

## C. ANALYSIS AT THE TRAIL LEVEL

The state offered the testimony of Karrah Dickeson as an expert to testify regarding the issue of "grooming" by pertrator in sexual abouse of children.(R.R.Vol3.p126).Appellant's Trail counsel objected, "Ido have an objection as to the general relevance,and under-403, that this is cumulative to the previous testimony. (R.R.Vol 3.p 131).. The Trail Court responded"....They're overruled (R.R.Vol.3p.132)

Ms. Dickeson testified that children are easily manipulate and perpetators are generally people they trust (R.R.Vol 3p 138-140_.

The Trail Court ERRED in determining that Karrah Dickeson testimony was relevant and more probative than prejudicial over objection by appellant's Trail Councel. An evidentiary fact that stands wholly unconnected to an element fact, however is not a "Fact of consequence". Rankin V. State,974 S.W. 2d@707 (Tex.Crim.App.1996. Dickeson testified that she knew very little,basically nothing about the case at hand,she knewdid not interview the victim in this case,Carolyn Sandoval. (R.R.Vol 3.p) Dickeson did not know the facts of the case and was unaware of anything that was alleged to have occurred between appellant and the alleged victim in this case.. Accordingly,the Trail Court committed erred inadmitting Karrah Dickerson's testimony in that it was irrelevant and

more prejudicial than probative,makeing it inadmissible under Texas Rule of Evidence 401 and 403. and was cumulative Evidence..

## D. ANALYSIS AT THE APPELLATE LEVEL

The Sixth Appeal Court Erred by determing that the Trail Court did not Error in admitting Karrah Dickeson's testimony The Court of Alleals pmprised 2 pages of thier opinion.. In actually addressing why it would not following the holding in the case being citd by the Petitoner as a reason why the Trail Court did not abuse it discretion in finding Karrah Dickeson testimony was relevant.The Sixth Court of Appeal wrote that the court also explicitly approved of the practice of testifying through hypothetical question. Tillman V. State,354 S.W. 3d@ 439, Hypothetical questions are relevant when fact of the hypothetical match the facts of the case being Tried. Becouse the facts of the hypothetical questions match the fact of this case, the relevancy requrement have been met. The Appeal Court Ststes Eldred failded todirect the court as to what unfair prejudice he suffered as a result of Dickeson's testimony. But Eldred did in his appeal state he was harmed by Dickeson testimont and that testimony was irrelevant and more prejudicial than probative makeing it inadmissiable under Texas Rule of Evidence 401 and 403. Eldred argues that Diseson's testimony encoraged the jurors to enyage in speculation and assume,based on the

25

characteristics of "Grooming" that Eldred must be gulity. the Court stats the testimony may have been prejudicial,it was not "UNFAIRLY PREJUDICIAL".. Appeal Court futher ststed the Teas Court of Criminal Appeal has recognized "Grooming" of children for sexual molestation as a facr of conscgaence more or less probable ? The Appeal Court ERRED in ruling that the Trail Court did not abuse it's discretion and that the testimony by Karrah Dickeson was not unfairly prejudiced because Rodgers V. State,205 (Tex.Crim.. App.2006).. Vela V. State 209 S.W. 3d@ 128 (Tex.Crim.App. 2006) as well as her testimony was cumulalive to the testimony of Kim Basinger who had preveausly testified on "Grooming" )R.R.Vol 3.p 93)..

Kim Basinger testified,question by the State and if I were to say "Grooming" is makeing a child belive that an abnormal situation is normal, would you agree or disagree with that Basinger answered I Would agree with that, Eldred also raises a challenge pursuant to Rule 403 of the Texas Rule of Evidence. The Supreme Court of the United States, The Texas Court of Criminal Appeals, and the Supreme Court of Texas have all recognized that scientific evidence can be excluded under a prejudice verus probative value balancing and that such analysis is distinct from the reliability test. SEE. Daubert V.Merrell Dow Pharms.,Inc,509 U.S.579,595(1993): Kelly V. State, 824,S.W.2d@568,572.(Tex.Crim.App.1992);

While qualification deals with the witness's background and experience, reliability focuses on the subject matter of the witness's testimont. Texas Rule Of Evidence 705(c), governs the relibility of expert testimony and states that :If the

26

Court determines that the underlying facts or data do not provide a sufficient basis for the expert's opinion under Rule 702 or 703, the opinion is inadmissible "Reliability: depends upon wheather the evidence has its basis in sound scientific methodology,which demands a technical showing that gives a trail judge the opportunity to "weed out testimony pertaining top so-called Junk Science." Thus, just because inadequately' test scientific theories might be shown to relate to the fact of a case,does not mean that they will always have a sufficiently reliable basis. Dickeson's testimony was not relevant and it was more prejudical than probative value and unfair.. The primary objestive of allowing Karrah Dickeson to testifiy was to bolster the crdlibility of the alleged child sexual assault victim by a CAC worker who are seasoned sexual assaual witness and come to trail with their own agenda and have long history of being "Coached" by prosecutors and law enforcement personnel about how to testify against the Defendant. The appeal Court ERRED by affirming Judgment in Pettioner was prejudiced by allowing Karrah Dickeson to testify as her testimony was cumulative evidence and should have been excluded because it's probative value was outweighed by it unfair prejudice of needless presentation of cumulative Evidence under Tex.Rul.Evid.403...

27

## GROUND THREE RESTATED

Ground Three: The Court of Appeals, By affirming Judgment ERRED by concluding Eldred did not presesrve the Medical exception argument for Appeallate review..

Eldred's Final point of error complained that the trail Court abused it'sdiscretion in excluding evidence that Keilburg had been previously abused on two occasions bt other adult males.

The Texas Rape Shild Law includes an explicit exception for evidence "That is necessary to rebut or explain scientfic or medical evidence offered bt the State." Tex.R.Evid.412. Eldred claims that the evidence concerning the prior two instances of abuse should have been admitted to rebut the medical condition of Keilburg's hymen..

## A. STANDARD OF REVIEW

A trail Court's decision to admit or exclude evidence is reviewed under the standard of abuse of discretion Lovr Vs. State, 861 S.W. 2d 899,903 (Tex Crim.App.1993). An abuse of discretion is shown when the trail Court's determination is so clearly wrong as to lie outside the Zone of reasonable disagreement. Cantu V. State,842 S.W. 2d 667,682 (Tex.Crim. App. 1992). Absent a clear showing of Bias, a trail Court's actions will be presumed to have been correct. Brumit V. State,206 S.W. 3d 639 (Tex.Crim.App.2006).

## B. LAW ON APPLICATION

The jury is sole judge of the crediblity of witness and may accept or reject any part of their testimony.. Jonson V. State, 517 S.W. 2d 170,173 (Tex.Crim.App.1978). Procedure of offering evidence, If the defendant proposes to introduce and documentary evidence or to ask any question, question, either by drect examination or cross-examination of any witness, concerning specific instances of the alleged victim's past sexual behavior, The must inform the Court out of hearing of the jury prior to introducing any such evidence or asking sucg question. After this Notice,the Court shall conduct an in camera hearing,recorded by the Court Reported,to determine wheather the proposed evidence is admissible under paragraph (6) Evidence of specific instances. In a prosecution for Sexaul Assult or Aggravated Sexual Assault, or attempt to commit Sexual Assault or Aggr avated Sexual assault, evidence of specific instances of an alleged victim's past Sexaul behavior is also not admissible, unless (1). Such evidence is admitted in accordance with paragaphs (c) and (d) of this rule; The Court shall determine what evidence is admissible and shall accordingly limit the questioning The defendant shall not go outside these limits orrefer to any evidence ruled inadmissiable in camera without prior approval of the Court without the presence of the jury. Miles V. State.61 S.W. ed 682,686 (Tex.App.-Houston[1Dist.] 2001, pet.ref'd). Therefore,the recociliation of any conflicts in the evidence is within the exclusive province of the Trier

of facts. Fuentes V. State,991 S.W. 2d 267,271 ( Tex.Crim.
App.1999). Consequenlity, a review of the legal sufficiency
of the evidence accords great deference to the responsibility
of the trier of fact to resolve in the Testimony to weigh the
evidence, and to draw reasonable inferense there from,
Turro V. State,867 S.W. 2d 43,47 (Tex.Crim.App.1993).

## C. ANALYSIS AT THE TRAIL LEVEL

The Court Erred in not allowing Appellant's trail
Counsel to question victim in the presence of the Jury conc-
erning her past sexual contact. The reviewing Court must
presume that the Trier of fact resolved any conflicting
inference in favor of the prosesecution and must defer to
that resolution. Appellant's Trail Counsel Specifically ask
the forensic interviewer, "Q"... Did Ms. Sandoval make any
allegations agation other individuals other than Zack
Eldred when she was being interviewed by you ? "A": She told
me about two other incidents that happened when she was at a
younger age in life..."Q": Okay. But did she specifically
mention her Dad and Stepdad?.."A"YES".. (R.R.Vol 3.P9).
and,again after the testimony regarding the alleged victim's
medical records,Appellants Trail Counsel argued,"....I thimk
that the testimony of this witness that the alleged
victim's hymen was not intact opens the door to prior sexual
contact....The Jury is going to be leftwith the thought
that Zack Eldred was the one that caused her hymen not to be
intact. Where as she's at least had two prior molestations

30

by two different men." (R.R.Vol 3.p99). Appellant's Trail Counsel the argued "AT least I Would Proffer the hearing We've had outside the presence of the jury as what I would have asked her in the presence of the Jury." (R.R.Vol3.p127). The Trial Court responde4d."YESH,I"M NOT GOING TO LET YOU GO THEIR....(R.R.Vol #p.127)...

## D. ANALYSIS AT THE APPELLATE LEVEL

The Court of Appeals analysis comprised of one(1) and a half pages of the opinion. In actuallly addressing why it wouls once again not follow the holding in the cases being cited by the Petitioner as a reason why the trail Court did not abuse it's discretion in finding Eldred did not secure a ruling on his request to use evidence of prior sexual abuse in cross-examining Keilburg, The appeal Court wrote it is well establiched that an issue raised on appeal must be the same issued raised by objection asserted at Trail Tex.R. APP.P.33.1(a); Ibarra V State,11 S.W. 3d 189,197 (Tex.Crim App.1999).(holding notyhing preserved for review if objection at trail does not comport with issue on appeal) The defendant's objection must "let the trail judge know what he wants, why he thinks himself entitled to it,And to do so cearly enough for the judge to understand him at a time when the trail Court is in a proper position to do something about it "' Thomas v State, 408 S.W.3d877,884 (Tex.Crim. App.2013.)(quoting Lankston V.State,827 S.W.2d907,909 (Tex.Crim.App.1992)).

31

The appeal Court stated the only issue raised on alleal is that evidence regarding the victim's prior Sexual history addmissible to rebut the states medical evidence. Because Eldred's first objection was withdrawn bur see (R.R.Vol3p 118-127) MR.HARRELSON: Your Honor,I would object to her hitany now that she's a witness. THE COURT. Again Jeff, I'm going to overrule your objection to that and keep that testimony "OUT",MR.HARRELSON renewed his objection and ask the court to allow him to question the victim about her pasy sexual expereances..The trail court overruled. The Court states the objection clearly confines itself to Keilburg's testimony with the phase "BASEDON THE WITNESS"S TESTIMONY" This phrase negates any argument that the first objection was incorporated into the second objection and negates any conclusion that the Medical evidence complaint was implicit from context. The appeal court misapply the record by stateny none of the statements made by the Trail Court indicate an intent to rule on the medical evidence exception,and futher write in the Court of Appeals opinion the Error argued on appeal is not the same as the objection ruled upon by the Trail Court,and their conclusion that Eldr4d's third point of Error has not been preserved for appellate review...

The Sixth Court of Appeals was clearly wrong in their opion and determination of Eldred's objections. To preserve a complaint for appellate review,a part must generally have presented to the trail court a timely request,objection

32

or motion that states the spcific grounds for the desired r ruling,If they are not apparent from the context of the request,objection, or motion. SEE Tex.R.app.p.33.1(a): Masly v. State,983 S.W. 2d 249,265 (Tex.Crim.App.1998(Op.on reh'g),cert.denied,526 U.S.1070,119 S.Ct.1466,143 L.Ed.2d 550 (1999). The Court responded "YEAH I'M NOT GOIG TO LRT YOU GO THERE...." (R.R.Vol.3p,127) This was the court's ruling and it was implicit from context...

## CONCLUSION

On Petitioners Ground one the court of appeals impropely overruled his objected to Missy Davison's outcry testimony,providing the hearsay statements made by the alleyed victim to Missy Davison during the Forensic interview at the Children's Advocacy Center, as Missy Davison was not the proper 38.072 outcry wittness and her testimony was inadmisable...

On Petitioner Ground Two; The Appeal Court impropley Found Karrah Dickeson Testimony relevant when I was irrelevant and was cumulative evidence making it more prejudicial that pobative and futher making it inadmissible under Tex.R. 401 and 403..

On Petitioners Ground Three the appeal Court impropely found the petitioner di not preserve medical exceptece and by not allowing the testimony of the victim regarding other sexual experiences with other men to be presented in frony of the jury to rebut the states medical evidence..

33

Under all applicable circumstances,The Court of Appeals Erred in affirming the Trail Court's decision.The Court should grant discretionary Review and,allow complete briefing on these grounds upon such review,reverse the Court of Appeals and Reverse and Remand the case to the Trail Court

## PRAYER FOR RELIEF

WHEREFORE, Petitioner prays the Court Grant Discretionary Review and. upon such review, to Reverse the Judgment of the Court of Appeals and to Reverse the Trail Court; and for such other and further relisf it which he may show himself Justly Entitled...

34

Respectfully Submitted

ZACK G.ELDRED JR.PRO-SE

TDCJ #1812117

Clements Unit

9601 Spur 591

Amarillo,tx 79107-9606


## CERTIFICATE OF SERVICE


I, ZACK G.ELDRED,JR. CERTIFY that a copy of the above and Foregiong Petition For Discretionary Review has been File by placing it in the UNITED STSTS MAIL,Postage prepaid, on this 21s day of December, 2015, To The Court Of Criminal Appeals of Texas P.O. Box 12308,Capital Station,Austin Texas 78711


Respectfull Submitted

Zack G. Eldred,Jr. Pro-Se

TDCJ #1812117



# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

---

No. 06-13-00128-CR

---

ZACK ELDRED, JR., Appellant

V.

THE STATE OF TEXAS, Appellee

---

On Appeal from the 102nd District Court
Bowie County, Texas
Trial Court No. 11-F-762-102

---

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Carter

# OPINION

## I.    Factual and Procedural Background

Zack Eldred, Jr., appeals from his conviction of continuous sexual abuse of a child under fourteen years of age. *See* TEX. PENAL CODE ANN. § 21.02 (West Supp. 2013). The State alleged Eldred, age forty-nine, sexually abused Holly Keilburg (a pseudonym), age thirteen, two or more times in a thirty-day period.

In his recorded statement[1] to the police and in a written statement, Eldred denied any sexual acts with Keilburg, though he admitted that he and Keilburg slept in the same bed together. Keilburg, fifteen at the time of trial, testified that between July 1, 2010, and December 7, 2010, when she was thirteen, she and Eldred had sex "[f]ive to six times a month." Keilburg testified that (1) Eldred performed oral sex on her, (2) Eldred penetrated her vagina with his fingers, (3) she performed oral sex on Eldred, and (4) they engaged in sexual intercourse. In May 2011, when she was fourteen, Keilburg told her mother that she and Eldred had been having sexual relations. Keilburg's mother took her to the hospital on May 9, 2011. The hospital informed the police, and Keilburg was later interviewed on May 17, 2011, by Missy Davison, a forensic examiner with the Texarkana Children's Advocacy Center.

At trial, the State presented Keilburg's testimony as well as the outcry witness testimony of Davison. Karrah Dickeson, the Director of the Texarkana Children's Advocacy Center, testified as an expert witness for the State. The trial court excluded evidence that Keilburg had

---

[1]Both audio and video were captured by the recording.

been previously abused. A jury found Eldred guilty and assessed punishment at life imprisonment. The trial court sentenced Eldred consistent with the jury's assessment.

Eldred alleges that the trial court erred in three respects: (1) admitting the testimony of Davison as outcry witness testimony, (2) admitting the expert testimony of Dickeson, and (3) excluding evidence that Keilburg had been sexually assaulted in the past. We conclude that Davison was a proper outcry witness, Dickeson's expert testimony was relevant and admissible under Rule 403 of the Texas Rules of Evidence, and any error in excluding the prior sexual abuse of Keilburg was not preserved for appellate review.

## II. Davison Was a Proper Outcry Witness

In cases involving certain sex crimes against children, Article 38.072 of the Texas Code of Criminal Procedure provides an exception to the hearsay rule for testimony by outcry witnesses when specific requirements are met. *See* TEX. CODE CRIM. PROC. ANN. art. 38.072 (West Supp. 2013). An outcry witness is defined as the first person eighteen years of age or older, other than the defendant, to whom the child victim makes a statement about the offense. TEX. CODE CRIM. PROC. ANN. art. 38.072, § 2(a)(3). The outcry must in some discernible manner describe the alleged offense; it must be more than just words generally suggesting that something in the area of child abuse occurred. *See Garcia v. State*, 792 S.W.2d 88, 91 (Tex. Crim. App. 1990); *Broderick v. State*, 35 S.W.3d 67, 73 (Tex. App.—Texarkana 2000, pet. ref'd). If contested by the defense, the trial court must hold a hearing outside the presence of the jury to determine "'based on the time, content, and circumstances of the statement' whether the victim's out-of-court statement is 'reliable.'" *Sanchez v. State*, 354 S.W.3d 476, 484–85 (Tex.

3

Crim. App. 2011) (quoting TEX. CODE CRIM. PROC. ANN. art. 38.072, § 2(b)(2)). The victim must either testify or be available to testify at this hearing. *Id.* at 485.

This Court has observed that "an outcry witness is not person-specific, but event-specific." *Broderick*, 35 S.W.3d at 73; *see Mireles v. State*, 413 S.W.3d 98, 104 (Tex. App.—San Antonio 2013, pet. ref'd); *Josey v. State*, 97 S.W.3d 687, 692 (Tex. App.—Texarkana 2003, no pet.) (mother proper outcry witness for act of oral contact, but forensic interviewer proper outcry witness for act of digital penetration); *accord Lopez v. State*, 343 S.W.3d 137, 140 (Tex. Crim. App. 2011). Multiple outcry witnesses are permissible, but there can only be one outcry witness per event. *See Lopez*, 343 S.W.3d at 140.

Eldred argues that Davison's testimony was inadmissible as hearsay because (1) Keilburg's age did not allow use of the outcry statute and (2) Keilburg made statements about the offense to numerous adults prior to being interviewed by Davison. Eldred notes the State's contention during opening argument that "[t]he outcry happened when the child was at the hospital."

At the beginning of trial, the trial court conducted a hearing outside the presence of the jury to determine whether Davison was a proper outcry witness. The State introduced the testimony of Davison and Keilburg to establish that Davison was the first adult to whom Keilburg made discernible allegations. When asked by the trial court if the defense would be calling any witnesses, the defense responded, "No, Your Honor." Keilburg testified at this hearing, and relevant excerpts of that testimony follow:

> Q. [By the State] Okay. Did you tell your mom the details of what happened between you and Mr. Eldred?

4

A.    No, ma'am.

Q.    Okay. A little bit later were you asked to talk to some nurses . . . ?

. . . .

Q.    . . . Do you remember giving them any details about everything that had happened?

A.    No, ma'am.

. . . .

Q.    [By defense counsel] . . . . Did you tell anybody the details there at the hospital, or did you give it to the CAC person that interviewed you?

A.    The person who interviewed me.

. . . .

Q.    . . . . But when the nurses were giving you your treatment or your exam, did they ask you some questions about what had happened to you?

A.    A little bit, yes, sir.

. . . .

Q.    Did you ever talk to your mother about the details of what had happened?

A.    No, sir.

Although Eldred presented no witnesses, Eldred and the State agreed to the admission of

the medical records from the hospital visit. The medical records provide as follows:

WHEN AMANDA AND [DR. FORTENBERRY] INTERVIEWED THE PT ALONE SHE ADMITTED TO REGULAR INTERCOURSE WITH THE MAN. WHEN ASK HOW OFTEN SHE STS "EVERYTIME I STAY AT HIS HOUSE[.]"

5

. . . .

"WHEN IT FIRST HAPPENED HE JUST RUBBED ON ME AND I HAD A STRONG ORGASM." . . . SHE SAID THAT AFTER THAT TIME HE USED HIS FINGERS INSIDE OF HER AND TOLD HER SHE WOULD BE SORE FOR A FEW DAYS. . . . WHEN ASKED WHEN THE LAST TIME SHE HAD SEX WITH ZACK SHE SAID AROUND 1 AM TODAY 5-9-11.

The medical records also indicate that Keilburg's mother claimed to have called Eldred and that Eldred denied the allegations.

We review a trial court's decision to admit testimony from an outcry witness for an abuse of discretion. *Brown v. State*, 189 S.W.3d 382, 385 (Tex. App.—Texarkana 2006, pet. ref'd); *Tear v. State*, 74 S.W.3d 555, 558 (Tex. App.—Dallas 2002, pet. ref'd). A trial court does not abuse its discretion unless the trial court's decision is outside the zone of reasonable disagreement. *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000); *Divine v. State*, 122 S.W.3d 414, 420 (Tex. App.—Texarkana 2003, pet. ref'd). We must review a trial court's ruling in light of what was before it at the time the ruling was made. *Weatherred*, 15 S.W.3d at 542.

We begin by noting that the inquiries of both Eldred and the State during the hearing on the propriety of Davison as an outcry witness focused on whether Keilburg had revealed the details of the offense prior to the interview by Davison. As correctly noted by the trial court, the standard is whether a discernable allegation has been made to an adult. *See Garcia*, 792 S.W.2d at 91 (outcry must be more than general allusion of sexual abuse). It is well established that the proper outcry witness is not to be determined by comparing the statements the child gave to different individuals and then deciding which person received the most detailed statement about

6

the offense. *Broderick*, 35 S.W.3d at 73; *Thomas v. State*, 1 S.W.3d 138 (Tex. App.—Texarkana 1999, pet. ref'd); *see also Reed v. State*, 974 S.W.2d 838, 841 (Tex. App.—San Antonio 1998, pet. ref'd).

### A. A Fourteen Year Old Can Make an Outcry

Article 38.072 of the Texas Code of Criminal Procedure provides, "This article applies to a proceeding in the prosecution of an offense under any of the following provisions of the Penal Code, if committed against a child younger than 14 years of age . . . ." TEX. CODE CRIM. PROC. ANN. art. 38.072, § 1. Eldred contends that because Keilburg was fourteen at the time she made the outcry, Article 38.072 does not apply.

This Court has previously rejected this argument. In *Harvey v. State*, 123 S.W.3d 623 (Tex. App.—Texarkana 2003, pet. ref'd), we held that the outcry statute applies when the offense is committed while the victim is younger than the specified statutory age and the victim makes the outcry before her eighteenth birthday. *Id.* at 628 (citing *Manuel v. State*, No. 03-96-00185-CR, 1997 Tex. App. LEXIS 3298 (Tex. App.—Austin June 26, 1997, pet. ref'd) (not designated for publication)). Other Texas Courts of Appeals have agreed with this interpretation. *See, e.g., Salas v. State*, No. 04-12-00015-CR, 2013 Tex. App. LEXIS 2867 (Tex. App.—San Antonio Mar. 20, 2013, pet. ref'd) (mem. op., not designated for publication); *Alejo v. State*, No. 03-10-00436-CR, 2011 Tex. App. LEXIS 6652 (Tex. App.—Austin Aug. 19, 2011, no pet.) (mem. op., not designated for publication); *Olivera v. State*, No. 05-08-00527-CR, 2009 Tex. App. LEXIS 8641 (Tex. App.—Dallas Nov. 10, 2009, pet. ref'd) (not designated for publication). We are not persuaded that our prior precedent was incorrectly decided.

## B. Davison Was a Proper Outcry Witness

Eldred's main argument is that Davison was not a proper outcry witness because Keilburg made discernible statements to several different adults prior to being interviewed by Davison. The outcry statute authorizes an exception to the general rule forbidding the admission of hearsay evidence for the child's first discernible description of the offense to an adult.

The trial court in this matter suggested that a statement must include a description of "how, when, and where" to be discernible, and the State, citing to dicta from a 2012 Eastland Court of Appeals opinion, urges us to adopt this as the standard for discernibility. *See Michell v. State*, 381 S.W.3d 554, 559 (Tex. App.—Eastland 2012, no pet.) (suggesting in dicta that to be discernible under Article 38.072, statement must include description of "how, when, and where"). This Court has previously rejected the position that to be discernible under Article 38.072, a statement must include a description of "how, when, and where." *See Brown*, 189 S.W.3d at 386. As we stated in *Brown*, "If a child tells someone 'how, when, and where' an offense occurred, this is *sufficient* to be a proper outcry statement." However, we declined to imply a requirement "that the details of 'how, when, and where' are *necessary* to constitute a proper outcry statement." *Id.* We see no reason to deviate from our prior precedent, and we disagree with the State's contention that a discernible statement must describe "how, when, and where." Such a requirement would be more restrictive than the discernibility standard announced by the Texas Court of Criminal Appeals. *See Garcia*, 792 S.W.2d at 91. "We instead rely on the well-established rule that, to be a proper outcry statement, the child's statement to the

8

witness must describe the alleged offense in some discernible manner and must be more than a general allusion to sexual abuse." *Brown*, 189 S.W.3d at 386; *see Garcia*, 792 S.W.2d at 91.

In *Brown*, this Court concluded the statements were not discernible because they "were not event-specific enough to show that they concerned separate and discrete events." *Brown*, 189 S.W.3d at 386. Although we did not rely on a dictionary definition in *Brown*, we note that *Brown* is consistent with the common understanding of discernible as demonstrated by the dictionary definition. "Discern" means to "recognize or identify as separate and distinct." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 355 (11th ed. 2006).

The issue before us is whether Davison was the first adult to whom Keilburg made statements concerning separate and discrete events of abuse. If the State presents evidence that a person is a proper outcry witness, the burden to rebut this evidence then falls on the defendant. *See Garcia*, 792 S.W.2d at 91. The record in this case does contain some rebuttal evidence relating to the propriety of Davison as an outcry witness. The record establishes that Keilburg talked about the abuse to numerous adults prior to being interviewed by Davison on May 17, 2011. Prior to this interview, Keilburg had discussed the abuse with her mother. The medical records from her May 9 hospital visit contain several quotes attributed to Keilburg concerning the abuse, and these notes were entered by four different hospital employees—Powell, Fortenberry, Amanda Kelly, and Matthew Hull. The medical records further suggest that Keilburg may have discussed the abuse with a fifth hospital employee, Odia Russette, but it is not clear from the records that Russette attributed any explicit quotes to Keilburg. The medical records also indicate that Keilburg was interviewed by Officer McMillan while at the hospital.

9

Davison testified that she had discussed the case with Officer Todd Aultman. The record, however, does not indicate whether Officer Aultman personally interviewed Keilburg.

The medical records from Keilburg's May 9 hospital visit comprise the entirety of the evidence offered by Eldred to rebut the State's evidence that Davison was a proper outcry witness. Eldred did not call Keilburg's mother, Dr. Fortenberry, any of the other hospital employees, or Officer McMillian to testify at the pretrial hearing. Nonetheless, the medical records alone are sufficient to rebut the State's evidence that Davison was the outcry witness concerning three events—the two initial events of abuse and the abuse that occurred the night before the May 9 hospital visit. Powell was the proper outcry witness for these three events. As to every other event, given the lack of credible rebuttal evidence, the trial court's conclusion that Davison was the appropriate outcry witness falls squarely within the zone of reasonable disagreement. Consequently, Davison was a proper outcry witness for all but the three events identified above.

Eldred's argument at trial and on appeal was that Davison was not an appropriate outcry witness for any event. When Davison testified concerning Keilburg's description of the initial two events of sexual abuse—events for which Davison was not the proper outcry witness—Eldred objected very broadly to Davison's qualifications as an outcry witness generally. Eldred did not object on the basis that Davison did not qualify as the outcry witness for those specific events, and he has raised no issue on this basis on appeal. Because Davison was a proper outcry witness for some of the events of sexual abuse, the trial court did not abuse its discretion in admitting her testimony and in overruling Eldred's overly-broad objections. Making specific

10

objections to each act or event is particularly important in a continuous sexual abuse case involving numerous separate and discrete acts of sexual assault, each of which could have a separate outcry witness. To preserve error concerning a proffer of evidence containing both admissible and inadmissible material, the objection must specifically reference the inadmissible material. *See Willover v. State*, 70 S.W.3d 841, 847 (Tex. Crim. App. 2002); *Sonnier v. State*, 913 S.W.2d 511, 518 (Tex. Crim. App. 1995) (failure to segregate between admissible and inadmissible evidence failed to preserve any error as to admission of all). If the complaint about admissibility fails to refer to the objectionable portions of the evidence, then the trial court may safely admit or exclude it all. *Willover*, 70 S.W.3d at 847. We overrule Eldred's first point of error.

## III.   The Trial Court Did Not Err in Admitting Dickeson's Testimony

Eldred argues in his second point of error that the trial court erred in admitting the expert testimony of Karrah Dickeson. Dickeson did not interview Keilburg and had no personal knowledge of any facts related to the case. Instead, Dickeson testified concerning common characteristics of "grooming"[2] by child predators and responded to several hypothetical questions posed by the State. Eldred objected to Dickeson's testimony as irrelevant. *See* TEX. R. EVID. 402. Alternatively, Eldred argued that even if relevant, the probative value of the evidence was substantially outweighed by its prejudicial effect. *See* TEX. R. EVID. 403. Eldred raises these same issues on appeal.

---

[2]According to Dickeson, grooming is the process employed by sexual predators on their victims through which the abnormal (sexual abuse) is made normal.

11

## A. Dickeson's Testimony Was Relevant

The Texas Court of Criminal Appeals has noted that the Texas Rules of Evidence require a trial judge to make three separate inquiries, all of which must be met before admitting expert scientific testimony. According to the court, the trial court must determine whether

"(1) the witness qualifies as an expert by reason of his knowledge, skill, experience, training, or education; (2) the subject matter of the testimony is an appropriate one for expert testimony; and (3) admitting the expert testimony will actually assist the fact-finder in deciding the case." These conditions are commonly referred to as (1) qualification, (2) reliability, and (3) relevance.

*Vela v. State*, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006) (quoting *Rodgers v. State*, 205 S.W.3d 525, 527 (Tex. Crim. App. 2006)).

Relevancy "lends itself to a liberal policy of admission of evidence for the jury's consideration." *Morales v. State*, 32 S.W.3d 862, 865 (Tex. Crim. App. 2000). The Texas Court of Criminal Appeals explained,

Relevance is by nature a looser notion than reliability. Whether evidence "will assist the trier of fact" and is sufficiently tied to the facts of the case is a simpler, more straight-forward matter to establish than whether the evidence is sufficiently grounded in science to be reliable. This is not to say that the relevancy inquiry will always be satisfied. *See Pierce*, 777 S.W.2d at 414–16 (expert could not say which scientific principles he discussed were applicable to facts in case and had no knowledge of witnesses' testimony); *Rousseau*, 855 S.W.2d at 668 (expert referred to "studies" and did not discuss whether any factors he planned to testify to would apply to facts of case); *Williams v. State*, 895 S.W.2d 363, 366 (Tex. Crim. App. 1994) (expert failed to connect "generic testimony" to specific facts of case). The expert must make an effort to tie pertinent facts of the case to the scientific principles which are the subject of his testimony. Establishing this connection is not so much a matter of proof, however, as a matter of application.

*Jordan v. State*, 928 S.W.2d 550, 555 (Tex. Crim. App. 1996); *see Vela*, 209 S.W.3d at 131; *Morales*, 32 S.W.3d at 865.

12

As noted by the State, Rule 703 of the Texas Rules of Evidence permits an expert to base her opinion on data and facts made known to her during trial. TEX. R. EVID. 703; *Tillman v. State*, 354 S.W.3d 425, 439 (Tex. Crim. App. 2011); *Jordan*, 928 S.W.2d at 556 n.8. The court has also explicitly approved of the practice of testifying through hypothetical questions. *Tillman*, 354 S.W.3d at 439. Hypothetical questions are relevant when the facts of the hypothetical match the facts of the case being tried. *Id.* Because the facts of the hypothetical questions arguably match the facts of this case, the relevancy requirement has been met. The trial court did not abuse its discretion in overruling Eldred's relevancy objection.

**B.    The Prejudicial Effects of Dickeson's Testimony Did Not Substantially Outweigh the Probative Value**

Eldred also raises a challenge pursuant to Rule 403 of the Texas Rules of Evidence. The Supreme Court of the United States, the Texas Court of Criminal Appeals, and the Supreme Court of Texas have all recognized that scientific evidence can be excluded under a prejudice versus probative value balancing and that such analysis is distinct from the reliability test.[3] *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993); *Kelly v. State*, 824 S.W.2d 568, 572 (Tex. Crim. App. 1992); *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 557 (Tex. 1995); *see also State v. Mechler*, 153 S.W.3d 435, 437 (Tex. Crim. App. 2005) (applying Rule 403 analysis to intoxilizer); *cf. Nenno v. State*, 970 S.W.2d 549, 560 (Tex. Crim. App. 1998) (reliability standard applicable to soft sciences).

---

[3]The United States Supreme Court's caselaw on this subject relates to Rule 403 of the Federal Rules of Evidence, and the Texas Court of Criminal Appeals and the Texas Supreme Court's caselaw relates to Rule 403 of the Texas Rules of Evidence. The Rules are substantially similar.

13

Under Rule 403 of the Texas Rules of Evidence, a trial court may exclude evidence if its probative value is substantially outweighed by the danger of unfair prejudice. *See* TEX. R. EVID. 403. Our analysis is guided, though not limited, by the following factors, known as the *Montgomery* factors: "(1) the probative value of the evidence; (2) the potential to impress the jury in some irrational yet indelible way; (3) the time needed to develop the evidence; and (4) the proponent's need for the evidence." *Mechler*, 153 S.W.3d at 440; *see Montgomery v. State*, 810 S.W.2d 372, 389–90 (Tex. Crim. App. 1990) (op. on reh'g).

Other than arguing that better expert witnesses existed, Eldred fails to direct us to what unfair prejudice he suffered as a result of Dickeson's testimony. Eldred argues,

> [T]he proper way to introduce such testimony would have been through the forensic interviewer, Missy Davison, who has the same qualifications as Karrah Dickeson, and could've testified as to the grooming process, if that testimony were relevant and less prejudicial than probative. However, the State instead offered such testimony through a witness who never even spoke with the alleged victim in this case, and knew nothing of what was alleged to have taken place between Appellant and the victim.

The Texas Court of Criminal Appeals has recognized "grooming" of children for sexual molestation as a legitimate subject of expert testimony under Rule 702 of the Texas Rules of Evidence. *Morris v. State*, 361 S.W.3d 649, 669 (Tex. Crim. App. 2011); *see* TEX. R. EVID. 702. As noted above, the court has approved of expert witnesses testifying even when they lack personal knowledge of the facts in a case. *See Tillman*, 354 S.W.3d at 439.

What is the probative value of the evidence? How compellingly does the evidence serve to make a fact of consequence more or less probable? The trial court in this case could have reasonably concluded that the inherent probative force of Dickeson's testimony was considerable

14

since the testimony explained how sexual predators establish and assert control over their child victims. Such knowledge is outside the common experience of most jurors, and expert testimony can assist the jurors in understanding how sexual predators groom their victims. This factor favors admission of the testimony.

What is the potential to impress the jury in some irrational but nevertheless indelible way? Eldred argues that Dickeson's testimony clearly impressed the jury, causing them to make irrational conclusions. Because Dickeson had not examined Keilburg, Eldred argues that Dickeson's testimony encouraged the jurors to engage in speculation and to assume, based on the presence of any of the characteristics of grooming, that Eldred must be guilty. We disagree. The testimony was directly related to the charged offense, and the only thing inflammatory about the testimony was directly related to the nature of the offense. While the testimony may have been prejudicial, it was not "unfairly prejudicial."

Further, the amount of time needed to develop Dickeson's testimony was minimal. Dickeson's testimony spans approximately eleven pages of a six-volume reporter's record. The State developed the evidence quickly and with minimal distraction. This factor favors admission of the evidence.

What was the State's need for this evidence? Did the State have other probative evidence available to it to help establish the facts at issue and were the facts related to an issue in dispute? Eldred argues that the availability of Davison negated the State's need for Dickeson's testimony. As highlighted by the State during oral argument, the decision of which expert would be most beneficial is generally a matter of trial strategy. Although Davison's availability may have

reduced the State's need for Dickeson's testimony, the record does not contain a comprehensive comparison of the credentials of Davison and Dickeson. The State's evidence likely would have been legally sufficient without Dickeson's testimony, but the testimony was relevant, and the witness was not shown to have been unqualified. Neither the State nor the defendant is constrained to use only one witness to prove a fact of consequence.

We cannot conclude that the probative value of Dickeson's testimony was substantially outweighed by the danger of unfair prejudice or by needless presentation of cumulative evidence. The trial court did not abuse its discretion.

## IV. Eldred Failed to Preserve Error Related to Exclusion of Prior Sexual Abuse Evidence

Eldred's final point of error complains that the trial court abused its discretion in excluding evidence that Keilburg had been previously abused on two occasions by other adult males. The Texas Rape Shield Law includes an explicit exception for evidence "that is necessary to rebut or explain scientific or medical evidence offered by the State." TEX. R. EVID. 412. The State introduced evidence that Keilburg's hymen was no longer intact. On appeal, Eldred claims that the evidence concerning the prior two instances of abuse should have been admitted to rebut the medical condition of Keilburg's hymen. We conclude Eldred has failed to preserve the medical exception argument for appellate review.

Eldred's first request to introduce evidence of the prior abuse clearly raised the issue of the medical evidence exception. Eldred argued at trial,

> Lastly, I think that the testimony by this witness that the alleged victim's hymen was not intact opens the door to prior sexual contact under the State's Motion in Limine. The jury is going to be left with the thought that Zack Eldred was the one

16

that caused her hymen not to be intact, whereas she's at least had two prior molestations by two different men.

Eldred, though, never secured a ruling on this objection. After a discussion with the trial court and the State, Eldred withdrew this objection and opted, instead, to question the witness, Kim Basinger, a Sexual Assault Nurse Examiner, concerning other causes of the hymen not being intact. The following colloquy occurred:

[Defense Counsel]: All right. Then I'll just do it on cross.

THE COURT: So you're withdrawing it now?

[Defense Counsel]: Yes, sir.

THE COURT: Your last one?

[Defense Counsel]: Yes, sir.

THE COURT: All right.

Basinger testified in the presence of the jury, "Anything that might penetrate the female sexual organ could cause injury to the hymen and as well as other structures." Basinger also agreed that this "could include non-sexual activity, such as sporting activities or the like."

After Keilburg testified at trial, Eldred once again sought to present evidence of the prior abuse, though he justified the request differently the second time. Keilburg had testified, "He started rubbing me, and then he started pulling down my pants. And then that's when he put his mouth on my vagina, and I was a little bit nervous at first, you know, because it's the first time I had done anything like that."

17

A few minutes later, Eldred argued that this testimony opened the door to the two instances of prior sexual abuse.

> Your Honor, based on the witness's statement, this is what I wrote down, that this was the first time I had done anything like that, I would submit that the time when she was victimized by her father and her stepfather are now ripe for cross-examination. I would ask that I be able to cross-examine her based on that. I don't think that opens any doors to Zack Eldred's extraneous offenses just based on the witness's testimony.

Keilburg was questioned outside the presence of the jury. Keilburg initially claimed to remember the two incidents of prior sexual abuse—one that occurred when she was two and the other that occurred when she was five—but eventually testified that her mother told her about the incidents. Eldred did secure a ruling on his request to use evidence of prior sexual abuse in cross-examining Keilburg; the trial court overruled the request.

It is well established that an issue raised on appeal must be the same issue raised by the objection asserted at trial. TEX. R. APP. P. 33.1(a); *Ibarra v. State*, 11 S.W.3d 189, 197 (Tex. Crim. App. 1999) (holding nothing preserved for review if objection at trial does not comport with issue on appeal). The defendant's objection must "'let the trial judge know what he wants, why he thinks himself entitled to it, and to do so clearly enough for the judge to understand him at a time when the trial court is in a proper position to do something about it.'" *Thomas v. State*, 408 S.W.3d 877, 884 (Tex. Crim. App. 2013) (quoting *Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992)).

The only issue raised on appeal is that evidence regarding the victim's prior sexual history was admissible to rebut the State's medical evidence. Because Eldred's first objection was withdrawn, our inquiry concerns whether the second objection independently raised the

18

medical evidence exception or somehow incorporated the grounds of the first objection. The second objection makes no reference to the victim's hymen, to medical evidence, or to any medical condition. It contains neither an explicit nor an implicit reference to medical evidence. Further, the medical exception to the Rape Shield Law is not apparent from the context. *See id.* (finding that error preserved "if meaning is adequately conveyed by context"). The objection clearly confines itself to Keilburg's testimony with the phrase "based on the witness's testimony." This phrase negates any argument that the first objection was incorporated into the second objection and negates any conclusion that the medical evidence complaint was implicit from context. None of the statements made by the trial court indicate an intent to rule on the medical evidence exception.

The policies of error preservation have not been satisfied under these circumstances. *See id.* at 884–85 (finding that error preserved if record establishes preservation policies were satisfied). The error argued on appeal is not the same as the objection ruled upon by the trial court, and we conclude that Eldred's third point of error has not been preserved for appellate review. Even if the objection was preserved, the testimony of the child is not medical or scientific evidence and, therefore, was not subject to rebuttal on that basis.

REPORTER'S RECORD
VOLUME 3 OF 6 VOLUMES

TRIAL COURT CAUSE NO. 11F0762-102

APPELLATE CAUSE NO. 06-13-00128-CR

| THE STATE OF TEXAS | ) | IN THE DISTRICT COURT |
| | ) | |
| VS. | ) | OF BOWIE COUNTY, TEXAS |
| | ) | |
| ZACK GUTHRIE ELDRED, JR. | ) | 102ND JUDICIAL DISTRICT |

---------------------------------------

**TRIAL ON GUILT/INNONCENCE**

---------------------------------------

On the 12th day of September, 2012, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Bobby Lockhart, Judge presiding, held in New Boston, Bowie County, Texas;

Proceedings reported by machine shorthand.

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

---

A P P E A R A N C E S

MR. JAMES ELLIOTT
    SBOT NO. 06557500
MS. KELLEY CRISP
    SBOT NO. 24062683
MS. SAMANTHA OBLESBY
    SBOT NO. 24070362
Bowie County District Attorney's Office
    601 Main Street
    Texarkana, Texas  75501
    Telephone Number:  (903) 735-4800
ATTORNEY FOR THE STATE


MR. JEFF HARRELSON
    SBOT NO. 00798241
Harrelson & Matteson
    P. O. Box 40
    Texarkana, Texas  75504
    Telephone Number:  (903) 772-0300
ATTORNEY FOR DEFENDANT


*-*-*-*-*

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

---

I N D E X
VOLUME 3
(TRIAL ON GUILT/INNOCENCE)

Wednesday, September 12, 2012    PAGE   VOL.

| | PAGE | VOL. |
|---|---|---|
| Proceedings | 5 | 3 |
| Defense Objection to Outcry Witness | 5 | 3 |
| Arraignment | 29 | 3 |
| Opening Statement by Mr. Crisp | 31 | 3 |
| Opening Statement by Mr. Harrelson | 33 | 3 |
| Motion to Invoke the Rule | 86 | 3 |

STATE'S WITNESSES:

| | Direct | Cross | Voir Dire | |
|---|---|---|---|---|
| Missy Davison | 8 | 13 | | |
| | 15 | 17 | | |
| | 35 | 53 | | |
| | 55 | | | 3 |
| Todd Aultman | 56 | 79 | | |
| | 82 | 83 | | 3 |
| Kim Basinger | 88 | 100 | | 3 |
| Carolyn Sandoval | 19 | 22 | | |
| | 102 | 120 | | |
| | 124 | 127 | | 3 |
| Karrah Dickeson | 129 | 140 | | 3 |

| | | |
|---|---|---|
| State Rests | 141 | |
| Motion for Directed Verdict | 143 | |
| Objection to Charge | 145 | |

DEFENSE WITNESSES:   Direct   Cross   Voir Dire

| | Direct | Cross | Voir Dire | |
|---|---|---|---|---|
| Chris Eldred | 150 | 151 | | |
| | 152 | | | 3 |

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

---

| | | |
|---|---|---|
| Defense Rests | 154 | |
| State Closes | 154 | |
| Motion for Directed Verdict | 154 | |
| Court's Charge | 155 | |
| Closing Argument by Ms. Crisp | 163 | |
| Closing Argument by Mr. Harrelson | 169 | |
| Final Closing Argument by Ms. Crisp | 172 | |
| Jury Deliberating | 176 | |
| Verdict | 178 | |
| Court Reporter's Certificate | 181 | |

EXHIBIT INDEX

STATE'S

| NO. | DESCRIPTION | OFFERED | ADMITTED | VOL. |
|---|---|---|---|---|
| 1 | Warning of Rights | 62 | 62 | 3 |
| 2 | Interview CD | 64 | 64 | 3 |
| 3 | Written Statement | 72 | 72 | 3 |
| 4-13 | Photographs | 74 | 74 | 3 |
| 14 | Medical Record | 87 | 88 | 3 |

RECORD EXHIBITS:

| | | | | |
|---|---|---|---|---|
| State's No. 1 | Interview CD | 64 | 64 | 3 |
| Defense No. 1 | Medical Records | 24 | 24 | 3 |

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

PROCEEDINGS

(OPEN COURT, DEFENDANT PRESENT, NO JURY PRESENT)

THE COURT: Melanie, if you would, let the record reflect that we're in here. It's about 8:20. The jury is not in the courtroom. We convened Court a little bit earlier this morning to allow the defense to raise an objection to the State, I guess, potentially calling a Children's Advocacy Center forensic interviewer as an outcry witness. Jeff, is that your understanding?

MR. HARRELSON: Correct, Your Honor. The State filed a notice of intent to call Missy Davison as their outcry witness under 38.07(2), and it's our position that under the statute she does not qualify as the outcry witness. We have really one main issue, is that Missy Davison is not the first person over the age of 18 to which the alleged victim made statements about the offense, as well as at the time of the statement she was not under 14. She was over 14 at the time of the declaration.

THE COURT: All right. Sam?

MS. OGLESBY: Your Honor, in this case she did make a statement to her mother, but under Garcia, which is a principal case dealing with this matter on who is a proper outcry witness, it states that it must

be more than a general allusion of sexual abuse. In this case, the only time she gave details as to leading to the offense for which the defendant is charged, continuous sexual abuse, was to Missy Davison which is the CAC interviewer where she gave the how, the when, the why, the where, which under Hayden v. State, that sums the specific details which make it sufficient for an outcry statement. So we would allege that based on those cases and based on the multitude of cases where someone would say, daddy touched me and then give specific details later, where multiple Courts have found where even though there was some general allegation of sexual abuse made to a prior person, that the second person where the more details were given leading to the offense, that made up the elements of the offense, that that was the proper outcry witness. And that is the exact situation we have in this case. And then I have a multitude of cases for the Court to consider where I've highlighted relevant portions for the Court.

THE COURT: Well, I think I asked you and my able assistant yesterday to find me a line of cases. The word that they seem to use in each and every one of those cases is the word discernable, and I think they use that basically in describing the how, when, and where that you just mentioned. And several of those

cases did touch on the fact that the outcry witness was not the first person that was told basically a general statement, but not something that was in-depth. And when I broke out my trusty Webster's dictionary last night, discernable simply means to make out clearly what it is. And I think, with that, do you have your CAC interviewer here this morning, Ms. Crisp?

MS. CRISP: Judge, I do.

THE COURT: Do you want to put her on the stand?

MS. CRISP: Yes, sir. The State would call Missy Davison, Judge.

THE COURT: Jeff, let me ask before she does that, do you have anybody you want to call witness wise?

MR. HARRELSON: No, Your Honor.

THE COURT: Okay. Good morning. If you would, come around and raise your right hand. Do you solemnly swear the testimony you're about to give to be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: Yes, sir.

THE COURT: Have a seat, please, ma'am. Ms. Crisp, begin whenever you wish.

MS. CRISP: Yes, sir.

MISSY DAVISON

having been duly sworn, testified as follows:

MS. CRISP: Just to speed this process up, Judge, it's my understanding that we're going to designate her as an outcry. Of course, we do intend to designate her as an expert. If Mr. Harrelson has no objection, I'm not going to prove her up as a forensic interviewer if we just are going to talk about the details of the --

MR. HARRELSON: I don't think that's necessary for the purpose of this hearing, but at the trial, obviously, I do.

MS. CRISP: Absolutely.

THE COURT: I understand. I think we'll do it just for brevity this morning, but if she comes back and testifies in front of the jury, I understand.

MS. CRISP: Sure.

THE COURT: Go ahead, Ms. Crisp.

DIRECT EXAMINATION

BY MS. CRISP:

Q. Yes, ma'am. Can you state your name for the record?

A. Missy Davison.

Q. Missy, how are you employed right now?

9

A. I'm employed with the Texarkana Children's Advocacy Center.

Q. And what do you do there at the advocacy center?

A. Currently I'm the program director.

Q. Ma'am, as part of your duties there at the advocacy center, do you conduct forensic interviews with children?

A. Yes, ma'am.

Q. And basically what is a forensic interview?

A. Basically a forensic interview is just -- it stands for fact finding. We just get the statement from the child. Whenever there's any type investigation going on with a child, they come to our center after the investigators call us, and we do a forensic interview. It's audio and video recorded. We have a semistructured protocol that we abide by, and basically what we do is we just get to know the child, build a rapport, go through the rules of the room. And that's just basically if there's anything we get wrong we want them to correct us. If they don't know the answer, it's okay to say I don't know. Then we go through truth and lie. And if they know why they're there, they tell us, and we just get the details of everything that they have their statement in their own words.

Q. Ma'am, in May of 2011, did you conduct a forensic

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

10

interview of a young female child? Her legal pseudonym is Holly Keilburg, but her name is Carolyn Sandoval?

A. Yes, ma'am.

Q. And did, in fact, Carolyn make specific statements to you, detailed statements about being sexually assaulted by one Zack Eldred?

A. Yes, ma'am.

Q. When exactly were those statements made? Does May 17th, 2011, seem right to you?

A. Yes.

Q. And where were you, ma'am, when those statements were made to you?

A. At the Texarkana Children's Advocacy Center in the forensic interview room.

Q. Now, at the time -- and I know this seems like a silly question, but I have to ask it to you legally. At that time on May 17th were you, in fact, over the age of 18 years?

A. Yes, ma'am.

Q. Okay. Now, at the time of the interview, was the victim approximately 14 years old?

A. Yes.

Q. However, at the time of the alleged incident, she was about 12 or 13; is that correct?

A. Yes, ma'am.

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

11

Q. Okay. Ma'am, if you know, and I think you do, is Carolyn available to testify at the trial in this case?

A. Yes, ma'am.

Q. Now, when you talked about the details with Carolyn, approximately how long was your interview?

A. Approximately an hour.

Q. Now, you are aware, are you not, ma'am, that we are here for continual sexual abuse of a child under 14 years?

A. Yes, ma'am.

Q. And are you also aware that that charge contains multiple allegations? In this case, I think, five or six different variations of aggravated sexual assault and indecency of a child?

A. Yes, ma'am.

Q. Throughout your talks or sort of your interview with the child, did she describe to you in detail five or six different acts of both ag sexual assault of a child and indecency?

A. Yes, ma'am.

Q. Okay. Now, did she tell you, ma'am, that during their sexual affair, did she call it a sexual affair?

A. She did.

Q. And did this child view him as her boyfriend?

A. Yes, ma'am.

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

12

Q. What did she tell you about the different ways that he and her would have sexual intercourse?

A. She talked about that they would -- it would happen at his house, and he would, I believe her words were, he would insert his dick into her private area. She talked about him sucking on her chest and her private area. She talked about him rubbing her private area and her chest with his hands.

Q. Did she also tell you that she put her mouth on his penis?

A. Yes, she did.

Q. Did she tell you that he performed oral sex on her, meaning he put his mouth on her vagina?

A. Yes, ma'am.

Q. Did she also tell you that he would digitally penetrate her vagina with his fingers?

A. Yes.

Q. Ma'am, did she also tell you that this carried on for months, from July 1st, 2010, through, I think, it was sometime around the first or middle of May 2011?

A. Yes, ma'am.

Q. And that this happened several times a month?

A. Uh-huh (yes).

Q. Okay. Whenever you and she were talking about the sort of times that they were together, did she tell

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

**13**

you that they watched pornography together?

A. Yes, ma'am, she did.

Q. Did she, in fact, tell you that they would re-enact the pornography when they were in the bedroom?

A. Yes.

Q. Did she also tell you that they tried many different sexual positions?

A. Yes, she did.

Q. Did she mention to you that they would do, in her words, 69?

A. Yes, ma'am.

Q. Ma'am, did she tell you that while they were having sexual intercourse, what you and I would consider sexual intercourse in the traditional way, where his penis went in her vagina, that he wore a condom every single time?

A. Yes, she did.

MS. CRISP: Your Honor, that's all I have right now. I'd pass the witness.

THE COURT: Mr. Harrelson?

MR. HARRELSON: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. HARRELSON:

Q. Ms. Davison, I'm Jeff Harrelson. We know each other. If I understand you correctly, the statement

**14**

that Ms. Sandoval made to you was on May the 17th of 2011?

A. Yes, sir.

Q. Do you know how Ms. Sandoval was referred to your office?

A. Well, generally a child comes to our office after there's been an investigation. So it would happen if an investigator calls our office and sets up an interview.

Q. Do you remember specifically, though, who it was that referred her to your office in this case?

A. If I believe correctly, it would have been the law enforcement investigator.

Q. Okay. Is that Todd Aultman?

A. Yes, sir.

Q. Did you talk with Detective Aultman before conducting the interview?

A. I generally talk with all the investigators before each interview just to get a brief synopsis of kind of what's going on with the case.

Q. So you were at least aware generally of the allegations that Ms. Sandoval had made before your interview?

A. Yes, sir.

Q. Did you look at any medical records before you spoke with her?

**15**

A. No, sir.

Q. Do you remember if you ever spoke to her mother in addition to Detective Aultman before the interview?

A. I just introduce myself to the parents, or whoever their guardian that's there, I introduce myself and let them know what I'm going to do as far as the forensic interview process, but any other details, I don't get that from the family members.

MR. HARRELSON: No further questions, Your Honor.

MS. CRISP: Yes, sir, briefly.

REDIRECT EXAMINATION

BY MS. CRISP:

Q. Ma'am, Mr. Harrelson just asked you if law enforcement had referred the victim to you. Is that not how it happens in every case?

A. That's how it happens in every case.

Q. So people can't just walk in off the street and get a forensic interview?

A. No, ma'am.

Q. Okay. You are not law enforcement?

A. No, ma'am.

Q. And if you -- do you get a brief synopsis of every case before you do an interview?

A. Yes, ma'am.

**16**

Q. Okay. But are you going to do the interview the same way every time?

A. Yes, ma'am.

Q. And it has -- well, can you tell this Court whether or not what the deputy tells you affects sort of your indifference or how you do your interview?

A. No. It doesn't at all. Basically, what it does, it just gives me a general idea about what the allegations are. Within any forensic interview semistructure protocol, we check for all types of abuse, but there are -- so what we would do is we still go through the same process. We build rapport. We go over the rules of the room. We do truth and lie. If they know why they're there, they tell the detailed story. If they don't, then what we do is we still go through all types of abuse within the family to make sure they're safe, physical abuse, neglect. We go through drugs, alcohol, those types of things. And then we go over the drawings and go over touches and make sure they understand the places they're not supposed to be touched and go over the sexual abuse part, which would be the time if sexual abuse has happened, they would tell us that part; and we get the details.

MS. CRISP: That's all I have.

THE COURT: Jeff, anything else?

## Page 17

RECROSS-EXAMINATION

BY MR. HARRELSON:

Q. While she's on the stand, Your Honor, this may touch a different issue. But, Ms. Davison, did Ms. Sandoval make any allegations against other individuals other than Zack Eldred when she was being interviewed by you?

A. She told me about two other incidents that happened when she was at a younger age in life, and, if I recall, she said they had already been investigated. So we didn't go into detail over those.

Q. Okay. But did she specifically mention her dad and her stepdad?

A. Yes, sir.

MR. HARRELSON: Thank you. That's all.

THE COURT: Anything else?

MS. CRISP: That's all I have, Judge.

THE COURT: Got one question. Let me ask you this: In, I guess, your pre-interview with Detective Aultman before the witness, before you interviewed the witness or the victim, does he just give you a brief synopsis, or does he go into detail on the how, when, and where everything happened?

THE WITNESS: No, sir. It's just a brief synopsis.

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

## Page 18

THE COURT: So as far as how, when, and where the allegations occurred happened with the victim? You didn't have any idea before she told you; is that correct?

THE WITNESS: That's correct.

MR. HARRELSON: Nothing further.

THE COURT: All right. You can step down. Thank you.

MS. CRISP: Judge, Mr. Harrelson and I have agreed, I think we have, the victim is here. I do intend to call her and ask her a couple of questions, and just my questioning is going to be very brief, basically who did you tell, what did you tell them. I'm not sure. I think Mr. Harrelson has some medical that you want to go through?

MR. HARRELSON: I was going to ask Ms. Sandoval about what she told people at the hospital. Depending on the depth of her testimony, I may need to introduce it, and I may not.

THE COURT: When did you want to call her, right now?

MS. CRISP: Yeah.

THE COURT: Sure.

MS. CRISP: Carolyn Sandoval.

THE COURT: Does Mr. Barker have her ready?

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

## Page 19

MS. CRISP: Yes, sir.

THE COURT: Young lady, just come right up here, if you would. If you would, raise your right hand for me. Do you solemnly swear the testimony you're about to give to be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: Yes, sir.

THE COURT: Have a seat right there and listen to Ms. Crisp. She has some questions she'd like to ask you.

DIRECT EXAMINATION

BY MS. CRISP:

Q. Hi, Carolyn. Will you scoot up a little bit and talk into that microphone for us? Can you tell -- this is the court reporter right here, and she's going to write down everything you say. That's what she's doing with her hands when she types. We're basically here. The jury is not here yet. I'm going to ask you a couple of questions about who you told about your relationship with Zack Eldred and sort of when you told them, nothing too difficult. Can you state your name, your real name on the record for the Judge?

A. Uh-huh (yes).

Q. Go ahead.

A. Carolyn Sandoval.

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

## Page 20

Q. Okay, Carolyn. And right now, as you sit there, how old are you?

A. Fifteen, fixing to be 16 in December.

Q. Okay. From July the 1st, 2010, to December the 7th, 2010, were you 13 during that time frame?

A. Yes, ma'am.

Q. Okay. And you know who Zack Eldred is?

A. Yes, ma'am.

Q. Okay. I'm indicating the defendant in this cause, and I'm going to ask you, is that the same Zack Eldred that you know?

A. Yes, ma'am.

Q. Okay. Carolyn, basically is what happened you were at the hospital with your mom, and she asked you if you were pregnant. And you told her you were having a sexual affair with Zack Eldred; is that right?

A. Yes, ma'am.

Q. Okay. Did you tell your mom the details of what happened between you and Mr. Eldred?

A. No, ma'am.

Q. Okay. A little bit later were you asked to talk to some nurses, or did you talk to nurses at the hospital?

A. A little bit.

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

21

Q. Okay. Do you remember giving them any details about everything that had happened?

A. No, ma'am.

Q. Okay. Now, I know they asked you a few things. I have some -- I have a piece of paper here.

MS. CRISP: Judge, can I approach the witness?

THE COURT: Yes.

Q. (BY MS. CRISP:) Carolyn, I'm telling you, I'm representing to you that this is a piece of paper that came straight from your medical records. Basically here at the bottom of the page it says that you and Zack have been having sex for months. Do you remember saying something like that?

A. Yes, ma'am.

Q. Okay. And then he rubbed on me, do you remember saying that?

A. Yes, ma'am.

Q. Okay. And do you remember telling the nurse that he used a condom?

A. Yes, ma'am.

Q. Okay. And do you remember telling the nurse that he said if you told anybody he'd kill himself?

A. Yes, ma'am.

Q. Okay. Beyond giving some of this, you did not

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

22

tell anybody there that day all the sort of different ways that you and him had your relationship? Did you tell anybody the details there at the hospital, or did you give it to the CAC person that interviewed you?

A. The person who interviewed me.

MS. CRISP: Judge, I'm going pass the witness.

THE COURT: Jeff?

CROSS-EXAMINATION

BY MR. HARRELSON:

Q. Carolyn, my name is Jeff Harrelson. I represent Mr. Eldred. Can I call you Ms. Sandoval?

A. Yes, sir.

Q. Is that okay? Thank you. Do you remember what day it was that you went to the hospital, and they checked you out; and you talked to some of these nurses?

A. Not the exact day, but it was around close to the middle of May.

Q. Okay. If they wrote down in these records that it was May the 9th, do you have any problem with that?

A. No, sir.

Q. Okay. But you did talk to the people at the hospital before you went and talked to Missy at the child advocacy center; is that right?

A. A little bit, yes, sir.

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

23

Q. About a week before, does that sound about right?

A. Yes, sir.

Q. Okay. But when the nurses were giving you your treatment or your exam, did they ask you some questions about what had happened to you?

A. A little bit, yes, sir.

Q. Okay. And did you tell them the truth when you talked to them?

A. Yes, sir.

Q. Did you ever talk to your mother about the details of what had happened?

A. No, sir.

Q. Even to this day, today?

A. No, sir.

MR. HARRELSON: That's all I have for the witness.

MS. CRISP: That's all I have, Judge.

THE COURT: We're going to let you go back now where you were before. They may or may not call you again, okay? Thank you very much.

MS. CRISP: Judge, I think we're going to jointly -- we've agreed to jointly offer the medical as a record exhibit. It has those statements that Mr. Harrelson and I talked about on there.

THE COURT: You want them as State's 1 or

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

24

Defense 1?

MS. CRISP: Either one is fine with me, Judge.

MR. HARRELSON: You can do it mine, Defense 1.

THE COURT: Do it Defense 1, Jeff?

MR. HARRELSON: Yes, sir, Record Exhibit 1. It consists of a seven-page document. The first page says Ark-La-Tex EDM Live, and it's a series of medical records that were provided to me in discovery.

THE COURT: All right. It's admitted then.

MR. HARRELSON: Thank you.

THE COURT: It's 20 minutes till nine. I told the jury 8:30. Is everybody ready?

MR. HARRELSON: Yes, sir.

MS. CRISP: Judge, do you want to hear any more argument from either side?

THE COURT: No. Samantha and Lisa both provided me with a stack of cases. I read them all last night, like I say, along with my dictionary. I think what I would prefer to do, though, is wait till she takes the witness stand, and not that you haven't laid a proper foundation for the admission of the testimony, but I think it will firm up more right before you get ready to offer the disc. And I'll make a ruling on it

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

25

at that time.

MS. CRISP: Okay. Now, I'm not going to play the interview, Judge, of the girl. I'm only playing Mr. Eldred's statement to Todd Aultman.

THE COURT: Okay. You're not going to play the child's interview?

MS. CRISP: Oh, no, sir.

THE COURT: Okay.

MS. CRISP: So, basically, I guess, Judge, Missy is going to be witness number one. So do you want me to proceed as if she is the outcry or --

THE COURT: Get her up to the point where we qualify her as an expert, and even though I don't think that's going to be any trouble, I'd rather do it right after that.

MS. CRISP: Okay. So you don't want me to mention her in my opening statement?

THE COURT: No. I don't mind if you mention her in opening statement. Yes, you can.

MS. CRISP: Okay.

THE COURT: I tell you what, let's just -- I understand the point you're trying to make. She's a qualified outcry witness, and I'm going to rule that she is such.

MR. HARRELSON: Your Honor --

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

26

THE COURT: Jeff, it looked like when I -- and I wrote down, apparently the interview was on May 17th. When I specifically asked her, you know, the interviewer if she asked in her pre-interview with Mr. Aultman she went into any details, she said she did not. And I thought the young victim's testimony as to what she told the hospital, from the cases I've read, and, more particularly, the most recent case that they provided me this morning is an opinion from June 28 out of the 11th Court of Appeals, and it's, of all names, Casanova Brown versus State. And issue number two specifically in that case is almost dead on point for what the argument here this morning is, and when I read that case and compare it with the testimony I've heard this morning from the potential outcry witness and the young victim, I'm going to admit it.

MR. HARRELSON: Just for purposes of the record, Your Honor, in the medical records as I've submitted as Defense Exhibit 1 for this hearing, the notes from the nurses at the hospital state that she admitted to regular intercourse with the man. She says Zack had put his penis in her mouth. At least from our position she did make detailed statements to the persons at the hospital, and they would be the correct outcry witness. But I understand the Court's ruling.

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

27

THE COURT: And, again, the line of cases that I read last night basically said, you know, that the victim can have spoke to other people about the incidents, but if she really didn't get down into the how, when, and where of it, that her testimony to an interviewer would still be admissible. And it appears to me in this case that's what's happened. Did she give a general statement to law enforcement about what happened, yeah. Did she make maybe a little bit more general statement to the nurse, perhaps so. But I don't think she got down to, and the word they constantly use was, discernable. And I just didn't think that she made a statement that was all that clear as to all the allegations, especially in this case where it's a continuous sexual assault. Other than just the elements of the sexual assault case, the State has other things to prove, and I think her statement to the CAC interviewer is by far the first clear outcry that she made of all the incidents.

MR. HARRELSON: Thank you, Your Honor. Just please note my objection, and obviously I'll object at the time of the testimony.

THE COURT: Sure. I'm sure you want to carry that objection each and every time?

MR. HARRELSON: Thank you.

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

28

THE COURT: Yes.

MS. CRISP: Judge, before the jury gets in here, I just want to make sure we had the volume.

THE COURT: Sure.

MS. CRISP: Judge, before I call Todd Aultman, did you want to excuse the jury and watch the video?

THE COURT: Do what now?

MS. CRISP: Before I call Deputy Aultman did you want to excuse the jury and watch the video?

THE COURT: No.

MS. CRISP: Okay.

MR. HARRELSON: There's not an issue as to the voluntariness of the statement, Your Honor.

THE COURT: There's not?

MR. HARRELSON: No.

MR. ELLIOTT: Written or video?

MR. HARRELSON: I viewed it all, there's no --

MR. ELLIOTT: Judge, may the record reflect that neither the written statement nor the video is being contested as to voluntariness of the statement?

THE COURT: Jeff, is that true?

MR. HARRELSON: Correct, Your Honor. I've reviewed each -- visited with my client, and there are

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

29

no suppression issues as far as that is concerned.

THE COURT: Sure. The record will so reflect then.

THE BAILIFF: All rise for the jury, please.

(OPEN COURT, DEFENDANT AND JURY PRESENT)

THE COURT: Everyone please be seated. Good morning, ladies and gentlemen. We are here to actually begin today, and the very first thing that happens is each side is given an opportunity to make an opening statement. An opening statement is merely them having an opportunity to tell y'all where they think their case is going and how they're going to get it there. And, with that, Ms. Crisp?

MS. CRISP: Judge, did you want to arraign the defendant?

THE COURT: I'm sorry. Yes. Go ahead.

MS. CRISP: Yes, sir. In the name and by the authority of the State of Texas, the grand jury of Bowie County, Texas, duly organized in the January term 2012, in the District Court of Bowie County, Texas, do present in the county of Bowie and the State of Texas that Zack Eldred, Jr., hereinafter referred to as the defendant, did then and there, during a period that was 30 days or more in duration, to wit, from on or about July 1st, 2010, through December 7th, 2010, when the

MELANIE C. HARRIS, CSR, CCR, RPR—(903) 831-6926

30

defendant was 17 years of age or older, commit two or more acts of sexual abuse against Holly Keilburg, a pseudonym, a child younger than 14 years of age, namely, indecency with a child by contact. The defendant, with intent to arouse or gratify the sexual desire of the defendant, intentionally or knowingly engaged in sexual contact with Holly Keilburg, a pseudonym, by touching the genitals of Holly Keilburg, a pseudonym; aggravated sexual assault of a child, he did then and there, intentionally or knowingly, cause the penetration of the sexual organ of Holly Keilburg, a pseudonym, a child who was then and there younger than 14 years of age, by the defendant's finger; aggravated sexual assault of a child, the defendant did then and there, intentionally or knowingly, cause the penetration of the sexual organ of Holly Keilburg, a pseudonym, a child who was then and there younger than 14 years age by the defendant's tongue; aggravated sexual assault of a child, the defendant did then and there, intentionally or knowingly, cause the penetration of the sexual organ of Holly Keilburg, a pseudonym, a child who was then and there younger than 14 years of age, by the defendant's sexual organ; aggravated sexual assault of a child, the defendant did then and there, intentionally or knowingly, cause the penetration of the mouth of

MELANIE C. HARRIS, CSR, CCR, RPR—(903) 831-6926

31

Holly Keilburg, a pseudonym, a child who was then and there younger than 14 years of age, by the defendant's sexual organ, against the peace and dignity of the State.

THE COURT: Mr. Eldred, to the allegations in the indictment, how do you plead, sir?

THE DEFENDANT: Not guilty.

THE COURT: All right. You can be seated. That was Ms. Crisp very politely letting me know I forgot to have her read the indictment. So, Ms. Crisp, you can begin your opening statement now.

MS. CRISP: Ladies and gentlemen, the charge that we're here on, the continual sexual abuse of a child is the legal charge, but we're really here because Mr. Eldred is a thief. And he's a thief in the worst way. He's stolen the innocence of a childhood of this child. The testimony you are going to hear over the next couple of days is going to tell you about violations of this child, her soul, her body, over and over and over. And it will not be fun, and it will not be easy. The testimony that you're going to hear is this child engaged in a sexual relationship, you heard in the indictment, of all kinds. The abuse happens any way you can imagine. And what you're going to hear is that it went on from July of 2010 through May of 2011.

MELANIE C. HARRIS, CSR, CCR, RPR—(903) 831-6926

32

However, we're here for the period of time from July 1st, 2010, to December 7th, 2010, while the child was still 13 years of age.

The outcry happened when the child was at the hospital and had some pains, and you're going to hear that she thought she might be pregnant. After her trip to the hospital, she was taken to the children's advocacy center, and you're going to hear that she made an outcry to a trained and certified forensic interviewer. And that testimony will be very difficult to hear. It's going to be a detailed description about how this individual convinced this child that this was God's will, and this was what God wanted. See, he told her he was a minister, an ordained pastor, and used the Bible to convince this child that they were soul mates. It is inconceivable the testimony you will hear from that child, and you will hear from her. She is going to tell you about the sexual relationship and how she loves him. He told her he would never leave her. He told her they were going to get married, and they were going to have children. And the testimony that you are going to hear is that they were planning their future together. You're going to hear that she was 13 and that he was 49.

You're also going to hear from Deputy Todd Aultman. He's going to tell you that he

MELANIE C. HARRIS, CSR, CCR, RPR—(903) 831-6926

33

interviewed the defendant. You're going to hear evidence that this defendant and that child slept together in the same bed over and over and over and over. Ladies and gentlemen, this is an important case for everybody. I told you that in voir dire. It's a big case, but what this case also represents is justice for this child. And at the end of the evidence when the State rests its case, your job is going to be simple. Listening and sitting through the evidence will not be simple, but it's the oath that you've taken to do; and you will do it. And I have confidence that you will return a verdict of guilty on the charge of continual sexual abuse because that is justice in this case. Thank you.

THE COURT: Mr. Harrelson, do you wish to make an opening statement at this time?

MR. HARRELSON: I would, Your Honor. Good morning, ladies and gentlemen. We talked to you yesterday morning about what you'd hear when you were being selected for the jury, and I need you to keep in mind a few things. Zack Eldred, under the law, is presumed to be innocent, and he remains that way unless the State can bring you proof beyond a reasonable doubt to convince you of each and every element that the law requires. What the attorneys say is not evidence. What

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

34

Ms. Crisp just told you is what she anticipates the evidence will be, but that's y'all's job is to listen to those witnesses and determine whether you believe them or not, beyond a reasonable doubt. You committed to me yesterday that each and every one of you would listen to all the evidence before you made your mind up. I'm going to hold you to that. Listen to the testimony and judge it with the credibility that each of you bring to the room here. And I will submit to you at the end of the day, at the end of the trial, that the State will not have met their burden of proof by proving every single element of the charge alleged beyond a reasonable doubt. And I will ask you to return a verdict of not guilty. Thank you.

THE COURT: Ms. Crisp, call your first witness.

MS. CRISP: Yes, sir. The State would call Missy Davison.

THE COURT: I swore you earlier, but let's go ahead and do it again. Do you solemnly swear the testimony you're about to give to be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: Yes, sir.

THE COURT: Have a seat. Ms. Crisp, begin whenever you wish.

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

35

MS. CRISP: Thank you, Judge.

MISSY DAVISON

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. CRISP:

Q. Ma'am, could you please state your name for the ladies and gentlemen of this jury?

A. Missy Davison.

Q. Missy, can you tell the jury how you're currently employed?

A. I'm employed with the Texarkana Children's Advocacy Center as the program director.

Q. And how long have you been there, ma'am?

A. I've been there since March 1st, 2005, a little over seven years now.

Q. And there at the -- can I call it the CAC center?

A. Yes, ma'am.

Q. Okay. There at the CAC center, what are your duties? What do you primarily do from day to day?

A. Currently from day to day I just deal with a lot of the administrative parts of the CAC, but I also conduct forensic interviews. I'm a licensed professional counselor. So I also provide counseling for some of the kids that we see at the office.

Q. And on May 17th, 2011, what were your duties at

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

36

the CAC center?

A. I was a forensic interviewer.

Q. And on that day, May 17th, 2011, were you over the age of 18?

A. Yes, ma'am.

Q. Okay. Now, what kind of training and experience have you received that would qualify you for the position that you now hold at the CAC center?

A. I have a bachelor's degree in counseling psychology. I also have a master's degree in counseling psychology where I've been licensed as a professional counselor. As far as forensic interviewing, I have training in Arkansas and Texas. With Arkansas, it's a week long, 40-hour training specialized for forensic interviewing. In Texas, it's three blocks, which is a core curriculum, and I've been through all three of those, plus there's a four and five. And those are just interchanging where it's the new education or training and that type of just continuing education with the forensic interviewing.

Q. Ma'am, have you conducted several forensic interviews?

A. Yes. I've conducted approximately over 1300.

Q. And does this -- do these interviews include sort of the children that are victims of both physical and

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

37

sexual abuse?

A. Yes, ma'am.

Q. Ma'am, have you, in fact, been recognized in this jurisdiction as an expert in the field of forensic interviewing?

A. Yes, ma'am.

Q. And has that been on multiple occasions?

A. Yes, ma'am.

MS. CRISP: Your Honor, at this time the State would offer Ms. Davison as an expert in her field.

THE COURT: Mr. Harrelson?

MR. HARRELSON: If we could approach the bench, Your Honor.

THE COURT: Yes, sir.

(AT THE BENCH, ON THE RECORD)

MR. HARRELSON: I just have an objection to the fact, not for her qualifications, but because the need for an expert in this case has not been established.

MS. CRISP: Judge, these girls testify routinely as to what a forensic interview is. It's an explanation for the jury. It's going to assist the jury.

THE COURT: You're not going to specifically ask her an opinion question, I think, is what he's --

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

38

MS. CRISP: Judge, I intend to ask her to explain to the jury how the forensic process works, and I do believe this individual is qualified to see if a child is going to act like they have signs of maybe telling her a story. I do not intend to ask her if this child is telling the truth or a lie.

THE COURT: Is that what you were getting at, Jeff?

MR. HARRELSON: Basically, and I don't think that would assist the jury. Therefore, this may not be the proper time for the objection under that, but at least I would object to her qualification as an expert and that line of testimony.

THE COURT: Okay. That objection is overruled. Continue, Ms. Crisp.

(OPEN COURT, DEFENDANT AND JURY PRESENT)

MS. CRISP: Judge, has Ms. Davison been so designated?

THE COURT: Yes. She's designated as an expert in that field.

MS. CRISP: Thank you.

Q. (BY MS. CRISP:) Okay. When you were talking about CAC, did you tell the jury that it was the child advocacy center, or did I skip over that part?

A. Well, I did tell them I worked at the child

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

39

advocacy center.

Q. Okay. Can you tell them generally what all goes on at the child advocacy center?

A. Yes. At the child advocacy center, it's a safe, neutral environment that kids who have been with any type of investigation that have been possibly abused or allegedly abused can come to our center and receive a forensic interview with a specialized trained forensic interviewer. When I say it's a neutral environment, we are a stand-alone facility. We're not law enforcement. We're not Child Protective Services. We are just the children's advocacy center, and so we have a waiting area that's kid friendly where they can relax and hopefully not feel so nervous or feel scared about being in trouble like you might would if you went to a law enforcement agency. And then we have a special room in the back where it's just the child and the forensic interviewer and video recording cameras that we have in the room, because every interview we do is video recorded. And it's just the child and the forensic interviewer in that room, and then in a different room down the hall is the investigators. And they watch just on a closed-circuit TV.

And basically what we do is we provide the forensic interview, and the forensic interview is a

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

40

semistructured type of interview. We have a semistructured protocol that we abide by, and basically what that is, is we just get to know the child at first. So we build a rapport with them so they feel comfortable with us. We go through the rules of the room, and basically what that means, if we get something wrong, we want them to correct us. If they don't know the answer, it's okay. We want them to tell us they don't know. And if we ask a question they don't understand, to let us know, and we'll ask it in a better way. And then we go through truth and lie and just to make sure they understand the difference, and then ask them if they tell us the truth that day. And then we also tell them we'll tell the truth. And then if they know why they're there, they tell us. If not, then we continue on with our semistructured protocol, and basically what that is, is we just go over every type of abuse that might happen to a child. So we cover the family, physical abuse, sexual abuse, neglect, those type of things. And then we educate at the end to make sure they know what to do if something like that happens to them.

Q. Ma'am, as part of your duties at the CAC center, did you conduct a CAC interview or a forensic interview of a female child, her legal pseudonym would be Holly Keilburg, but her name is actually

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

41

Carolyn Sandoval?

A. Yes, ma'am.

Q. And did you do that in May 2011?

A. Yes, ma'am.

Q. Did Carolyn make to you specific statements, detailed statements about being sexually assaulted?

A. Yes, she did.

Q. And where were those statements made to you exactly?

A. In the forensic interview room at the child advocacy center.

Q. And are you -- to your knowledge, if you know, were you the first person that the child gave sort of her account to in serious detail?

A. Yes, ma'am.

Q. Ma'am, is that child available to testify in this trial?

A. Yes, ma'am.

Q. Can you please recount for the jury what exactly Carolyn told you about the nature of her relationship with the defendant, Zack Eldred?

MR. HARRELSON: Your Honor, I have an objection. I'm renewing my previous objection under 38.07(2).

THE COURT: And it's overruled.

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

42

Q. (BY MS. CRISP:) Go ahead, Ms. Davison.

A. She told me that, as far as the allegations, that Zack Eldred put his dick in her private area. She also said that that happened several times. She said that he rubbed on her chest and private area with his hand, and he also sucked on her chest and private area with his mouth. She said that she also put her mouth on his dick and sucked his dick, I believe, a couple of times.

MR. HARRELSON: Your Honor, if I could, just for preservation purposes, if I could have a running objection to this line of testimony, as well as I would like to add under 403.

THE COURT: Yes. And it's overruled.

MR. HARRELSON: Thank you.

Q. (BY MS. CRISP:) Ma'am, before we keep going, how long, about how long was your interview with the child?

A. It was about an hour long.

Q. Okay. When you were talking to this child, did she tell you that this was sort of her boyfriend?

A. Yes, she did.

Q. Did she tell you that she loved him?

A. She did.

Q. And this affair, how did she refer to it?

A. She called it a sexual affair.

Q. Now, was it your understanding that she was

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

43

trying -- that she and the defendant were trying to keep it a secret?

A. Yes. She said they were.

Q. And why was that?

A. She said that they had decided together to keep it a secret, and they would face the consequences together, if necessary. But she also said that he told her that he didn't want anyone to know because if he did, then he would, I believe, commit suicide. And she didn't want the blood to be on her hands, and she didn't want to feel guilty for him doing that if it got out.

Q. Did the child specifically tell you she did not want his blood on her hands?

A. Yes. Those were her exact words.

Q. Now, did the child explain to you that she was 13 years old when it started?

A. Yes, ma'am, she did.

Q. And whenever she was having her sexual affair with the defendant, Zack Eldred, did she tell you that each and every time they would have sexual intercourse that he would wear a condom?

A. Yes, ma'am, she did.

Q. Now, and, Judge, I just want to apologize to the Court and the jury for the graphic language, but did she tell you, and I quote, that he would never cum inside

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

44

her?

MR. HARRELSON: Your Honor, I object to leading.

THE COURT: Overruled.

Q. (BY MS. CRISP:) Go ahead, ma'am.

A. Could you repeat the question? I'm sorry.

Q. Did he, and I'm using her words, did she tell you that he would never cum inside of her?

A. Yes, ma'am.

Q. Now, whenever she would describe to you the details of the child's -- or, pardon me, the victim's parts, did you believe she understood what everybody's anatomy meant?

A. Yes.

Q. Did you go over that with her?

A. Yes, ma'am.

Q. So that you and she both understood if you were talking about his private, her private, her chest, his chest, et cetera?

A. Yes, ma'am.

Q. Okay. Whenever the child would say sort of her purpose for having a sexual affair, what did she say? What was she getting out of it?

A. Basically that they were in love. She said that it started out just talking, and they would talk about,

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

45

you know, just normal things, is what she said. And then they began to talk about their love for each other and that she enjoyed it. She cared for him and that he felt the same for her.

Q. Whenever she talked about where they would have these encounters, did she tell you where it usually happened?

A. She said it usually happened at his house in his bedroom.

Q. Did she tell you on one occasion about his son being out of the house?

A. Yes, ma'am.

Q. And what did she tell you about that?

A. She told me that his son was, I believe, gone to his prom, and that he was there, I think, till maybe five or something in the morning. And they, I believe, had a sexual affair that night.

Q. Now, did the victim at all tell you about her and the defendant watching videos on the Internet?

A. Yes, ma'am, she did.

Q. And what did she tell you about the videos on the Internet?

A. She said that they would Google teenage virgin sex videos, and they would watch them. And they would -- sometimes they would, depending on what they

46

saw, they would try new acts or new types of positions. Some she liked, and she said it felt good, awesome. It was cool. And some she said she didn't like the position, that it was uncomfortable, and it was weird.

Q. Ma'am, did she tell you, in fact, that her and the defendant would use multiple sexual positions?

A. Yes, ma'am.

Q. And what exactly did she tell you?

A. She said that they -- actually one of the positions she said was 69, and she described that to me as her being on top of him with her face, basically her mouth on his dick and that he had his mouth on her private, in the 69 position.

Q. And did she describe the number of sexual positions as being many or several?

A. Yes. She said there was so many that she couldn't remember them all.

Q. Now, whenever you continued to talk to her, did she say that it would happen several times a month?

A. Yes, ma'am.

Q. What did she say about that?

A. I believe I asked just, you know, how many times, if she knew kind of within a month how many times it might would occur, and I believe she told me it was several times a month, maybe -- I can't remember exact

47

if it was three or four, but several times a month it would occur.

Q. And that started in July of 2010?

A. Yes, ma'am. As I recall, she said it was before school started when she was 13.

Q. Ma'am, did she also describe to you things that perhaps you would consider to be inappropriate, like he was going to mash the pimples on her face and back?

A. Yes, ma'am.

Q. And did she describe to you that she stayed in his bed?

A. Yes, ma'am.

Q. And what did she tell you about staying with him or sleeping in his bed?

A. That they would sleep together. I believe she talked about them cuddling, if I remember correctly, that they would lay together and talk. And then they would, basically, I think her words were, if she felt horny, then they would have sex, or a sexual affair. If she didn't, then they wouldn't, or they would, you know, watch those videos on-line and try different positions.

Q. Ma'am, at the end of the conversation that you had with her, had she described to you that he touched her genitals?

A. Yes.

48

Q. And did she tell you that that happened underneath the clothes or over the clothes or both?

A. It was under the clothes.

Q. Did she describe to you that he put his fingers inside her vagina?

A. Yes, ma'am.

Q. Did she describe to you that the defendant performed oral sex on her, meaning his tongue was in her vagina?

A. Yes, ma'am.

Q. Did she describe to you that he had put his sexual organ in her sexual organ?

A. Yes, ma'am.

Q. And, finally, did she describe to you that she would place her mouth on his sexual organ?

A. Yes, ma'am.

Q. Okay. Ma'am, in addition to you being what we would refer to as the outcry witness, you also are an expert in forensic interviewing, in the interview process. Can you tell the ladies and gentlemen of the jury about a disclosure, how a disclosure comes about, and what the different types of disclosure are?

A. Yes, ma'am. We have the types of disclosure are accidental and purposeful, and what those are basically is when a child actually discloses that something

49

happened. When it's accidental, that's usually if someone came in and saw something happen, so then they have to disclose. If maybe they've kind of told a friend a little bit, and they tell an adult, and so then they have to tell someone within -- either their parent or maybe law enforcement or someone like myself. So that would be considered accidental. Also, if something happened within this instance of the case, the child thought she was pregnant, and so, therefore, had to tell mom a little bit about what happened. So that would be accidental because it wasn't something that she was ready to tell. She didn't come up to someone and say, hey, I want to tell you what happened to me. That would be purposeful. And within that we have stages of disclosure. Stages of disclosure you have denial, tentative, active. And basically what that is, is if they're in active disclosure, they're going to tell you everything from the beginning to the end and give you the details of it, if their age and development is appropriate for that.

Tentative basically is they're going to tell a little bit. They may give you some information. They may not want to give you all of it because they're not really for sure what's going to happen either to themselves or the perpetrator. They may be scared about

— MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926 —

50

someone getting in trouble, themselves getting in trouble. They also -- so sometimes they'll say, I don't know, or just, you know, like I said, they'll give just a little bit of the information, and then you have to ask further questions to elicit other details of the abuse.

Q. Ma'am, in this case I believe your testimony was that there was an accidental disclosure?

A. Yes, ma'am.

Q. And are there, in fact, sort of reasons that children might not want to disclose?

A. Yes, ma'am.

Q. And what are some of those reasons?

A. Some of the reasons are that they're afraid of getting in trouble, that they may fear that something they did was wrong. They may have been told that they were going to get in trouble if they tell. In this instance, she didn't want to tell because she was told that he was going to commit suicide. So she didn't want to -- him to harm himself because she loved him. She didn't want him to do something that she would feel like it was her fault. There's also times that they don't want them to get in trouble, worried about them having to go to jail or something happening. I believe in this interview she mentioned him worried about him being

— MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926 —

51

executed and going to jail. So in that instance a lot of kids don't want to tell because they're afraid of the consequences of either their actions, if they understand what's going on, and most of them don't give a full understanding. They just understand within the process of the sexual abuse that either I might get in trouble because they've been told that, or the perpetrator is going to get in trouble. And most of the time they love the perpetrator. In this instance she did. So she didn't want to get him in trouble, and she didn't want to have him hurt himself.

Q. Now, when you go through the interview, as you did with this child, do you frequently look, or are you trained to look for indicators that the child may have been coached?

A. Yes, ma'am.

Q. And what would some of those indicators be?

A. We look for sensory details. We look for consistency within their statement to us. We look for the child language, to make sure, you know, a lot of kids, they have their own language where they say certain things.

MR. HARRELSON: Your Honor, I object under 702. I don't think this is scientifically reliable evidence.

— MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926 —

52

THE COURT: Rephrase your question again, Ms. Crisp.

MS. CRISP: Yes, sir. For the Court or for --

THE COURT: To me.

MS. CRISP: Yes. The witness was explaining sort of the factors that she would look for that might indicate that the child was coached.

THE COURT: The objection is overruled.

Q. (BY MS. CRISP:) Go ahead, ma'am.

A. Within sensory details, we look for details within their statement that actually have details of sensory. So, you know, taste, smell, what they saw, what they heard, what they felt. And within this, we look for all those details, and then if they stay consistent within their story or their statement throughout the interview with the questions that I ask and the things that they say, if the basis of what they keep telling me is the same thing, and if it's in their own words.

Q. Ma'am, throughout the interview with this particular child, did you note any red flags that came up to you that the child was coached?

A. No, ma'am.

Q. Did she, in fact, display the characteristics of

— MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926 —

53

not being coached?

A. Yes, ma'am.

Q. Did she give you sensory details?

A. Yes, ma'am.

Q. Did she tell you things that you think would be appropriate for a child of her age to report?

A. Yes, ma'am.

Q. And we're talking about a 13-year-old child. What would you expect her to be able to relay to you about abuse?

A. Being 13, she should be able to tell me the who, what, when, where, number of times, kind of a free narrative of everything that happened, and she was able to do that. Also being 13, they have limited knowledge of sexual acts, but not all the details usually, but what she had within that forensic interview.

MS. CRISP: I pass the witness, Judge.

THE COURT: Mr. Harrelson?

CROSS-EXAMINATION

BY MR. HARRELSON:

Q. Ms. Davison, I'm Jeff Harrelson. I represent Mr. Eldred. You mentioned one particular incident about when Mr. Eldred's son may have gone to a prom?

A. Yes, sir.

Q. Did that lead you to believe that the son was

— MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926 —

54

present other times?

A. Within my interview, I asked who was all there. I believe she told me that he was there sometimes, just in the living room.

Q. Okay. And you used a term a few minutes ago, "free narrative." Actually, the interview that you do, you're asking questions, and she's responding to them?

A. Yes, sir.

Q. So a free narrative in my mind means you just said, tell me what happened, and she goes on and on and on. That's not quite how the interview went, was it?

A. That's how it begins, yes, sir. So we allow her -- we say, tell me what happened, and then she does give her free narrative of everything. But kids don't always know to tell all the details, and since I am specifically trained to ask details that I would need to ask for investigation purposes and then for my forensic interview, that's when we do follow-up questions.

Q. So many of the details that you've related to this jury were in response to your questions, correct?

A. Some of them were, yes, sir.

MR. HARRELSON: Thank you. That's all I have. Pass.

THE COURT: Ms. Crisp, anything else?

MS. CRISP: Briefly.

— MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926 —

55

REDIRECT EXAMINATION

BY MS. CRISP:

Q. Ms. Davison, did you conduct the interview of this child as you would conduct the interview of all the other children that you've interviewed?

A. Yes, ma'am.

Q. And was the fact that you allowed her to sort of tell her story and then ask the details, is that what you generally do?

A. Yes, ma'am.

Q. You did not do anything different with this child?

A. No, ma'am.

MS. CRISP: That's all I have, Judge.

THE COURT: Jeff, anything else?

MR. HARRELSON: No further questions.

THE COURT: All right. Can she be excused?

MS. CRISP: Yes, sir.

MR. HARRELSON: Certainly.

THE COURT: Your next witness?

MS. CRISP: Judge, the State would call Deputy Todd Aultman.

THE COURT: Officer, if you would, raise your right hand. Do you solemnly swear the testimony you're about to give to be the truth, the whole truth,

— MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926 —

56

and nothing but the truth, so help you God?

THE WITNESS: I do.

THE COURT: Have a seat, please, sir. Ms. Crisp, begin whenever you wish.

MS. CRISP: Thank you, Judge.

TODD AULTMAN

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. CRISP:

Q. Deputy, could you state your name for the ladies and gentlemen of the jury?

A. Todd Aultman.

Q. And how are you currently employed?

A. I'm an investigator with the Bowie County Sheriff's Office.

Q. And how long have you been with the sheriff's office, Deputy?

A. The past seven years.

Q. And there at the sheriff's office, do you have a primary job, you have specific things that you do?

A. Yes, ma'am. Primarily I investigate crimes against children, and I do the sex offender registration and compliance.

Q. So if the sheriff's office, generally speaking, if the sheriff's office were going to investigate a

— MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926 —

57

crime involving sexual abuse of a child, it would go to you?

A. Yes, ma'am.

Q. Now, what kind of training and experience do you have?

A. I'm a master peace officer. I have advanced training in physical and child abuse, been to the Crimes Against Children Conference the past three years, advanced interview interrogation, multiple hours.

Q. So it would be fair to say that you've worked several of these cases?

A. Yes, ma'am.

Q. Deputy, as part of your duties there investigating the sort of sex crimes at the sheriff's office, did you come into contact with an individual by the name of Zack Eldred, Jr.?

A. Yes, ma'am, I did.

Q. And I'm indicating Zack Eldred, Jr. in the courtroom today and asking you if that's one in the same individual that you know to be Zack Eldred, Jr.?

A. Yes, ma'am, it is.

MS. CRISP: Your Honor, may the record reflect that this witness has identified the defendant.

THE COURT: The record will so reflect.

Q. (BY MS. CRISP:) Officer, what was the nature of

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

---

58

your contact with Zack Eldred, Jr.?

A. I was assigned a case to investigate, and Zack Eldred was listed as the suspect in a sexual abuse case.

Q. And, in fact, is that the case that brought us to Court today?

A. Yes, ma'am, it is.

Q. And can you tell the ladies and gentlemen of the jury what your investigation consisted of in this case?

A. Initially an offense report is taken by the patrol deputies in the field. The case is assigned to me. We have the victim interviewed at the children's advocacy center, and then typically the next step is I interview the listed suspect.

Q. Officer, as part of your investigation, was it necessary for you to determine the age of the defendant at the time the offense was alleged to have occurred?

A. Yes, ma'am.

Q. And was he approximately 49 years old?

A. Yes, ma'am.

Q. So it is your testimony that he's over the age of 17?

A. Yes, ma'am.

Q. Okay. Is also part of your job on a charge of this nature to determine the age of the victim at the

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

---

59

time of the alleged offense?

A. Yes, ma'am, it is.

Q. Officer, from your investigation, did the offense start to occur approximately July the 1st, 2010?

A. Yes, ma'am.

Q. At that time would the victim have been 13 years old?

A. Yes, ma'am.

Q. And is it also true that she turned 14 on December the 8th, 2010?

A. Yes, ma'am.

Q. So the period of time between July 1st, 2010, and December 7, 2010, she was 13 years old?

A. Yes, ma'am.

Q. Okay. I know this may seem like a silly question, but from July 1st, 2010 to December 7, 2010, did more than 30 days pass?

A. Yes, ma'am.

Q. Okay. Officer, during your investigation, did you determine where the abuse occurred?

A. Yes, ma'am, I did.

Q. And where was that?

A. At Zack Eldred's residence.

Q. And what town is that in, sir?

A. It's outside the city limits of New Boston, in

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

---

60

Bowie County, Texas.

Q. And that is in Bowie County?

A. Yes, ma'am.

Q. Did occasionally some of the abuse occur at the home of the victim, Carolyn Sandoval?

A. Yes, ma'am.

Q. And is that also in Bowie County, Texas?

A. Yes, ma'am, inside the city limits of DeKalb, I believe.

Q. Officer, did you, in fact, interview the defendant, Zack Eldred, regarding the charges that bring us to Court today?

A. Yes, ma'am, I did.

Q. And was he cooperative throughout that interview?

A. Yes, ma'am.

Q. Prior to speaking to the defendant, did you advise him of his constitutional rights?

A. Yes, ma'am, I did.

MS. CRISP: Your Honor, may I approach this witness?

THE COURT: Yes, ma'am.

Q. (BY MS. CRISP:) Officer, I'm handing to you now a document that's been marked for identification purposes as State's Exhibit No. 1, and ask if you recognize that document?

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

## 61

A. Yes, ma'am, I do.

Q. And can you tell the ladies and gentlemen of the jury what that is?

A. It is our standard warning form, warning of rights.

Q. Officer, prior to taking the defendant's statement, did you advise him of his right to remain silent?

A. Yes, ma'am, I did.

Q. Did you also advise him that any statement could be used against him?

A. Yes, ma'am.

Q. And did you tell him he had a right to an attorney, and if he couldn't afford one, you would appoint one or have one appointed?

A. Yes, ma'am.

Q. Did you also tell him that he could terminate the interview at any time?

A. Yes, ma'am.

Q. Did the defendant indicate to you that he understood each and every one of these rights?

A. Yes, ma'am.

Q. At this point did the defendant, in fact, give you a statement?

A. Yes, ma'am, he did.

— MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

## 62

Q. And after you explained the rights to him, did he sign the statement?

A. Yes, ma'am.

Q. Did he, in fact, initial each one of those rights indicating that he understood them to you?

A. Yes, ma'am.

Q. Okay. Did you also sign the waiver?

A. Yes, ma'am.

MS. CRISP: Your Honor, at this time the State would offer State's 1 into evidence.

MR. HARRELSON: No objection.

THE COURT: State's 1 is admitted.

Q. (BY MS. CRISP:) Officer, at any point in this interview did the defendant request an attorney?

A. No, ma'am.

Q. Did he ever ask to stop the interview?

A. No, ma'am.

Q. Did you threaten or coerce the defendant into giving a statement?

A. No, ma'am.

Q. And did you provide him sort of necessities? Did you allow him to go to the rest room or get him a glass of water if he asked?

A. Yes, ma'am.

Q. Officer, was, in fact, the video statement

— MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

## 63

recorded?

A. Yes, ma'am, it was.

MS. CRISP: Your Honor, may I approach this witness?

THE COURT: Yes.

Q. (BY MS. CRISP:) Officer, I'm handing you what's been marked for identification purposes as State's Exhibit 2, and ask you if that is, in fact, sort of the edited version of the interview given by Zack Eldred?

A. Yes, ma'am, it is.

Q. And was this recording prepared on a device capable of making an accurate recording?

A. Yes, ma'am.

Q. And did the operator of the device, that would be you, know how to operate it?

A. Yes, ma'am.

Q. And is, in fact, that accurate as to the statements made from Mr. Eldred to you?

A. Yes, ma'am.

Q. And would you identify for the ladies and gentlemen of the jury the individuals, the voices they're going to hear on the tape?

A. Just mine and Mr. Eldred's.

Q. Okay. And that is sort of just portions of the interview. The regular interview has not been altered

— MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

## 64

in any manner?

A. No, ma'am.

Q. And those are just portions that the State is offering, but that has not been altered, other than just sort of to be edited for sort of just purposes of making it shorter for viewing?

A. Yes, ma'am.

MS. CRISP: Your Honor, at this time the State would offer State's 2 into evidence.

MR. HARRELSON: Your Honor, I've reviewed the original video, as well as this edited version that's Exhibit 2, and I have no objection.

MS. CRISP: And, Your Honor, I will also at this time offer the full length video as Record Exhibit No. 1 for the State.

MR. HARRELSON: No objection.

THE COURT: Both are admitted.

MS. CRISP: Your Honor, at this time I would ask permission to publish the edited video to the jury.

THE COURT: Sure. It's, what, approximately 33 minutes?

MS. CRISP: Yes, sir.

THE COURT: Yeah. Absolutely.

(VIDEO PLAYING)

THE COURT: Kelley, before you begin again,

— MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

**65**

Jeff, it's obvious the audio and the visual portions of the last third of that tape were out of sync. Do you wish to renew any objections to it?

MR. HARRELSON: No, Your Honor. I don't have any objections.

THE COURT: Let me ask this: Is that pretty much as you heard it the first time?

MR. HARRELSON: The copy that I was provided did the same thing. I don't think that it really disrupts the flow.

THE COURT: I didn't either, but I still wanted to give you another chance to object if you wished to.

MR. HARRELSON: Thank you. No objection.

THE COURT: Go ahead, Ms. Crisp.

MS. CRISP: Thank you, Judge.

Q. (BY MS. CRISP:) Okay. Deputy, the interview, the portion of the interview that we and the jury just watched here in the courtroom, it was your job to -- you were the primary investigating officer in this case, were you not?

A. Yes, ma'am.

Q. And did portions of that interview send signals to you as the investigating officer or make you uncomfortable as to their inappropriateness level?

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

**66**

A. Oh, yes, ma'am.

Q. And as the investigating officer, what were some of the things that sent off red flags for you?

MR. HARRELSON: Objection, Your Honor. There's been no foundation laid for his expertise in this area.

THE COURT: Rephrase your question, to the witness, not me, this time.

MS. CRISP: Yes, sir.

Q. (BY MS. CRISP:) Officer, as part of your duty as the investigating officer in this case, is it your job to interview the suspects?

A. Yes, it is.

Q. And as part of the interview process, are you gathering information to make a final determination about the case?

A. Yes, ma'am.

Q. And when you interview suspects, are you looking for certain information that might say, hey, yeah, this is my guy or not?

A. Yes, ma'am.

Q. And did you do that in this case?

A. Yes, ma'am, I did.

MS. CRISP: Your Honor, I would -- he's the investigating officer. I'm sure he made a determination

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

**67**

whether it was probable cause whether or not to submit an affidavit, a warrant for arrest.

MR. HARRELSON: That's not the question. What I understood the question would be was that any physical observations that he made, that he could make some truth determination based on that. I don't think there's been any foundation laid for any expert opinion on that. If we're just going to go into the fact he got a warrant, that's okay.

THE COURT: I'm going to overrule your objection and just re-remind the jury, you know, they can believe all or none or any part of what they wish to believe of any witness.

Q. (BY MS. CRISP:) Officer, I may have worded my question very poorly. When you were interviewing this defendant, are things that he told you, certain statements he told you set off warnings in your head?

A. Yes, ma'am.

Q. And can you give the ladies and gentlemen of the jury an example about what that might have been?

A. Well, just a lot of the behavior that he talked about was --

MR. HARRELSON: Your Honor, objection. Now we're getting into scientific evidence about his observations. I object to that.

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

**68**

MS. CRISP: Judge, can we -

MR. HARRELSON: He's not been qualified as an expert on truth telling.

MS. CRISP: Judge, I'm not offering these for the truth of the matter. This officer's determination whether or not this is his suspect is obviously going to be derived from some statements made in the statement. He's not going to say he thinks he's telling the truth. I mean, the jury watched the interview.

THE COURT: I don't think his objection is the fact that it's hearsay. I think his objection is the fact that this witness may not be qualified to do it. I'll give you a little latitude on that particular question. Jeff, I'm not going to overrule your objection at this time. Let's wait and hear the answer, and then we'll see where it goes from there.

Q. (BY MS. CRISP:) Okay. Officer, after the interview was conducted, was the defendant arrested?

A. Yes, he was.

Q. Okay. Is it your determination -- or how does a person get arrested?

A. We collect a set of facts that would believe the offense was committed.

Q. Okay. And as part of that fact-finding sort of

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

69

mission, did this interview play into that?

A. Yes.

MS. CRISP: Your Honor, I think at this time it would be fair to ask what sort of facts led up to the arrest of this defendant.

THE COURT: I haven't overruled or sustained his objection yet.

Q. (BY MS. CRISP:) Okay. Officer, what statements were made by the defendant that sent off red flags to you as the investigating officer?

A. The statements he made about sleeping with the victim, cuddling, about shaving the arms and legs, just even about talking about having the talk with her, talking about a 14-year-old girl -- or a 13-year-old girl's period, about her masterbating, all that --

Q. Officer, after you had the video statement, did you, in fact, take a written statement from the defendant?

A. Yes, ma'am, we did.

Q. And why is it that we're going to have a written and an oral statement?

A. We were having trouble with our video system, and that's part of it not being in sync. And a couple videos didn't record. So at that time we were making sure we got a written statement along with the video

— MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926—

70

statement.

MS. CRISP: Your Honor, may I approach this witness?

THE COURT: Yes. Mr. Harrelson, I'm going to overrule your objection you made a few minutes ago.

MR. HARRELSON: Thank you, Your Honor.

Q. (BY MS. CRISP:) Officer, I'm going to hand you what's been marked for identification purposes as State's 3, and ask you if you recognize that document?

A. Yes, ma'am, I do.

Q. And can you tell the ladies and gentlemen of the jury what that is?

A. It is a voluntary statement under arrest. It has the warning at the top just like we read earlier.

Q. Okay. Now, at the top of that statement, what date does it have on it?

A. It has 1/7/08.

Q. Officer, was that, in fact, the date it was taken?

A. No, ma'am.

Q. Okay. Was it made on the same date as this oral statement?

A. Yes, ma'am, it was.

Q. Okay. Now, on State's Exhibit 3, do they contain the constitutional rights that we have previously gone

— MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926—

71

over?

A. Yes, ma'am, they do.

Q. And did the defendant indicate to you that he understood each of these rights?

A. Yes, ma'am.

Q. Did he indicate his understanding of those rights by signing that document?

A. Yes, ma'am.

Q. Did you also sign the document?

A. Yes, ma'am, I did.

Q. Did he ever give you any indication that he wanted to invoke any of the rights?

A. No, ma'am.

Q. Okay. When the statement was taken, how was it taken? Did you type it out? Did he type it out?

A. Yes, ma'am. I typed it.

Q. Okay. Can you tell the ladies and gentlemen of the jury how that happened?

A. After the interview, we went back and sat at my desk. He sat at the end of it. I explained about taking the written statement and went over the rights and all that stuff, and he talked; I typed.

Q. Okay. At the end of it, did you explain to him that he could make changes to it if he wanted to?

A. Yes. He was allowed to read over his statement.

— MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926—

72

Q. And did he, in fact, read over it and make any changes?

A. He did read over it, but no changes were made.

MS. CRISP: Your Honor, at this time the State would offer State's 3 into evidence.

MR. HARRELSON: No objection.

THE COURT: State's 3 is admitted.

Q. (BY MS. CRISP:) Officer, I believe we all have the rights down, if you would not mind --

MS. CRISP: Pardon me, Your Honor. Can he publish the statement to the jury?

THE COURT: He may.

Q. (BY MS. CRISP:) Could you read the defendant's statement to the jury, please?

A. Yes, ma'am. On Monday, May 9th, I received a call from Cassandra Garcia telling me that they were at the hospital with Carolyn Sandoval and that she said that we had been having sex and that her hymen was broken. Cassandra asked me if I had sex with Carolyn, and I told her no. Cassandra and I texted back and forth a couple of times, and that was the last I heard about anything until Investigator Aultman called and wanted to speak with me.

I came to Bi-State today and spoke with Investigator Aultman. I told him that I had met Carolyn

— MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926—

## 73

and her family about 10 months ago and had become good friends. Cassandra started asking me to baby-sit for Carolyn and her sister. A month or two in the friendship, the girls started spending night. We sat around watching TV, played on-line games together, and sometimes would fall asleep while watching Anime. I slept with the girls in my bed about 15 times, but nothing sexual ever happened. The door to my room was always open. I would wake up in the morning sometimes cuddled up with them. Both of the girls took showers at my house. I found myself falling in love with Carolyn, but there was no sexual intent with either of them.

On Sunday night, May the 8th, Carolyn was taking a shower at my house, and I could hear her masterbating in the shower. I talked with Carolyn about the masterbating and told her that she didn't need to do it at my house. She fell asleep in my bed, and later I went to bed, too. I was going to kiss her good night on the cheek, but she turned; and I kissed her on the neck. That morning we woke up spooning. Early in the relationship, I showed the girls a Web site about Sex Ed for home schooling because of questions the girls had. I never had any type of sexual relationship with Carolyn or Azura. I haven't had the want or drive for sex in a long time.

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

## 74

Q. Deputy, also as part of your investigation, did you take some photographs of the defendant's house?

A. Yes, ma'am, I did.

Q. Officer, I want to approach you and hand you a series of photographs that have been marked as State's 4 through 13, and ask if you recognize those photographs?

A. I do.

Q. Are you familiar with the objects contained in the photographs marked State's 4 through 13?

A. Yes, ma'am, I am.

Q. And do these photographs fairly and accurately represent the objects and the location as you personally observed them?

A. Yes, ma'am.

MS. CRISP: Your Honor, at this time the State would offer State's 4 through 13 into evidence.

MR. HARRELSON: No objection.

THE COURT: They're admitted.

MS. CRISP: And may I publish these to the jury, Judge?

THE COURT: Yes.

Q. (BY MS. CRISP:) Officer, I think you've testified, or you may not have, that you actually took these photographs?

A. Yes, ma'am.

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

## 75

Q. And do you recall, if you do, at what point in your investigation did you take the photographs?

A. Could you rephrase the question?

Q. Right. The photographs were taken after the interview with --

A. Yes, ma'am. Yes, ma'am.

Q. Okay. Was it sometime after, or do you recall?

A. Yes, ma'am. It was sometime after.

Q. And when you arrived to take the photographs at the defendant's home, who was there?

A. An individual by the last name of Crouch.

Q. And it appeared to you that he was staying there?

A. Yes, ma'am.

Q. All right. I'm going to show you State's 4, and ask if you recognize this photograph?

A. Yes, ma'am, I do.

Q. And what is that?

A. That's the exterior of Mr. Eldred's residence.

Q. And that is in New Boston, Bowie County, Texas?

A. Yes, ma'am.

Q. Okay. This is State's 5, ask if you recognize that?

A. Yes, ma'am. It's the master bedroom.

Q. State's 6?

A. It's a shot from the living area into the

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

## 76

kitchen.

Q. State's 7?

A. That's a shot of the living room itself.

Q. Okay. Deputy, I'm going to show you State's 8, and ask you if you can explain generally what appears in that photograph?

A. It's like an office area where it looks like a computer was at one time.

Q. Okay. In that photograph we see sort of keyboards, and I'm low tech, but looks like other accessories that would go with a computer?

A. Yes, ma'am.

Q. Officer, when you arrived there that day, did you see a computer?

A. No, ma'am, I did not.

Q. So you were unable to see the computer on that date?

A. Correct.

Q. This is State's 9. Can you tell the ladies and gentlemen what we're looking at in that photograph?

A. I believe that's one of the other bedrooms of the house.

Q. Okay. When you arrived there at the house, were there any small children running around?

A. No, ma'am.

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

77

Q. State's 10?

A. That's one of the areas of the living area.

Q. State's 11?

A. That is the shower head nozzle in the, I guess, master bath, I guess, what you'd call it.

Q. Okay. Officer, what are we looking at in State's 12?

A. That is another shot of the master bedroom.

Q. And what is that hanging on the wall?

A. That's the Christian flag.

Q. And that's in the master bedroom?

A. Yes, ma'am.

Q. Officer, finally, this is State's 13, can you tell us what we're looking at there?

A. That's in the bathroom. It's a shot of the shower. It's a small area. So it was not very easy to photograph.

Q. Okay. Deputy, in this case, was there an intent to obtain DNA evidence?

A. Yes, ma'am, there was.

Q. And what was the outcome of that testing?

A. There was no DNA found.

Q. And did you find that unusual for this type of case?

A. No, ma'am.

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

---

78

Q. Likewise, was there an attempt to obtain medical evidence of any kind?

A. Yes, ma'am.

Q. And what was the outcome of that?

A. There was -- evidence was gathered that was sent off to the lab for processing, but nothing was located.

Q. And is that unusual?

A. No, ma'am. It's not unusual at all.

Q. Okay. Witnesses, did you uncover that there were any witnesses that observed any of these acts of sexual abuse?

A. No, ma'am.

Q. And is that unusual?

A. No, ma'am.

Q. Officer, would it be fair to say that in these cases there's generally no DNA medical or witnesses?

A. Generally, no, there's not.

Q. Okay. After sort of your investigation was complete, was this defendant subsequently arrested?

A. Yes, ma'am.

Q. And on what charge was he arrested?

A. Continuous sexual abuse of a young child.

MS. CRISP: Pass the witness, Judge.

THE COURT: Mr. Harrelson?

MR. HARRELSON: Thank you, Your Honor.

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

---

79

CROSS-EXAMINATION

BY MR. HARRELSON:

Q. Detective Aultman, I'm Jeff Harrelson. We know each other.

A. Yes, sir.

Q. I represent Mr. Eldred. If I understand correctly, on May the 23rd of 2011, that you called Mr. Eldred and asked him to come to the Bi-State?

A. I believe I called him the day before, and we'd set up a time to meet on the 23rd, yes, sir.

Q. Okay. And did he show up at the appointed time?

A. Yes, sir.

Q. You didn't have to go out and gather him up?

A. No, sir.

Q. And he signed the forms to voluntarily speak to you?

A. Yes, sir.

Q. He gave you the interview that we just watched?

A. Yes, sir.

Q. He voluntarily gave you a written statement, as well?

A. Yes, sir.

Q. He signed off on that one?

A. Yes, sir.

Q. And in both of the interview and in the written

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

---

80

statement, he denied any intentional sexual contact with Carolyn Sandoval, correct?

A. Correct.

Q. And the facts that you stated earlier, the cuddling, shaving, sleeping in the same bed, those things that led you to get a warrant, none of those are criminal acts, are they?

A. Well, that's not what led me to get a warrant.

Q. Okay. If I understood your direction examination correctly, she asked you some things that led you to get a warrant, and I understand that's what you told all of us was that these various things led you to believe that a crime had been committed. But none of those things that you mentioned are criminal acts, are they?

A. No.

Q. Mr. Eldred never admitted any crime to you, did he?

A. No.

Q. At one point he volunteered to show you a card to prove that he was a minister?

A. Yes, sir.

Q. Did you ever see the card?

A. No, sir.

Q. Did you ever ask to see the card?

A. No, sir.

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

**81**

Q. The photographs that we just reviewed?

A. Yes, sir.

Q. Do you remember which date it was that those photos were taken?

A. See, would have been September 7th.

Q. Okay. September 7th --

A. I'm sorry. September 12th, 2011.

Q. One year ago today; is that fair?

A. Yes.

Q. Okay. So some months after May 23rd of '11 when you made the arrest?

A. Yes.

Q. Is it your understanding that Mr. Eldred did not live in that home after May 23rd, 2011?

A. Yes.

Q. So there was some months that he did not live there?

A. Yes.

Q. Do you know who was living there?

A. Yes.

Q. Who is that?

A. The Crouches.

Q. So the photos that were taken were while the Crouches were living there?

A. Yes.

— MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926 —

**82**

Q. And as far as this computer, did you go there looking to get a computer?

A. No, sir.

Q. Did you have a warrant to seize a computer?

A. No, sir. I had a consent to search that was signed by Mr. Eldred.

Q. Okay. So he voluntarily let you go look around in his house?

A. Yes, sir.

Q. Or what was his house back in May?

A. Yes, sir.

MR. HARRELSON: Your Honor, that's all I have for the witness. Pass.

THE COURT: Ms. Crisp, anything else?

MS. CRISP: Yes, sir.

REDIRECT EXAMINATION

BY MS. CRISP:

Q. Officer, after a defendant is arrested, is it unusual for you to continue to do things to assist in the investigation?

A. No, ma'am.

Q. Okay. When Mr. Harrelson was talking to you about the facts you considered, would it be fair to say that you considered several things?

A. Yes, ma'am.

— MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926 —

**83**

Q. In determining whether or not you were going to arrest the defendant?

A. Yes, ma'am.

Q. And can you tell us what you considered?

A. Primarily the victim's statement, and actually a warrant was already -- an arrest warrant was already obtained. I had an arrest warrant when he came for his interview, you know, during the -- he was not under arrest. I had not served the warrant or advised him that there was one, and so, I mean, depending upon the interview, I had the option of arresting him right afterwards or letting him go, whichever.

Q. And you made the decision to arrest him?

A. Yes, ma'am.

MS. CRISP: I'd pass the witness, Judge.

THE COURT: Jeff?

RECROSS EXAMINATION

BY MR. HARRELSON:

Q. You can instruct us on police activity here, but if you had a warrant before he showed up, a warrant is an order from a judge that says, arrest this person, correct?

A. Yes, sir.

Q. Okay. So do you really have the option of not arresting someone if a judge has signed off saying,

— MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926 —

**84**

arrest this person?

A. Well, I didn't necessarily have to arrest him at that moment. It could have been later or something else.

MR. HARRELSON: Fair enough. Thank you.

MS. CRISP: That's all we have, Judge.

THE COURT: All right. Can this witness be excused?

MS. CRISP: Judge, we may end up needing this witness later in the trial.

THE COURT: You've been released from the witness stand, but stay in the courthouse.

THE WITNESS: Yes, sir.

THE COURT: All right. Kelley, we've been at it almost two hours. Let's give everybody a short break. Ladies and gentlemen, let's take between a 15- and 20-minute break. If y'all would, don't begin deliberating, don't discuss the case among yourselves. I don't think you get a chance to talk to anybody else, but just don't begin any deliberations just yet. All right. If you would, Twister, take y'all back to the jury room.

THE BAILIFF: All rise for the jury, please.

(JURY RECESSED AT 10:23 A.M.)

(OPEN COURT, DEFENDANT PRESENT, NO JURY PRESENT)

— MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926 —

THE COURT: All right. The jury is out of the courtroom. Jeff, James, Kelley, anything out of the presence of the jury right now?

MR. ELLIOTT: Well, there's one little bit of housekeeping. Our next witness will be Kim Basinger, the SANE nurse, and we're going to offer the medical records consisting of 17 pages from CHRISTUS St. Michael's. These have been filed well ahead of time as the statutes require with a business record affidavit. We're going to offer these. Jeff, if you want to look at this and compare it to the one in the file, I think you'll find it's the same thing, but if you just want to be sure about it, that's fine.

MR. HARRELSON: That's fine.

THE COURT: Is that something you've seen through discovery, Jeff?

MR. HARRELSON: It is.

THE COURT: Any objections to it?

MR. HARRELSON: No.

THE COURT: Okay. Whenever James gets it marked or Kelley gets it marked, I'll admit it at that time.

MR. ELLIOTT: When we come back from break, Judge.

THE COURT: Sure. I think it will be 14.

All right, 15, 20 minutes.

(RECESS FROM 10:24 A.M. TO 10:46 A.M.)

(OPEN COURT, DEFENDANT PRESENT, NO JURY PRESENT)

THE COURT: The jury is not in the courtroom. Coming back from a break, Ms. Crisp, anything off the record, I mean --

MS. CRISP: Judge, if we haven't, I'd like to invoke the Rule. I don't think there's any witnesses in the courtroom. We certainly don't have any, but I've seen some people milling in and out. I just want --

THE COURT: Jeff?

MR. HARRELSON: No, sir. The only potential witness that I voir dired the jury on is Chris Eldred, and he's not in the courtroom. I think he's here in the courthouse, but I know he's not in the courtroom. He doesn't need to come in.

THE COURT: He's going to be one of your witnesses?

MR. HARRELSON: Possibly, but he'll stay outside the courtroom unless we need him. So we understand how the Rule works. I've explained that to him.

THE COURT: She's invoked the Rule.

MR. HARRELSON: I'll monitor the witnesses.

THE COURT: I will leave it up to you to

keep your witnesses out of the courtroom that you're planning on calling.

MR. HARRELSON: Thank you.

THE COURT: All right. Anything else before we bring the jury back?

MS. CRISP: No, Judge.

THE COURT: Twister, if you would, go ahead and get the jury for us.

THE BAILIFF: All rise for the jury, please.

(OPEN COURT, DEFENDANT AND JURY PRESENT)

THE COURT: All right. If everyone would please be seated. And, Mr. Elliott, I think the next witness, sir?

MR. ELLIOTT: Kim Basinger.

THE COURT: If you would, raise your right hand. Do you solemnly swear the testimony you're about to give to be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: Yes.

THE COURT: Have a seat. Mr. Elliott?

MR. ELLIOTT: Yes, Your Honor. At this time we would seek to move as State's 14 that which has been previously marked for identification as State's 14 and ask the record reflect it's been also tendered to counsel for his inspection?

THE COURT: Jeff, again, no objection?

MR. HARRELSON: No objection.

THE COURT: All right. State's 14 is admitted.

MR. ELLIOTT: May I approach the witness, Your Honor?

THE COURT: Yes.

MR. ELLIOTT: May we proceed, Your Honor?

THE COURT: Yes, sir.

KIM BASINGER

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. ELLIOTT:

Q. State your name, please, ma'am.

A. Kim Basinger.

Q. I said Basinger. I guess I was expecting a movie star. I'm sorry. Didn't mean to disappoint the jury here. Ma'am, what is your occupation and profession, please?

A. I am a registered nurse and a police officer.

Q. And within the category of being a registered nurse, do you have a specialty, or have you received any specialized training in any particular field?

A. Yes. I am a sexual assault nurse examiner.

Q. And is that what we commonly see referred to as a

89

SANE, S-A-N-E, examiner?

A. Yes, it is.

Q. And what are your qualifications for the position that you hold with reference to your being a SANE examiner?

A. In order to take the training in Texas, you have to at least have two years experience as a registered nurse. The training that I took was a 64-hour training. It involved 64 hours in the classroom learning from another SANE nurse about the dynamics of sexual assault and sexual abuse, how to do the exams. Once that classroom training was over, I had eight months to complete clinicals. Those clinicals meant that I spent 20 hours with a pediatrician in a pediatrician's office looking at growth and development of children, looking at their genitalia and the changes that it goes through as they mature, 24 hours with an obstetrician or gynecologist looking at well adult women's genitalia and the changes it goes through. Once I completed that, I did six sexual assault exams on adults with another SANE nurse, and I did 10 sexual assault exams on children with another SANE nurse. And then I did 16 hours of felony courtroom observation before I could get my certification.

Q. And do you have that certification?

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

90

A. Yes, I do.

Q. And did you go even further with your training, ma'am?

A. Yes, I did.

Q. And would you tell the ladies and gentlemen of the jury what that was, please?

A. I got certified through the attorney general's office here in Texas as a certified adult adolescent sexual assault nurse examiner and a certified pediatric sexual assault nurse examiner. I also got certified internationally through the International Association of Forensic Nurses in both those same categories. I am a certified forensic nurse, a certified forensic consultant through the American College of Forensic Examiners, and I've got my diplomate status through the American College of Forensic Examiners as a diplomate in forensic nursing and as a law enforcement expert. And just recently I got my fellowship through the American College of Forensic Examiners.

MR. ELLIOTT: At this time, Your Honor, we would offer her as an expert in her field.

THE COURT: Jeff, any objections?

MR. HARRELSON: I believe if I could have just one moment. No objection.

THE COURT: The Court will recognize her as

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

91

an expert.

Q. (BY MR. ELLIOTT:) Ma'am, if you would, please refer to State's 14, and I ask you, are you familiar with that document?

A. Yes, I am.

Q. And have you had a chance to examine that prior to coming to trial?

A. Yes, I have.

Q. And would you tell the ladies and gentlemen of the jury exactly what that document is?

A. The first page of the document is an affidavit.

Q. Now, if you could just generally tell us what the exhibit consists of as reflected by that first page?

A. Okay. It is the medical record of Carolyn Sandoval when she was in the emergency department at St. Michael's Health System here in Texarkana.

MR. ELLIOTT: And, Your Honor, at this point we would offer the witness's testimony as an expert in assisting the jury to understand the exhibit?

THE COURT: Yes.

Q. (BY MR. ELLIOTT:) Now, let me ask you this: As reflected by that document or exhibit, what complaint brings the child to the emergency room?

A. Abdominal pain.

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

92

Q. And was there a pain assessment done with regard to that?

A. Yes.

Q. Let me ask you this: Was there also an examination of the hymen?

A. Yes, there was.

Q. And was the hymen intact or not intact?

A. It was not intact.

Q. And with regard to any physical injuries, does the document reflect that the child suffered any kind of bruising or cutting or anything of that nature?

A. It does not, to my knowledge. There was one thing that the doctor wrote that I couldn't read, but it did not look as though there was.

Q. Now, if the child presents as complaining of abdominal pain, and during the course of the examination, the child relates a history of sexual abuse, do you find the absence of physical injury to be disturbing?

A. No, I do not.

Q. And why is that?

A. Because based on research in the field that has been peer reviewed, they only find injury in approximately five percent of all cases.

Q. And are you familiar with the term "grooming"?

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

A. Yes.

Q. And if I were to say grooming is making a child believe that an abnormal situation is normal, would you agree or disagree with that?

A. I would agree with that.

Q. Would a shorthand term for grooming be seduction?

A. It could be.

Q. Now, if a child is groomed and seduced, would you expect to find physical evidence of injury?

A. No.

Q. And children, of course, cannot consent, can they?

A. That is correct.

Q. But if someone is groomed and seduced, would they be compliant?

A. They could be, yes.

Q. And when I say, "compliant," what do you understand that term to mean?

A. To not fight, to maybe not even say no, just --

Q. Now, with regard to the statements made in State's 14, there are statements made for the purposes of medical treatment or diagnosis.

MR. ELLIOTT: And, Your Honor, even though we've got this admitted as a business record exhibit, we would also offer that under 803(4) which is a statement

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

made for medical purposes or diagnosis, the history that the child relays.

THE COURT: If you're requesting it be admitted under both, it is.

MR. ELLIOTT: If there's no objection, that's fine. If there is an objection to it, we offer it under that anticipating that objection.

MR. HARRELSON: No objection.

Q. (BY MR. ELLIOTT:) Ma'am, if you would, I believe on the last six pages of that exhibit we have some history as related by the child, and are you familiar with that?

A. Yes. I have read that history.

Q. Would you begin with Page 4, please, ma'am?

A. Okay. Bear with me. It's kind of hard to read.

Q. I understand.

A. About the middle of the page, on 5/9/11 at 9:45 a.m., Amanda Kelly documents, took patient to room 18 after triage. While helping patient into bed, mother states, and this is in quotes, there's something else going on if you can tell them. I need her checked to see if she's still a virgin. I found out that a family friend has been doing things to her, and I need to make sure. What will happen? Will the police be called. As the patient heard the word police, she became very upset

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

and shaking all over stating, and in quotes, you're trying to ruin my life. He loves me. He treats me good, like I matter, because I'm a Tom-boy and everyone at school hates me, but he loves me even though I don't like to take baths. I will go into a big depression and sadness and commit suicide if you do this.

Q. And is that the complete patient history on that page?

A. No. There's a little more. Down at the bottom, at 10:15, she told a nurse by the name of Matthew Hull, patient crying when arrived to the room. Tech Amanda was assessing the patient. Mother advised that she had just found out that a family friend, 50-year-old, had been touching her daughter inappropriately. Mother also states that I called him, and he denied this. Mother also requested that her daughter be checked for sexual activity.

Q. And if I can get you to refer to Page 5 of that exhibit, and, again, would you relay the patient history to the jury, please?

A. I asked the mother if myself and Amanda could speak with her daughter alone, and she agreed. When Amanda and myself interviewed the patient alone, she admitted to regular intercourse with the man. When asked how often, she states every time I stay at his

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

house. I ask her how she got to his house, and she states that her mom and soon to be stepdad took her by and dropped her off. The patient states to me that if I call the police she would kill herself. I advised her that it's my job to notify the doctor or someone superior to me of the claims.

Q. And Page 6, ma'am?

A. There is more at the bottom of five.

Q. I'm sorry. Please go ahead and include that?

A. At two o'clock in the afternoon, Carla Powell, RN, documents the SANE exam was finished. Patient states that she and Zack have been having sex for several months. When it first happened, he just rubbed me, and I had a strong orgasm. I told him I needed to tell my mother. Then we talked about it, and I knew he could go to jail. She states that he asked her to give him a few days to get his affairs in order, giving land to Chris, who she states is his son, and she said he has a daughter. Then he planned on killing himself when she told, before the police arrested him. She told me after she thought about it, she felt guilty and didn't tell. She said that after that time he used his fingers inside her and told her it would be sore for a few days. He had a wife so he knew about things like that. After the soreness went away, they had sex. He always used a

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

97

condom and would check to see if there were holes in it. And if it had a hole in it, he would throw it away and get another one. He didn't want me to get pregnant. If I didn't want to have sex, we wouldn't, only if I wanted to. When asked when the last time she had sex with Zack, she said around one a.m. today. It also states that patient had not taken a bath. She doesn't like to bathe, per her mom. Her hair was, and I'm going to Page 6.

Q. Yes, ma'am.

A. Oily, and her clothes were dirty. Patient doesn't shave legs or underarms but had trimmed her pubic hair. Patient did have a noted odor, and she stated, in quotations, age doesn't matter. Zack loves me and listens to me. Carla, RN, goes on to state that when she collected the saliva swabs, she asked the patient if Zack put his penis in her mouth, and she stated yes. When Carla collected the anal swabs, she asked if Zack had put his penis in her bottom, and she stated no, and that's gross, do people do that, that's nasty.

MR. ELLIOTT: We'd pass the witness, Your Honor.

MR. HARRELSON: Your Honor, if we could approach the bench.

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

98

THE COURT: Yes.

(AT THE BENCH, ON THE RECORD)

MR. HARRELSON: Based on this witness's testimony and reading the medical records that I had previously submitted in the outcry hearing, I would make a motion for a mistrial, stating that Missy Davison never should have been allowed to testify as the outcry witness as she did, because obviously this is the same information that was related through Missy Davison.

THE COURT: Sure. And for the reasons I said this morning before the jury got back in here, it's overruled.

MR. HARRELSON: Second, then I would ask the Court to strike Missy Davison's testimony as merely cumulative to this with a cautionary instruction to the jury not to listen to anything Missy Davison has told the Court.

THE COURT: And, again, I don't think that her testimony -- that this witness's testimony come up to be as discernable, as the appellate courts have indicated, and I overrule that objection also.

MR. HARRELSON: Lastly, I think that the testimony by this witness that the alleged victim's hymen was not intact opens the door to prior sexual contact under the State's Motion in Limine. The jury is

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

99

going to be left with the thought that Zack Eldred was the one that caused her hymen not to be intact, whereas she's at least had two prior molestations by two different men.

MR. ELLIOTT: Okay. I think we agree on that point, but here's where the trap is. If you open that door, you are saying that there is an alternate perpetrator which triggers the admission of extraneous offenses against your client.

MR. HARRELSON: That's not the purpose for my questioning. It's not --

MR. ELLIOTT: That's the result of your questioning, though.

MR. HARRELSON: I disagree, Your Honor. I feel like -- I'm merely wanting to show that there could be other reasons for the hymen not being intact. I'm not questioning even the victim's veracity about -- I don't know what his prior sexual accusations have anything to do with her prior sexual --

MS. CRISP: If I may?

THE COURT: Sure.

MS. CRISP: I feel like, Jeff, we can get there by asking this woman, there's no way to tell whether or not Zack Eldred was the one -- or there's no way to tell whether or not whatever with Zack Eldred was

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

100

the cause of her hymen not being intact. We've all heard that she could ride a bicycle. She could fall off a horse --

MR. HARRELSON: Okay. But the jury hadn't heard that.

MS. CRISP: Right. But you know what I'm saying, without us getting into this --

MR. HARRELSON: All right. Then I'll just do it on cross.

THE COURT: So you're withdrawing it now?

MR. HARRELSON: Yes, sir.

THE COURT: Your last one?

MR. HARRELSON: Yes, sir.

THE COURT: All right.

(OPEN COURT, DEFENDANT AND JURY PRESENT)

CROSS-EXAMINATION

BY MR. HARRELSON:

Q. Ms. Basinger, my name is Jeff Harrelson. I represent Mr. Eldred. If I understand correctly, you, yourself, have not examined Carolyn Sandoval?

A. That's correct.

Q. Have you spoken with Carolyn Sandoval?

A. No, I have not.

Q. You've reviewed records, and you're relating to us what the records told you?

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

101

A. That is correct.

Q. As part of your training, you have learned about female anatomy and what other causes there could be for a hymen not to be intact, correct?

A. That is correct.

Q. And could you relate some of those causes to the jury?

A. Anything that might penetrate the female sexual organ could cause injury to the hymen and as well as other structures.

Q. Okay. And that could include non-sexual activity, such as sporting activities or the like, correct?

A. It's possible.

MR. HARRELSON: Thank you, ma'am. Pass the witness.

THE COURT: James, anything else? Can this witness be excused?

MR. ELLIOTT: Yes, Your Honor.

THE COURT: Ma'am, you've been excused. Thank you. Y'all's next witness?

MS. CRISP: Your Honor, the State would call Carolyn Sandoval.

THE COURT: I swore you in this morning, but let me swear you in again, okay? Raise your right hand

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

102

one more time. Do you solemnly swear the testimony you're about to give to be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: Yes, sir.

THE COURT: Have a seat right there, and Ms. Crisp is going to ask you some questions.

CAROLYN SANDOVAL

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. CRISP:

Q. Hi, Carolyn. If you wouldn't mind to scoot up and talk into the microphone so the ladies and gentlemen of the jury can hear you, okay? Is that okay?

A. Yes, ma'am.

Q. Okay. And this lady right here is taking down every word I say and every word you say, and so I see you shaking your head up and down. But if you'll say -- if you want to say yes, if you'll go ahead and say yes so she can type it, or if you want to say no, go ahead and say no so she can type it down. Is that okay?

A. Yes, ma'am.

Q. Okay. Carolyn, can you tell the ladies and gentlemen of the jury your full name?

A. Carolyn Ann Sandoval.

Q. Carolyn, we've discussed that you have a legal

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

103

pseudonym, Holly Keilburg, but today we're going to use your name Carolyn. Is that okay with you?

A. Yes, ma'am.

Q. Okay. Before we get started with some questions, I want to ask you to talk a little bit about what is the truth and what is a lie. Is that okay with you?

A. Yes, ma'am.

Q. Okay. Carolyn, if I told you that there's a judge in the courtroom wearing a black robe, is that the truth, or is that a lie?

A. Truth.

Q. Okay. If I told you that it was raining right now in this courtroom, is that the truth or a lie?

A. That's a lie.

Q. Okay. Do you agree to tell me, and Mr. Harrelson when he asks you questions today, do you agree to tell the truth?

A. Yes, ma'am.

Q. You think you can do it?

A. Yes, ma'am.

Q. Okay. Carolyn, do you go to school right now?

A. Yes, ma'am.

Q. And how do you like to -- what do you like to do in your spare time, let's talk about that?

A. Watch TV and play on the computer.

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

104

Q. Carolyn, do you know a guy by the name of Zack Eldred?

A. Yes, ma'am.

Q. And I'm indicating the defendant in this cause, Zack Eldred, Jr., and I'm asking you is this the same person you know to be Zack Eldred?

A. Yes, ma'am.

MS. CRISP: Your Honor, may the record reflect that the witness has identified the defendant?

THE COURT: The record will so reflect.

Q. (BY MS. CRISP:) Carolyn, how do you know Zack Eldred?

A. I met him from my stepdad. He was supposed to be a friend of his.

Q. Carolyn, at some point did Mr. Eldred become more than just your friend?

A. Yes, ma'am.

Q. Can you tell the ladies and gentlemen of the jury if that happened about July the 1st, 2010, about that time did it start?

A. Yes, ma'am.

Q. And were you 13 years old at that time?

A. Yes, ma'am.

Q. Did you subsequently turn 14 -- sorry. Carolyn, did you later on turn 14 on about December the 8th,

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

105

2010?

A. Yes, ma'am.

Q. Okay. Carolyn, what kind of relationship did you have with Zack?

A. A sexual.

Q. Was he your boyfriend?

A. Yes, ma'am.

Q. Okay. I'm going to ask you, Carolyn, a series of questions that may be unpleasant for you. If you would like at any time to take a break, or you need a glass of water or anything, you will just tell me or the Judge, and we will do that for you. So you just let me know, okay? Okay?

A. Yes, ma'am.

Q. During the time that you were having a sexual relationship with Zack Eldred, and he was your boyfriend, did he live in New Boston?

A. Yes, ma'am.

Q. And do you know, if you do, do you know if New Boston is in Bowie County?

A. Yes, ma'am.

Q. Okay. Where did you live at the time that he was your boyfriend?

A. DeKalb, ma'am.

Q. And is DeKalb in Bowie County, Texas?

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

106

A. Yes, ma'am.

Q. Okay. Can you tell the ladies and gentlemen of the jury what happened when you first started having a sexual affair with Zack Eldred?

A. Could you repeat that?

Q. Okay. When did you start -- what's the first thing you can remember about having a sexual affair with Zack Eldred?

A. Well, it was one night over at my house. We were in my room. He was on the floor. I was lying on the bed. And he was talking to me, and he told me how from the Bible, that how Jesus take and -- well, God created a well with our souls in it, and our souls have two people connected together, a male and a female soul. And then he takes their souls out of the well, and he places them on Earth, and how he said we were supposed to be soul mates and how -- and that.

Q. Carolyn, after he told you that y'all were soul mates, what happened between y'all?

A. We were talking, and he -- I just started falling in love with him because it's like he was the first person in my life that ever understood me fully, that ever gave me true comfort in my life, you know, because I've had some bad experiences with, you know, bullying and stuff like that at school. And he talked to me

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

107

about how everything was going to be okay and how he was always going to be there for me, and he was never going to leave my side.

Q. Carolyn, whenever y'all were in your bedroom, did y'all have any kind of sexual contact at that time?

A. Yes, ma'am. We were talking and talking, and we were talking some more. And then he asked me the question of have I ever been eaten before.

Q. Okay. Did he explain to you what that meant?

A. Yes, ma'am.

Q. What did he say, Carolyn?

A. He said it's when you take your mouth, and you put it on your vagina.

Q. Carolyn, did he take his mouth and put it on your vagina?

A. Yes, ma'am.

Q. Okay. Around that same time or on that same time, did he touch you between the legs with his fingers?

A. Yes, ma'am.

Q. Can you tell the ladies and gentlemen of the jury what happened when he touched you between the legs?

A. He started rubbing me, and then he started pulling down my pants. And then that's when he put his mouth on my vagina, and I was a little bit nervous at

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

108

first, you know, because it's the first time I had done anything like that. And I was shaking, and my arms were up. And it's like I was -- and he just told me that it was perfectly natural. It was natural for that to happen.

Q. When he told you that it was natural for that to happen, you said your arms were up, can you show the jury where you had your arms? And did you say you were shaking?

A. (Witness nods).

Q. Were you crying?

A. No, ma'am.

Q. Okay. After that, what else happened? I mean, what can you remember happened after that?

A. After that, we started hanging out together over a long period of time, and then it just got to where we were having a sexual relationship with each other.

Q. Okay. Whenever he told you that y'all were soul mates, did he also tell you that he loved you?

A. Yes, ma'am.

Q. And did he tell you something to the effect of that he loved you like he's never loved anybody else?

A. Yes, ma'am.

Q. Carolyn, did you believe that?

A. Yes, ma'am. I truly did.

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

109

Q. Carolyn, at some point after your relationship started with Mr. Eldred, did you believe that you needed to tell somebody?

A. Yes, ma'am.

Q. And can you tell the ladies and gentlemen of the jury why you thought you might need to tell somebody?

A. Because in the back of my mind I felt like what we were doing was wrong.

Q. Okay. You felt like what you were doing was wrong. Did you go to the defendant and tell him -- pardon me, Carolyn. Did you go to Zack and say, I think I need to tell somebody?

A. Yes, ma'am.

Q. And what happened?

A. He said to at least let him get things lined around and in order and if -- just to wait a little while, and he said if I had to tell tonight, that he was going to commit suicide.

Q. Carolyn, when he told you that he was going to commit suicide, how did that make you feel?

A. It make me have like -- it made me feel like it was going to be all my fault and that his blood was going to be on my hands.

Q. Carolyn, over a period of time, was the defendant able to -- pardon me. I'm so sorry. Zack, was he able

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

110

to convince you that what you were doing was okay?

A. Yes, ma'am.

Q. And how was he able to do that? What did he tell you?

A. Nothing specifically. He was just using references from the Bible, and he told me he was a preacher and that he said God said it was okay. And it doesn't matter what age you are, and it's just human laws that wouldn't allow us to be together.

Q. Carolyn, did he convince you within your own mind that it was okay with God if you two had a sexual affair?

A. Yes, ma'am.

Q. Okay. Carolyn, during the time that you-all had a sexual affair, is part of what happened that the defendant put his hands inside your vagina?

A. Yes, ma'am.

Q. Carolyn, when I say the word, "vagina," do you understand that to mean your private part?

A. Yes, ma'am.

Q. Okay. Did he touch your private part with his hand?

A. Yes, ma'am.

Q. And did his fingers actually go inside your private part?

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

111

A. Yes, ma'am.

Q. Carolyn, when y'all were having your relationship, did his private part, and when I say, "penis" do you know what that means?

A. Yes, ma'am.

Q. Did his penis go inside your private part?

A. Yes, ma'am.

Q. Okay. Throughout these interactions, Carolyn, did the defendant have you put his private part inside your mouth?

A. Yes, ma'am.

Q. Carolyn, did he put his mouth on your private part?

A. Yes, ma'am.

Q. And I know this is an uncomfortable question for you, but did the defendant's tongue go in and around your private part?

A. Yes, ma'am.

Q. Okay. While y'all were having the sexual relationship, did the defendant use condoms?

A. Yes, ma'am.

Q. And can you tell the ladies and gentlemen of the jury whether that was sometimes or part of the time or all the time?

A. All the time.

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

112

Q. And, Carolyn, why was it that the defendant said he needed to use condoms?

A. So that way I wouldn't get pregnant so that we wouldn't get caught.

Q. Carolyn, whenever y'all were at his house, would you sleep with him in his bed?

A. Yes, ma'am.

Q. And was that on more occasions than you can count?

A. Yes, ma'am.

Q. While y'all were at his house and sleeping in his bed, did you watch pornographic videos?

A. Once or twice, yes.

Q. Okay. When you watched the pornographic videos, would you see people having sex on the videos?

A. Yes, ma'am.

Q. And at least once or maybe more, did you-all recreate or try to re-enact what was on the video?

A. Yes, ma'am.

Q. Carolyn, can you tell the ladies and gentlemen of the jury like if y'all were looking for videos, what y'all would search for or what y'all would look for to watch the videos?

A. Yes, ma'am.

Q. Can you tell them?

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

113

A. We went to like this Web site where it was like -- I can't remember exactly, but I think it was like virgin teenagers dot com, something like that. And it --

Q. Go ahead. I'm sorry.

A. And we saw a video of a European female girl. She was a teenager. Her parents weren't home. She invited some guy over, and it showed them step by step how to have intercourse. And we watched that.

Q. Now, on the video you watched, the girl was supposed to be a virgin?

A. Yes, ma'am.

Q. And on the video, did it show the person having sex with the virgin trying to talk to the virgin, what did they look like on the video?

A. We couldn't understand it because it was like they were speaking European, but it did have subtitles. And what went on was that he was talking to her and explaining to her step by step how to do this and how to do that.

Q. How did the girl look in the video? Did she look like she was young?

A. She looked really young, and she looked like she was really nervous at first.

Q. Carolyn, whenever y'all would have these sexual

— MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926 —

114

affairs, did you have -- try more -- have sex in multiple ways?

A. Yes, ma'am.

Q. And how many ways, if you could count, did you-all have sexual relations?

A. I have no idea.

Q. Is it more than you could count for this jury?

A. Yes, ma'am.

Q. Carolyn, at some point the forensic -- pardon me, Missy testified that you said you did 69, do you remember saying that?

A. Yes, ma'am.

Q. And did you and the defendant have sexual contact in that position?

A. Yes, ma'am.

Q. Can you tell the ladies and gentlemen of the jury what contact specifically that you and the defendant had like that?

A. The 69 we did was like I'm on top, he's on bottom, and we eat each other out.

Q. Okay. During that point, his mouth was on your vagina?

A. Yes, ma'am.

Q. And was your mouth on his penis?

A. Yes, ma'am.

— MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926 —

115

Q. Okay. You told the jury earlier that you thought it started around July 2010. After July of 2010, Carolyn, how often would you say that you and the defendant had some sort of sexual contact?

A. Five to six times a month. I'm not absolutely sure.

Q. Would you say -- would it be fair to say that from July 1st, 2010 to December 7th, 2010, that's the range we know when you were 13, that you had sexual contact between five and six times a month?

A. Yes, ma'am.

Q. Carolyn, when we talk about all the different ways y'all had contact in that time period, that included him putting his mouth on your vagina?

A. Yes, ma'am.

Q. Did that include him putting his hands on your vagina?

A. Yes, ma'am.

Q. Did that include him putting his hands inside your vagina?

A. Yes, ma'am.

Q. Did that include you putting your mouth on his penis?

A. Yes, ma'am.

Q. Carolyn, whenever y'all were having the sexual

— MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926 —

116

relationship, were you primarily doing it because he told you he'd never leave you?

A. Yes, ma'am.

Q. What did it mean to you to have him as your boyfriend?

A. It meant a lot.

Q. And can you tell the jury why that he -- did he tell you things like he loved you, and he was never going to leave you?

A. Yes, ma'am.

Q. And you believed him?

A. Yes, ma'am.

Q. Carolyn, you have talked a little bit to the jury about you were afraid of being caught. It went on for some time. Did anybody ever walk in on y'all?

A. No, ma'am.

Q. How is it that y'all were able to keep it a secret?

A. We stayed really quiet, and we shut and locked the door.

Q. Okay. When you had the door shut and locked, were there sometimes other people around, not in the bedroom, but outside the bedroom?

A. Yes, ma'am.

Q. At one point did you-all wait for Chris to go --

— MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926 —

117

Chris, can you tell the jury who Chris is?

A. Zack's son.

Q. Okay. Did you wait for him to go to the prom and have sexual relations?

A. Yes, ma'am.

Q. And can you tell them what happened?

A. He went to the prom. We shut and locked the door, and we just did whatever we wanted.

Q. And did that go on for some time?

A. Yes, ma'am.

Q. Okay. Carolyn, talk a little bit more about you and the defendant's relationship. Did you guys talk about having a future together?

A. Yes, ma'am.

Q. And what did y'all talk about?

A. The basic things, how many children we were going to have, what kind of job careers we were going to have, how are we going to pay our bills, how are we going to raise our kids, you know....

Q. Did you and Zack decide how many kids y'all wanted to have?

A. Six.

Q. When he was talking about y'all having kids and y'all getting together and getting married, did he tell you that he wasn't going to date other girls?

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

118

A. Yes, ma'am.

Q. And did you tell him that you were not going to date other boys?

A. Yes, ma'am.

Q. And what did y'all talk about, Carolyn? What did he say about it?

A. He said that -- and he promised me that he wouldn't date other girls because I'm the only one for him.

Q. Carolyn, at some point do you recall saying that Zack was the best thing that ever happened to you?

A. Yes, ma'am.

MS. CRISP: Pass the witness, Judge.

THE COURT: Jeff?

MR. HARRELSON: May we approach?

THE COURT: Sure.

(AT THE BENCH, ON THE RECORD)

MR. HARRELSON: Your Honor, based on the witness's statement, this is what I wrote down, that this was the first time I had done anything like that, I would submit that the time when she was victimized by her father and her stepfather are now ripe for cross-examination. I would ask that I be able to cross-examine her based on that. I don't think that opens any doors to Zack Eldred's extraneous offenses

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

119

just based on the witness's testimony.

MS. CRISP: Well, I mean, Judge, obviously we're going to have to take the jury out. This child, when she was victimized, she was very young, like two and five. And it's my understanding she has no memory of it. So I'm sure to her it was the first time something like that had happened. She testified that she was crying and shaking. So I feel like it's pretty reliable, I mean --

THE COURT: Jeff?

MR. HARRELSON: I feel like I at least need -- if we need to take the jury out and let me ask her those questions, I would ask the Court to do that.

THE COURT: Sure.

(OPEN COURT, DEFENDANT AND JURY PRESENT)

THE COURT: Ladies and gentlemen, I know in the central jury room yesterday I told you there would be one of those -- it never fails. It always comes to one of those points where I have to ask y'all to step out of the courtroom for a minute and let me hear something to determine whether or not it's going to be admissible. So if y'all would, would you please go with the bailiff.

THE BAILIFF: All rise for the jury, please.

(OPEN COURT, DEFENDANT PRESENT, NO JURY PRESENT)

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

120

THE COURT: Jeff, the jury is well out of earshot. Please, go ahead.

CROSS-EXAMINATION

BY MR. HARRELSON:

Q. Ms. Sandoval, I'm Jeff. We talked a little earlier. When Ms. Crisp was asking you some questions earlier, I understood your answer was that this was the first time that you had done anything like this?

A. (Witness nods).

Q. Is that a yes?

A. Yes, ma'am -- sir.

Q. Do you remember when you spoke with Missy at the CAC center?

A. Yes, sir.

Q. Did you remember that you told Missy that you had had some sexual contact with both your dad and your stepdad, do you remember telling her that?

A. My first stepdad, yes.

Q. Okay. Do you remember those events from your dad and your stepdad?

A. From a long time ago, yes, sir.

Q. You do remember them?

A. (Witness nods).

Q. Is that a yes?

A. Yes, sir.

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

121

Q. Were those incidents that you experienced back when you were very young, were they like what you experienced with Zack?

A. Yes, sir.

Q. So is it fair to say it really wasn't the first time that you had done anything like that with Zack?

A. I'm not sure.

Q. Tell me, if you can, the difference between what happened with your dad and your stepdad and what happened to you with Zack?

A. With my father, it wasn't like that, and with my stepdad, he did it with somebody else's child, is what I was told.

Q. Okay. So it wasn't with you?

A. No. It was with somebody else's child that he got caught with.

Q. I see. That's your stepdad?

A. My very first stepdad.

Q. Okay. And what is his name, just so it can be sure?

A. I think it was Raul Garcia.

Q. Okay. Raul Garcia was your first stepdad?

A. Yes, sir.

Q. Did your first stepdad, Raul Garcia, did he ever have any sexual contact with you?

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

122

A. Yes, sir.

Q. Okay. And you remember that?

A. Yes, sir.

Q. How was your experience with Raul different than with Zack?

A. We didn't have any intercourse.

Q. Okay. Did he just touch you in a sexual way?

A. Yes, sir.

Q. Okay. And what is your father's name?

A. I can't remember.

Q. Okay. Is his name Sandoval?

A. His last name, yes.

Q. Okay. Did your father, Mr. Sandoval, did he touch you in a sexual way?

A. Yes, sir.

Q. Do you remember it?

A. No, sir. I was two.

Q. Okay. So to you, when you stated that it was the first time you had done anything like that, when you were referring to Zack, were you telling us the truth?

A. Yes, sir.

Q. And why do you think those two things are different? Because there wasn't intercourse, is that it?

A. I think so.

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

123

Q. Well, you tell me. I don't want to put words in your mouth. What was the difference between what you experienced with Raul Garcia and Zack to where it was your first time with Zack?

A. Well, with my first stepdad, it's like he -- well, I'm not sure.

Q. And I know that these are hard questions, and I'm sorry to have to ask them. But what I'm wanting to make sure is that when you stated that it was your first time you had done anything like that, why did you consider that to be your first time with Zack?

A. Because it's the first time I can ever remember doing something like that.

Q. The first time you can remember like emotionally feeling like that or physically feeling like that or what?

A. Both, I think.

Q. Okay. So in your mind is what happened with Mr. Garcia something that's very different from what happened with Zack?

A. Yes, sir.

MR. HARRELSON: Fair enough. If I could have just a moment with my client. I'd pass the witness.

THE COURT: Sure.

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

124

REDIRECT EXAMINATION

BY MS. CRISP:

Q. Carolyn, just to clear up a couple things. You don't have a clear memory of what happened when you were two or five, do you?

A. No, not very clear. My mom had to tell me everything.

Q. Okay. So what you know about what happened when you were two and five you heard from somebody else; is that right?

A. Yeah.

Q. You could not tell the jury or anybody else the details of what happened to you because you do not remember; is that right?

A. Yes, ma'am.

Q. Okay. Carolyn, when you told the ladies and gentlemen of the jury that nothing like that had ever happened, do you mean like emotionally you were having a relationship, and y'all started getting intimate, is that what you meant?

A. I'm not entirely sure.

Q. Okay. Your testimony was that you started shaking and crying, do you remember saying that?

A. Not crying, but shaking.

Q. I'm so sorry, you're right, shaking. And were

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

you shaking as a result of the things that Zack was telling you, that he was never going to leave you, that he loved you, that he was going to be there for you?

A. Yes, ma'am.

Q. Okay. So you have never experienced anything like that before?

A. Yes, ma'am.

MS. CRISP: I'd pass the witness, Judge.

THE COURT: Jeff, anything else?

MR. HARRELSON: No, Your Honor. Just I have a legal argument.

THE COURT: Please. Do me a favor, Jeff, get a little closer if you don't mind.

MR. HARRELSON: Sure, not a problem. I understand that there may be some differences in her experiences, but under the State's Motion in Limine, they asked to have a hearing such as this if we wanted to introduce any prior sexual issue with the complaining witness. It's our position that her testimony that this was the first time for her to have done anything like that is actually not true, and I'd like to cross-examine her based on that. I don't want the jury to think that her first sexual experience was with Zack Eldred when, in fact, it was not.

THE COURT: Kelley?





MS. CRISP: Judge, this child just testified that she had no memory of it, or, if she did, it was very, very vague, very little memory, that what she thought she knows what came from her mother. Judge, I can represent to this Court that she and I have spoken, and the information that she has given me --

MR. HARRELSON: Your Honor, I would object to her litany now that she's a witness.

MS. CRISP: Okay. It was my understanding and belief that this child did not -- I would have never like misled Mr. Harrelson or this Court. Her testimony just now was he was whispering those things in her ear or telling her those things, that made her start to shake, because he was telling her that he would never leave her. He was telling her that he loved her. This child, even through his questioning here outside the presence of the jury, she has no idea what happened to her when she was two and five.

THE COURT: I mean, I'm sitting three feet from her. I do not hear her testimony to be that what happened to her before is anywhere near what's in the indictment. I mean, I don't -- I guess you could categorize it as a sexual experience, I'm not sure I would, and I don't think she remembers it as being that way, certainly the one with the father, the one with





Mr. Garcia or whatever. Again, Jeff, I'm going to overrule your objection to that and keep that testimony out.

MR. HARRELSON: At least I would proffer the hearing we've had outside the presence of the jury as what I would have asked her in the presence of the jury.

THE COURT: Yeah. I'm not going to let you go there. Anything else before we bring the jury back?

MS. CRISP: No, sir.

MR. HARRELSON: No.

THE COURT: All right. Twister, if you would, get the jury back for us.

THE BAILIFF: All rise for the jury, please.

(OPEN COURT, DEFENDANT AND JURY PRESENT)

THE COURT: All right. If everyone would please be seated. And, Mr. Harrelson, I believe you were at your cross-examination.

MR. HARRELSON: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. HARRELSON:

Q. Ms. Sandoval, my name is Jeff. I represent Mr. Eldred. I believe it was your testimony that at some point in your relationship that you felt like you were in love with Mr. Eldred?

A. Yes, sir.





Q. And that you wanted to marry him?

A. Yes, sir.

Q. Isn't it true that Zack told you that y'all can't get married because of how old you were?

A. Yes, sir.

Q. And that he agreed that he may date you after you turned 18 but not until then?

A. Yes, sir.

Q. Did y'all ever talk about the classes that he took to become a minister?

A. Huh?

Q. Did he ever talk to you -- you said y'all talked quite a lot. Did he ever talk to you about how he became a minister or a pastor?

A. Yes, sir.

Q. Did he show you a little card that showed that he really was?

A. No, sir.

Q. Okay. But that you believed that he was?

A. Yes, sir.

MR. HARRELSON: That's all I have of the witness, Your Honor. I'll pass.

THE COURT: Ms. Crisp, anything else?

MS. CRISP: Judge, that's all we have.

THE COURT: All right. Ma'am, you can step

129

down. If you would, just go back with Mr. Ballard.

MS. CRISP: Judge, we've got one more witness. I anticipate her testimony to be brief.

THE COURT: Brief?

MS. CRISP: Yes, sir.

THE COURT: Good. If you would, call your next witness.

MS. CRISP: Judge, the State would call Karrah Dickeson.

THE COURT: Ms. Crisp, let me ask you this: This is your last witness?

MS. CRISP: Yes, sir.

THE COURT: If you would, raise your right hand. Do you solemnly swear the testimony you're about to give to be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: Yes, sir, I do.

THE COURT: Have a seat. Ms. Crisp, begin whenever you wish.

MS. CRISP: Yes, sir.

KARRAH DICKESON

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. CRISP:

Q. Ma'am, can you state your name for the ladies and

130

gentlemen of the jury?

A. Yes. Karrah Dickeson.

Q. And, Ms. Dickeson, how are you currently employed?

A. I'm the clinical director at the Texarkana Children's Advocacy Center.

Q. Okay. How long have you been employed in that capacity?

A. Since October of 2006.

Q. Okay. And what are your current duties, ma'am?

A. I'm a therapist, and I oversee all the therapists, the other therapists and intern at the advocacy center, provide them with clinical supervision. I am also a forensic interviewer and an extended forensic evaluator.

Q. Ma'am, what kind of training and experience have you completed to sort of make yourself qualified for the position that you now hold?

A. I have a bachelor's degree from Louisiana State University in sociology. I have a master's degree in counseling psychology from Texas A & M-Texarkana. I'm licensed by the Texas State Board of Professional Counselors as a licensed professional counselor. I completed a 3,000-hour postgraduate internship. I am a certified trauma-focused therapist. I have

131

approximately 40 hours in forensic interviewing. I have 24 hours in extended forensic evaluation. I have approximately 70 hours in crimes against children and approximately 80 hours in trauma-focused treatment.

Q. Ma'am, have you, in fact, been recognized as an expert in this jurisdiction before?

A. Yes, ma'am, I have.

Q. And has that been on several occasions?

A. Yes, ma'am.

MS. CRISP: Your Honor, at this time we would offer Ms. Dickeson as an expert in her field.

MR. HARRELSON: Your Honor, no objection to the designation, but I do have an objection as to general relevance, and under 403, that this is cumulative to the previous testimony.

THE COURT: All right. She is recognized as an expert and --

MS. CRISP: Judge --

THE COURT: I'm not sure the --

MR. HARRELSON: Those others may be a little premature. We'll wait and see what the questions are.

THE COURT: Sure. Mr. Harrelson, if it comes up, and you make those objections, then I'll rule on them as they come to me.

MR. HARRELSON: Thank you, Your Honor.

132

THE COURT: But until then they're overruled.

Q. (BY MS. CRISP:) Ma'am, can you tell the ladies and gentlemen of the jury if you're familiar with the concept of grooming?

A. Yes, ma'am, I am.

Q. And can you tell them what that means?

A. Yes. Grooming is the process of making abnormal behavior normal. In a sexual offense, grooming -- there are six stages to grooming.

MR. HARRELSON: Your Honor, now I make my objection.

THE COURT: Overruled.

MR. HARRELSON: General relevance and cumulative, 403.

THE COURT: Sure. And it's overruled.

MR. HARRELSON: Thank you.

Q. (BY MS. CRISP:) Go ahead, ma'am.

A. The first stage is going to be targeting the victim, and so in this stage, typically a sexual predator would look for a victim that -- the vulnerability of the victim or of the child, their emotional neediness, their social skills, how well they interact, their maturity levels, that type of thing, how strong of a personality they have.

133

The second stage of grooming is gaining trust with the victim. That's going to be, you know, getting them to trust them, finding out the things that they're interested in, what does the child like to do, what are things that are going to encourage the child to have a relationship with this person.

The third stage is filling that need, and so that is actually giving the child the affection, the love, the attention that they need. Often -- sometimes victims are not getting the acceptance that they typically would look for maybe from their peers or from their family, the neediness, that type of thing. And so the perpetrator would try to fill those needs at that point.

The next stage is isolating the child, and this is where they're going to engage the child in being with them alone, find activities where they can be alone, maybe the places that they go together, that type of thing, find things that interest the both of them, and so that would encourage them to be together just the two of them, also, to allow that person to just reinforce that connection that they have. Okay.

The next stage is going to be -- stage five is going to be sexualizing the relationship, and that's where at this point the child has got -- they already

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

134

have developed that emotional attachment, that emotional neediness. And so at this point they groom the child into what are okay sexual acts, and so they move at it in a slow pace. They introduce it little by little. It may be TV. It may be talking about sex. It may be, you know, quote unquote education. It could be movies, engaging in activities that would make small sexualized behavior okay, and then they move it -- they progress it along. Often this is the stage where they would shape the child's sexual needs, and they would find things that the child is engaged in that sexually engages the child. So this isn't typically -- they don't force the child usually to do something that they're super uncomfortable with because they've moved them into -- it's a gradual exposure.

And then the last stage is maintaining control. By this time usually the child or the victim is very entangled in the relationship. There's guilt. There's shame. There may be a sense of a relationship. There may be -- well, all of those, guilt, shame, that sense of relationship, or a sense of loyalty to the perpetrator, be afraid that what if someone finds out, what will someone think about me, I must have wanted this because I've been involved in the relationship. So it's that period of gradual exposing someone to

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

135

something that has not been a normal behavior, but now it's become an okay normal behavior.

Q. Okay. Now, that we've gone through the six stages, just to be clear with the jury, you have not treated the victim in this case?

A. No, I have not.

Q. And, frankly, you know very little about it?

A. Correct.

Q. Okay. So I'm going to just ask you some hypothetical situations. You have discussed on the first step being pick the victim, someone that was susceptible, maybe somebody that got bullied at school or something like that. Is that what your idea of picking a victim is?

A. Yeah, someone that's vulnerable.

Q. Okay. Then, of course, establishing trust. Ms. Dickeson, when we talk about establishing trust, if a perpetrator told a child, I love you, and I'll never leave you, are those things that would be indicative of them trying to establish trust?

A. Yes, absolutely.

Q. Okay. When you say, "fill the needs," if someone felt lonely or somebody felt like they needed company, would that fill their need? Would that fill the child's need?

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

136

A. Yes. And also what you just said about telling the love and the affection, that would be filling that need, something that child is not receiving somewhere else.

Q. If you heard, for example, that a child said something to the effect of, perpetrator is the best thing that ever happened to me, would you feel like that child needed that connection with the perpetrator?

A. I would say that the child felt like they needed, yes, that that was -- that was an important relationship because they were getting that from them.

Q. Okay. Now, the next step four would be isolating the child. My question to you is, if perpetrator and child hypothetically were in the bedroom, let's say, they played video games, is that something that a perpetrator and a child may have in common?

A. It's finding that connection that they have and building on it.

Q. Okay. And that would sort of pave the way for it to progress?

A. Yes, ma'am.

Q. Okay. When you talk about sexualizing the relationship, if the victim and the perpetrator were playing video games and watching pornographic materials on the Internet, would that be sexualizing?

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

137

A. Well, the pornographic material, yes, that would be sexualizing, making it -- becoming more comfortable with the sexualized behavior, yes.

Q. And what if the video games contained sexual nature photographs or people doing sexual things?

A. Well, then, yes, absolutely.

Q. Okay. Number five, you said -- I guess now we're on number six, to maintain control or a sense of a relationship. When you say, "maintain control of the relationship," let me give you a hypothetical. If the perpetrator said to the child, if you tell, I'm going to kill myself, would that be a way to maintain control?

A. That would be, I think, the ultimate, yes, the guilt, the loyalty, that type of thing.

Q. Now, in a hypothetical situation, if a perpetrator was 50 and a child was 13, if the perpetrator said, I'm going kill myself to a child of 13, what would happen to a child? How does a child's mind work?

A. Well, at 13, or in any adolescent's mind, their brain isn't fully developed, one, to impulse controls or decision-making skills, or to handle that type of emotional pressure. So, you know, even establishing right from wrong at that age is very difficult. That's where we have that personal fable that teenagers get

—— MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926 ——

138

into, you know, it'll never happen to me risky behavior type thing. And so likely the child would feel an overwhelming sense of, if I tell, he's going to kill himself.

Q. Okay. Let's talk about another hypothetical situation about children being manipulated. Ms. Dickeson, would you agree with me or would it be fair to say that children can be easily manipulated?

A. Of course.

Q. Okay. If you add to that, that children are easily manipulated, what if you add sort of another dynamic, and it was somebody they looked up to, like a mentor or a preacher?

A. Well, typically in these type of situations it is someone that they look up to. Sexual abuse usually is someone that they know and trust. You know, we teach stranger danger all the time, but strangers typically aren't the people that perpetrate against children. It's people that they have developed some sort of relationship, that they know and that they do trust.

Q. So in the majority of the cases that you see, how many are strangers? Of perpetrators, pardon me?

A. I would say over the years, less -- and I've been there, this is my sixth year, less than three percent. I mean, very few.

—— MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926 ——

139

Q. Now, when we talk about a child sort of being manipulated by somebody in a position of authority, is it uncommon for the child to allow the abuse or to go along with the abuse for what we would consider a long period of time, several months even?

A. Well, and that's a myth that people think about sexual abuse. They think that -- typically people think that children are going to fight their abusers, and they're going to tell them no, and they're going to yell and scream and fight it off. Very seldom does that happen. Kids do go along with their abuser, especially if they're groomed to believing that this is okay. We teach kids from day one, you do what grown-ups tell you to do, and so when grown-ups tell you to do something, they do it. And so, yes, it's not uncommon. As a matter of fact, it's very common for a child to actively participate in the abuse that their perpetrator does against them.

Q. Okay. Another hypothetical would be if you hear a 13-year-old child say that they were in love with their perpetrator, would that be uncommon for the child to form that sort of attachment?

A. Well, no. I mean, a child, if they have been groomed along the way, and this relationship has developed, and the perpetrator has told them that they

—— MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926 ——

140

love them and that, you know, whatever -- it depends on the grooming that they've experienced. And so as a teenager, who someone that is seeking that love and acceptance and is seeking that, you know, an older person to pay attention to them, I would not say it would be uncommon.

MS. CRISP: Judge, I think that's all I have. I pass the witness.

THE COURT: Jeff?

MR. HARRELSON: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. HARRELSON:

Q. Ms. Dickeson, I'm Jeff Harrelson. We know each other.

A. Yes, sir.

Q. If I understood your direct testimony, you said you know very little about this case?

A. Correct.

Q. You haven't talked to Carolyn Sandoval, I don't guess?

A. No, sir, I have not.

Q. Or talked to any of the other witnesses who may have testified today?

A. I have introduced myself today, but that's it.

Q. Y'all didn't talk substance of the case?

—— MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926 ——

141

A. No, sir.

Q. And you haven't talked to Zack Eldred?

A. No, sir.

MR. HARRELSON: Thank you, ma'am. That's all I have.

THE COURT: Kelley, anything else? James?

MS. CRISP: Judge, that's all we have for this witness, and the State of Texas would rest its case.

THE COURT: Karrah, thank you for your testimony.

THE WITNESS: Yes, sir.

THE COURT: All right. It's five till twelve. Kelley, you say the State rests?

MS. CRISP: Yes, sir.

THE COURT: All right. Let's do this. Let's go ahead and take the noon break, and, ladies and gentlemen, I'm going to give you till like 1:15. And the reason being, during the break the State' attorneys and the defense attorney, we're going to do the charge I told you about, get basically the instructions to y'all prepared where sometime this afternoon we'll get to that. But anyway, the noon break is a really good time for us to work. So that will be done at the noon break. So rather than just taking the typical hour, let's go

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

142

ahead and make it an hour and fifteen minutes. And that way, maybe the lawyers can squeeze in a sandwich and get that done. So, if you would, go with the bailiff right now, and be back in the jury room at 1:15. And, again, don't begin deliberations, don't discuss the case with anybody, and I'll see you back here in an hour and twenty minutes.

THE BAILIFF: All rise for the jury.

(JURY RECESSED FOR LUNCH AT 11:55 A.M.)

(OPEN COURT, DEFENDANT PRESENT, NO JURY PRESENT)

THE COURT: All right. The jury is out of earshot and out of the courtroom. Kelley, the charge?

MS. CRISP: Judge, Mr. Harrelson and I have -- I E-mailed it to him last night. We've talked informally this morning. I think that he doesn't have any objections to it. I don't know --

MR. HARRELSON: Your Honor, I'd like the chance to review it one more time, but I do not anticipate that I will be offering any lesser included offenses. If that changes after the noon hour, I'll let you know, but I don't anticipate there's going to be much we have to fuss about over the charge.

THE COURT: Jeff, I think perhaps one thing, and maybe you and Kelley have already discussed this, and I just haven't been made aware of it. It's almost

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

143

time for me to know whether or not Mr. Eldred is going to testify or not.

MR. HARRELSON: I understand. Before we go any further, I do need to make a motion at the close of the State's case.

THE COURT: I forgot, yes.

MR. HARRELSON: At this point, defendant moves for a directed verdict of acquittal based on insufficient evidence for the underlying offenses that would constitute the elements --

THE COURT: Hold on a second. Everyone sit down. I'm sorry. Go ahead, Jeff. I didn't mean to interrupt you.

MR. HARRELSON: That's okay. Based on insufficient evidence of the underlying elements of continuous sexual abuse of a child under 14, as well as all lesser included offenses, as well as the dates in question. I think there's insufficient evidence to prove those elements and would ask the Court for a verdict of acquittal.

THE COURT: State want to respond?

MS. CRISP: No, Judge.

THE COURT: All right. The motion is overruled.

MR. HARRELSON: As far as Mr. Eldred

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

144

testifying or whether we'll have any evidence, I'm going to discuss that matter with him. I'll be able to instruct the D.A. on how we're going to handle that as far as the charge is concerned.

THE COURT: Well, maybe the quicker thing to give y'all a little bit more time was, Ms. Crisp, is it very hard to do the charge almost as soon as you know that? I mean, it doesn't take very much longer.

MS. CRISP: No, Judge. The only thing would just be avoiding another break and having them in and out.

THE COURT: So you're talking about just a few minutes as opposed to needing an hour?

MS. CRISP: Sure.

MR. HARRELSON: Your Honor, I think during the noon hour I can have sufficient conversations with my client and the district attorneys to where we can present you a charge after lunch.

THE COURT: Sure.

MR. ELLIOTT: We'll be down in our office and the law library.

MR. HARRELSON: Thank you.

THE COURT: I was just trying to make sure we don't waste an hour and a half, and if that's the case, then we'll be in recess until 1:15. And, Jeff,

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

145

just get with them, and I'll be right here at the courthouse the whole noon hour.

MR. HARRELSON: Yes, sir.

THE COURT: All right. We're in recess.

(RECESS FROM 11:58 A.M. TO 1:14 P.M.)

(OPEN COURT, DEFENDANT PRESENT, NO JURY PRESENT)

THE COURT: Jeff, as I understand it, right before the lunch break, the State rested; is that correct?

MS. CRISP: Yes, Judge.

THE COURT: Anything else from the State, though, before --

MS. CRISP: Not at this time, Judge.

THE COURT: And, Jeff, have you had an opportunity to look at the charge?

MR. HARRELSON: I did look at the charge, Your Honor.

THE COURT: And?

MR. HARRELSON: I have an objection to the charge that the State proposes in that it fails to contain provisions of Penal Code 21.02(g)(2). It's our submission that the statute reads, it is an affirmative defense to prosecution under this section that the actor did not use duress, force, or threat against a victim at the time of the commission of any of the acts of sexual

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

146

abuse alleged as an element in the offense, and at the time of the commission of any of the acts of sexual abuse alleged as an element of the offense, the actor was not required under Chapter 62, Code of Criminal Procedure, to register for life as a sex offender or was not a person who under Chapter 62 had a reportable conviction or adjudication for an offense under this section or an act of sexual abuse as described in Subsection C. It's our submission that the charge should contain an affirmative defense that we could argue to the jury.

THE COURT: Samantha?

MS. OGLESBY: Your Honor, in looking at the statute it's clear that those three requirements have to be met. The individual has to be no more than five years of age, cannot have used force, duress, or a threat, and cannot have a reportable conviction or be required to register as a sex offender. It's not that he gets an affirmative -- it's an affirmative defense if he meets one of those three elements. He must meet all three of those elements. And is used in the statute, and so, therefore, there is no way that this defendant applies for that affirmative defense. And it should not be in the jury charge.

THE COURT: All right. I'm looking at the

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

147

statute, give me just a second to look over it here. Jeff, I'll give you a chance to respond. I read it as, when I read it, and I'm looking at Section G, just where it says it is an affirmative defense to prosecution, then it lists one, then the (a) and (b), then just two alone, then 3(a) and (b). And I see them being conjunctive as requiring all of them. Now, I'll give you a chance to respond, though.

MR. HARRELSON: Thank you, Your Honor. Obviously, I guess would be preferable in the statute if it said one and two and three, but it says one semicolon two and three. I think it would be more clear if they'd had an and after subsection one. Therefore, it's my submission that we don't have to have one. We just have to have two and three.

THE COURT: Samantha?

MS. OGLESBY: I agree it would have been helpful if the legislature had done that. They didn't. They put one and. But it's still clear from reading the statute there is no or. It's not if you meet one or two or three. There is an and. So, therefore, you must meet all requirements, and if that were the case, if any one of those three was an affirmative defense, we wouldn't be here. No one would ever be here.

THE COURT: And, Jeff, I'll tell you what I

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

148

spot in the statute when I read it, and agreeing with the State would be like this: You know, when I read section number one, and it's not a semicolon, just a colon, and then they go to (a) and (b). And between (a) and (b) they've got or. So I don't think it's the legislature missed putting an or between each of them. So I think they're all -- I think it takes all three. And then the same thing when you look at number three, it's got a colon at the end of it, and it says when you read (a) and to the end of section (a) it says or. So I don't think the legislature left those ors out on purpose. I think that it takes all three. That's how I read it.

MR. HARRELSON: Thank you, Your Honor, if you just note my objection for the record.

THE COURT: I will. I will.

MR. HARRELSON: Other than that, we have no additional objections to the charge.

THE COURT: Sure. And that objection is overruled. And with that --

MR. HARRELSON: I have a single witness that will be very brief.

MR. ELLIOTT: And I think we need a short hearing outside the presence of the jury.

THE COURT: Yeah. Mr. Elliott caught me

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

149

just before I got on the bench and -- Melanie, I don't think you can hear them, can you? Just let the record reflect that the State and the defense counsel are having a brief conference. Now, Mr. Elliott, Jeff?

MR. HARRELSON: I understand that the hearing that he wants outside the presence has to do with my witness that I intend to call. So if I could go ahead and call him right now, we could do this hearing right now.

THE COURT: James?

MR. ELLIOTT: Yes, sir. That's --

THE COURT: Sure.

MR. HARRELSON: I would call Chris Eldred. He's out in the hallway.

THE COURT: Jeff, while he's getting that witness, was that your only objection to the charge?

MR. HARRELSON: Yes, sir.

THE COURT: So as it is now, it's okay? Noting your objection, though.

MR. HARRELSON: Correct.

THE COURT: All right. Sir, if you would, come around right here and, if you would, just raise your right hand for me. Do you solemnly swear the testimony you're about to give to be the truth, the whole truth, and nothing but the truth, so help you God?

— MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926 —

150

THE WITNESS: Yes, sir.

THE COURT: Have a seat. Jeff?

CHRIS ELDRED

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. HARRELSON:

Q. Sir, could you state your name, please?

A. Christopher Eldred.

Q. And are you the son of Zack Eldred?

A. Yes, sir.

Q. Have you been present in the Bowie County courthouse today during the trial?

A. Yes, sir.

Q. Have you been out in the hallway?

A. Yes.

Q. Have you been able to hear any of the testimony of the witnesses?

A. No, sir.

Q. Has anyone come out and spoken to you and related to you any of the information that any of the witnesses has testified to?

A. No, sir.

MR. HARRELSON: That's all I have.

THE COURT: Mr. Elliott?

— MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926 —

151

CROSS-EXAMINATION

BY MR. ELLIOTT:

Q. Mr. Elliott, there's a lady sitting -- that lady in purple, has she not spoken to you today?

A. She has but not about the case.

Q. What was the subject of your conversation?

A. Just about everyday events.

Q. What about the gentleman dressed in red? Ma'am, you're not a witness, please. What about the gentleman that had on a red T-shirt, black hair?

A. He didn't say anything about the case, no, sir.

MR. ELLIOTT: All right.

THE COURT: And, Mr. Elliott, I'm not sure you put that in the form of an objection to this witness testifying. If you did --

MR. ELLIOTT: No. We just wanted to know if there was a violation of the Rule.

THE COURT: I thought so. So anyway, the Court's going to allow him to testify.

MR. HARRELSON: Thank you, Your Honor.

THE COURT: There's no sense in him leaving the witness stand. I'll just bring the jury back unless anybody has got anything else outside the presence of the jury?

MR. HARRELSON: No, Your Honor.

— MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926 —

152

THE COURT: All right. Twister, if you would, get the jury for us.

THE BAILIFF: All rise for the jury, please.

(OPEN COURT, DEFENDANT AND JURY PRESENT)

THE COURT: All right. Ladies and gentlemen, everyone please be seated. And, Mr. Harrelson?

MR. HARRELSON: Your Honor, we'd call Chris Eldred to the stand.

THE COURT: Yes. And the witness has been previously sworn. So go ahead, Mr. Harrelson.

MR. HARRELSON: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. HARRELSON:

Q. Sir, could you state your name, please?

A. Christopher Eldred.

Q. And, Mr. Eldred, is Zack Eldred your father?

A. Yes, sir.

Q. And during the time of late 2010, were you living in a home with him near New Boston, Texas?

A. Yes, sir.

Q. And you're familiar with the layout of the home?

A. Yes, sir.

Q. Do you know which one was your father's bedroom?

A. Yes, sir, I do.

— MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926 —

## 153

Q. Does it have a door on it?

A. It does.

Q. Was the door able to be shut and locked?

A. No, sir.

Q. Why not?

A. It was broken.

Q. What part of the door was broken?

A. The latches and the door handle both were broken.

Q. Okay. So could the door be shut?

A. It could, but it could not be -- oh, well, it couldn't be opened from the inside.

Q. Was something wrong with, you said, the handle?

A. Yes, sir. Yes, sir.

Q. Could you lock the door?

A. No, sir, you could not.

MR. HARRELSON: That's all I have of the witness.

MR. ELLIOTT: No questions, Your Honor.

THE COURT: All right. Jeff, anything else from this witness?

MR. HARRELSON: No, Your Honor. I would request that he be released.

THE COURT: Sir, you've been excused.

MR. HARRELSON: He would like an opportunity to stay in the courtroom if he could.

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

## 154

THE COURT: All right. Jeff, you need a few minutes?

MR. HARRELSON: No, Your Honor. With that, defense rests.

THE COURT: All right. Any rebuttal from the State?

MS. CRISP: No, sir. The State would close.

MR. HARRELSON: May I approach the bench with counsel?

THE COURT: Sure.

(AT THE BENCH, ON THE RECORD)

MR. HARRELSON: Your Honor, at the close of the defense case, defense renews its motion for a directed verdict on the same grounds as previously stated.

THE COURT: Sure. Melanie could you hear everything? All right. The motion is denied.

MR. HARRELSON: Thank you, Your Honor.

(OPEN COURT, DEFENDANT AND JURY PRESENT)

THE COURT: And, again, I've got the charge.

MS. CRISP: Judge, we have no objection to the Court's charge.

THE COURT: Jeff, any objections?

MR. HARRELSON: Only the one previously stated, Your Honor.

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

## 155

THE COURT: All right. Ladies and gentlemen, the evidence and the testimony you're going to hear in this case has been concluded. We're at that point now where I will basically give you instructions that are the law that you have to apply in your deliberations.

All right. To the members of the jury, the defendant, Zack Eldred, Jr., stands charged by indictment with the felony offense of continuous sexual abuse of a child alleged to have been committed in Bowie County, Texas, on or about July the 1st, 2010 through December the 7th, 2010. The defendant has entered a plea of not guilty to this charge. You are instructed that the law applicable to this case is as follows: A person commits the offense of continuous sexual abuse of a child if, during a period that is 30 or more days in duration, a person commits two or more acts of sexual abuse, regardless of whether the acts of sexual abuse are committed against one or more victims, and at the time of the commission of each of these said acts of sexual abuse, the actor is 17 years of age or older and the victim is a child younger than 14 years of age. For purposes of this section, act of sexual abuse means any act that is a violation of one or more of the following penal laws:

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

## 156

Number one, indecency with a child under Section 21.11. If the actor committed the offense in a manner other than by touching, including touching through the clothing, the breast of a child. Number two, aggravated sexual assault under 22.021. Section 21.11 provides that a person commits an offense of indecency with a child if with a child younger than 17 years of age, whether the child is of the same or opposite sex, number one, a person engages in sexual contact with a child or causes the child to engage in sexual contact, or, number two, with intent to arouse or gratify the sexual desire of any person, (a), exposes the person's anus or any part of the person's genitals knowing the child is present, or, (b), causes a child to expose the child's anus or any part of the child's genitals. Sexual contact means any touching by a person, including through the clothing, of the anus, breast, or any part of the genitals of a child with the intent to arouse or gratify the sexual desire of any person.

Section 22.021 provides that a person commits an offense of aggravated sexual assault if the person intentionally or knowingly, number one, causes the penetration of the anus or sexual organ of a child younger than 14 years of age by any means; number two,

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

157

causes the penetration of the mouth of a child younger than 14 years of age by the sexual organ of the actor; or, number three, causes the mouth of a child younger than 14 years of age to contact the anus or sexual organ of another person, including the actor. You are instructed that as to the offense of aggravated sexual assault penetration is completed regardless of how slight.

In order to find the defendant guilty of the offense of continuous sexual abuse of a child you are not required to agree unanimously on which specific acts of sexual abuse were committed by the defendant or the exact date when the acts were committed. However, in order to find the defendant guilty of the offense of continuous sexual abuse of a child, you must agree unanimously that the defendant, during a period that is 30 days or more in duration, committed two or more acts of sexual abuse.

A person acts intentionally, or with intent, with respect to the nature of his conduct or to the result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result. A person acts knowingly, or with knowledge, with respect to the nature of his conduct or the circumstances surrounding his conduct when he is aware of the nature

—— MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926 ——

158

of his conduct and that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

Now, bearing in mind the foregoing instructions, if you believe from the evidence beyond a reasonable doubt that the defendant, Zack Eldred, Jr., on or about July the 1st, 2010, through December the 7th, 2010, in Bowie County, Texas, during a period that was 30 days or more in duration, committed two or more acts of sexual abuse against a child whose pseudonym is Holly Keilburg, said acts of such abuse having been violations of one or more of the following penal laws, namely, the first one is indecency with a child, namely by engaging in sexual contact with Holly Keilburg by touching the genitals of Holly Keilburg with the intent to arouse or gratify the sexual desire of the defendant. The next one is aggravated sexual assault of a child, namely, by causing the penetration of the sexual organ of Holly Keilburg, a child who was then younger than 14 years of age, by the defendant's finger. The next one is sexual assault of a child, namely, by causing the penetration of the sexual organ of Holly Keilburg, a child who was then younger than 14 years, by the defendant's tongue. The next one

—— MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926 ——

159

is aggravated sexual assault, namely, by causing the penetration of the sexual organ of Holly Keilburg, a child who was then younger than 14 years by the defendant's sexual organ, or sexual assault of a child, namely, by causing the penetration of the mouth of Holly Keilburg, a child who was then younger than 14 years, by the defendant's sexual organ, then you will find the defendant guilty of the offense of continuous sexual assault as charged in the indictment. Unless you so find beyond a reasonable doubt, or if you have reasonable doubt thereof, you will acquit the defendant and say by your verdict not guilty.

The defendant is on trial solely on the charge contained in the indictment. However, evidence of extraneous offenses, wrongs, or acts committed by the defendant may be admitted for certain limited purposes. If there is any evidence before you in this case showing the defendant committed an extraneous crime, wrong, or act, you cannot consider said testimony for any purpose unless you first find and believe beyond a reasonable doubt that the defendant committed such extraneous crime, wrong, or act. If you find and believe beyond a reasonable doubt that the defendant committed an extraneous crime, wrong, or act, then you will consider the same for the limited purpose of showing the

—— MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926 ——

160

defendant's intent, the state of mind of the defendant, and Holly Keilburg, and the previous and subsequent relationship between the defendant and Holly Keilburg.

In a criminal case, the law permits the defendant to testify on his own behalf. However, the same law provides that the fact that a defendant has not testified shall not be considered as a circumstance against him. You will, therefore, not consider the fact that the defendant has not testified as a circumstance against him. You will not in your deliberations to consider your verdict allude to, comment on, or in any manner refer to the fact that the defendant has not testified. All persons are presumed to be innocent, and no person may be convicted of an offense unless each element of the offense is proved beyond a reasonable doubt. The fact that a person has been arrested, confined, indicted for, or otherwise charged with an offense gives rise or no inference to guilt at his trial.

The State has the burden of proving the defendant guilty, and it must do so by proving each and every element of the offense charged beyond a reasonable doubt. If it fails to do so, you must acquit the defendant. It is not required that the State prove the defendant's guilt beyond all possible doubt. It is

—— MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926 ——

161

required that the State's proof excludes all reasonable doubt concerning the defendant's guilt. A grand jury indictment is the means whereby a defendant is brought to trial in a felony prosecution. It is not evidence of guilt, nor can it be considered by you in passing on the issue of guilt of the defendant. The burden of proof in criminal cases rests upon the State throughout the course of the trial and never shifts to the defendant. In deliberating on the case, you are not to refer to or discuss any matter or issue not in evidence before you. In determining the guilt or innocence of the defendant, you shall not discuss or consider punishment, if any, which may be assessed against the defendant in the event the defendant is found guilty beyond a reasonable doubt.

As jurors, you are exclusive judges of the facts proved and the credibility of the witnesses and the weight to be given their testimony; that is, you may believe all, any part, or none of the testimony of any witness you have heard in this case. However, in matters of law, you are governed by any instructions previously given you by the Court and the instructions contained in this charge. During your deliberations of this case, you must not consider, discuss, nor relate any matters not in evidence before you. You should not consider, nor mention any personal knowledge or

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

162

information you may have about any fact or person connected in this case which is not shown by the evidence.

When you retire to deliberate upon your verdict, the first thing you shall do is elect a presiding juror. It is the duty of the presiding juror to preside during your deliberations, see that they are conducted in an orderly manner, vote with you, and certify your verdict to the Court by signing his or her name in the appropriate form that correctly reflects the jury's verdict. After you retire to the room to deliberate, no one has any authority to communicate with you except the bailiff of this Court, and you may not discuss the case with him. If you desire to communicate with the Court, have your presiding juror reduce this communication to writing, date and sign the same, and deliver it to the bailiff for transmittal to the Court, and it will be answered if legally possible. Your verdict must be unanimous, and, when reached, you will notify the bailiff in the manner instructed. And the Court will send for you, and your verdict will be received in open Court. And it's signed by me as the District Judge for the 102nd District Court.

Ladies and gentlemen, the verdict form in this case is a single page. It has the cause number and

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

163

the style at the top. It says, forms of verdict, number one, and choose one of these two. It says, we, the jury, find the defendant, Zack Eldred, Jr., guilty of continuous sexual abuse of a child as charged in the indictment. The second part, the bottom half of the page says, we, the jury, find the defendant not guilty of continuous sexual abuse of a child as charged in the indictment. Just sign whichever one is y'all's verdict. And with that, Ms. Crisp?

MS. CRISP: Yes, sir. I might need the overhead. I might not have been in the courtroom whenever you told us how long.

THE COURT: I didn't. We're perhaps a little ahead of schedule. Why don't I give you ten and ten?

MS. CRISP: Okay. I may not take it all, Judge.

THE COURT: All right. You give us back any time you wish.

MS. CRISP: Yes, sir.

Ladies and gentlemen of the jury, I remember telling you in my opening statement that the information that was going to come to you from the witness stand was going to be pretty tough to hear, and I think you'll agree with me that that's exactly what it was. That

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

164

child sat up here today and told you horrible things that no child should have to recount having been suffered at the hands of a 50-year-old man. The testimony, as it goes through a trial, often I'll have my indictment, and then I'll check off, if y'all remember me telling you that I have elements I have to meet, and then if I meet them, I'll put a check mark by it. So this indictment that you should be familiar with by now, if you'll remember me telling you I had to show you the elements of the indictment, and there they are. Of course, we established that date from June 1st, 2010, through December the 7th, 2010. We pretty well got that. That testimony came in and was not disputed. The defendant was over the age of 17, and obviously our victim was 13 when it happened.

Now, you-all have to decide -- there are two parts to the indictment, two pages. I think you'll remember me telling you, you needed to pick, out of all of those, y'all need to decide on two. You don't all have to decide which two, but you need to decide if you find him guilty, two of those out of the dots you see there, there's five. So did we prove to you the following: That with the intent to arouse himself that he touched that child on the genitals, and you bet we did. You bet we proved that. I told y'all in voir dire

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

that all I needed to bring to y'all was the testimony of one witness, and she sat up there and looked right at me and told you under oath that he did touch her. Then she told you that not only did he touch her on the outside, that he put his hands inside her. And she recounted in gruesome detail about him putting his hands up in her. Then did he penetrate her with his fingers? You bet he did. Okay. What about with his tongue? Do y'all remember that terrible story that she told you? She was at her house in DeKalb, and he was on the floor. And she was on the bed, and he said -- I mean, I can't even say it. He asked her if he could perform oral sex on her. And she was shaking. Y'all remember the testimony where I asked her, can you show the jury what she looked like, and she was shaking like this. She's 13. And then she said he put his mouth on her vagina, and she said that he was telling her things to talk her into it, like I'm going to love you, and I'm never going to leave you, and nobody had ever -- do y'all remember when she told you that, nobody had ever told me they weren't going to leave me before.

And then finally down there on the second part, did he penetrate her with a sexual organ? You bet he did. Do y'all remember her saying, well, yeah, he used a condom every time so we wouldn't get in trouble,

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

and I wouldn't get pregnant. And then finally he had her put her mouth on his penis, and she sat up there and told you all of those. Y'all only have to think that two happened, but I'm telling you I proved every one of them to you.

Perhaps the most disturbing of all of the testimony was when she told you about that well full of souls, y'all remember that? That well full of souls, where he told her that all of the souls in the universe were down at the bottom of the well and that the Lord picked their souls up and put them together and that they were going to be together forever. And y'all remember when I said, Carolyn, did you believe that? She said, yes, ma'am, I did. Of course, she did. Of course, she believed it. A grown woman who had all of her faculties and all of her capabilities would believe it if somebody told her something like that. And you get a child, and she said, well, I had some problems at school, I wouldn't fit in, I was being bullied. Of course, she believed it. And he knew it, and he picked her. That's the saddest part about this case, is this predator picked this child. You remember in opening when I said he violated her? You bet he did, over and over and over and over. That child sat up there and told you five or six times a month, I just can't

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

remember. How many different sexual positions did you have, Carolyn? I don't know. We tried so many I can't remember. That child, that 13-year-old child sat and described to y'all those different sexual positions. It is inconceivable.

That statement, the statement by the defendant, y'all heard him recount things on that statement, inappropriate, terrible. Well, yeah, we slept in the same bed together. Yeah, we cuddled. Yeah, we spooned. Yes, I loved her.

You heard Ms. Dickeson from the CAC center tell you about grooming, and we went through six steps. If this case didn't meet each one of those steps, what case will? He picked her out because he knew he could do it. Then he built trust. If I love you, and I'm never going to leave you, and I'm going to be here forever, and we're soul mates doesn't build trust with a 13-year-old girl, what does? And then he isolates her, and then he starts doing things that they both like, like playing video games. And next thing you know, he makes sexual behavior okay, and he did. And they are watching pornographic videos of virgins from Europe. Did you hear that child sit there and testify about watching a movie of a virgin child with subtitles, and that kid looks scared. And I remember saying, did you

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

believe that, Carolyn? And she said, yes, ma'am, I did. I did. I did believe that we were in love. And then they planned their future. Do y'all remember that testimony? You remember that part? They were going to have six kids, and they budgeted their money. And they were going to work and where they were going to live and what they were going to do and how they were going pay their bills. This is with a child. This is with a 13-year-old. The courage and the conviction and the bravery of that child exceeds all expectations. How could you ask for more? I remember on voir dire, I said, can you convict with the testimony of a witness, and each one of you sitting in this box told me that you could do it. I remember saying, row by row, row one, row two, row three, row four, can you do it, and you all nodded. And I remember saying something like, I'm going to assume that you can do it. It is that time right now, and we're there. And it's up to you guys to decide did the State meet its case. Absolutely I did. When that child took that stand and told you and recounted each and every detail of this horrible abuse, I met my burden, and this man is guilty. Is there DNA? No. He used condoms on her. Is there a witness? There never will be. You're not going to hold a 13-year-old down and have sex with her, put your mouth on her vagina,

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

169

have her perform oral on you in the room with somebody. Is there medical evidence? She thought they were in love. She thought this was her boyfriend. This was her future husband. No, she didn't fight him.

Guys, I'm going to get a little bit more time to talk to you in a minute, but at the end of your jury charge there's going to be a verdict form. And it's going to say, we, the jury, find the defendant, Zack Eldred, Jr., guilty of the offense of continuous sexual abuse of a child, fill in guilty. He's guilty. You know he's guilty. I said, you know how you know if it's beyond a reasonable doubt is you go home, and you lay your head down, and you think I did the right thing today. Today is that day; tonight is that night. When you go back there, it's a simple decision. I told you it was not a simple case, but it will be a simple decision. Go back there and write guilty. Thank you.

THE COURT: Jeff?

MR. HARRELSON: Thank you, Your Honor. May it please the Court?

THE COURT: Sure.

MR. HARRELSON: Ladies and gentlemen, it's real easy to get swept up in emotion in this type of case, but your oath as a juror is to evaluate the facts, because what's required in a criminal case is that the

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

170

State prove all elements, a list of items, beyond a reasonable doubt to each of your satisfaction, including the dates in the indictment. You have to find beyond a reasonable doubt from on or about July 1, 2010, through December 7 of 2010. Understand from the testimony that there was no mention of this or outcry till May of '11 when Carolyn Sandoval was well past the age of 14. She's required to be under 13 -- or under 14 for this to be this criminal offense. Those elements, they have to prove at least two of those five things there, but I'll submit to you, and we talked about this in voir dire, and you've heard about it a lot today, there aren't any witnesses. There aren't any forensics, DNA, hair, other things that people come to expect these days. There's not any medical evidence, despite the fact that she went through a forensic exam at the hospital. We talked about computer sites that they viewed together, and you heard Zack Eldred say, I'll get my computer and bring it up here for you. There is no evidence of computer sites that they visited together.

Zack Eldred got called by Todd Aultman, and he voluntarily came to the Bi-State, sat down, said, sure, I'll talk to you, waived his rights. Y'all watched it all. He gave a voluntary statement. He did not admit to any crime. That's where this emotion comes

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

171

in, because the things that were said on that tape and the things that were testified to are not crimes. And Detective Aultman admitted that. Most importantly, Zack Eldred, you heard him say it, he denied any form of sexual contact with her.

As far as Carolyn's testimony, she told you that she was in love with Zack Eldred. His words during his statement were that she had a crush on him. And we all have life experience, and you guys know what that feels like. A couple of things, though, she admitted to you that Zack told her, at your age, we can't date until you turn 18. That was her words. I asked her, and she could have answered any way. But she admitted that that's what Zack told her.

The door that she said was locked while there were people in the house, you've heard testimony that the door is not able to lock, that Chris Eldred was present in the home during these times these incidents were supposed to have happened. Most importantly, the one incident that we continue to talk about is this prom, what happened during the prom. Folks, I don't know of a prom that occurs between July and December. I'll submit to you that that prom occurred well after the fact that she turned 14. Proms occur at the end of the school year. That had to have been around the time

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

172

of his arrest. Even if you believe that, that's not an element of this offense.

I say all this to you to tell you, you've taken an oath to a true verdict render, and unless the State has proved all these elements to your satisfaction beyond a reasonable doubt, the law requires that you find Zack Eldred not guilty. This is the last time I'm going to get to talk to you, and I'm going to ask you, once you've analyzed this evidence, and you look at those dates and the inconsistencies in this testimony, what you don't have, your verdict is down here on the bottom. We, the jury, find the defendant not guilty of continuous sexual abuse of a child as charged in the indictment. Thank you.

THE COURT: Ms. Crisp?

MS. CRISP: Yes, sir. Ladies and gentlemen, this is the part where I get to respond briefly to defense counsel's arguments. First of all, when you see this business about the prom, from July 1st, 2010 to December 7th, 2010, was the time during the relationship that she was 13. You know by now, having listened to the testimony, that the relationship continued until May, till she thought she was pregnant. Now, the law is, and rightly so, that y'all get to hear about the entire relationship, not just for the tiny part of the

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

173

relationship that he's on trial for. So, yeah, I'm sure they did have sex in May or April, whenever the prom was, because they were still going on. It started in June, and it ended in May, or July and ended in May.

Now, when we talk about Carolyn said something like, yeah, he said he couldn't date me or marry me till I'm 18. I'm sure he did, right after he told her they were soul mates and that they needed to keep it a secret or he's going to kill himself, kill himself. Did you hear that child sit up here and say, I don't want his blood on my hands? You know what about the door, she said the door was shut. She also said it happened at her house. This man abused her everywhere he could, every way he could.

Let's talk about him again. Let's talk about what we heard him say. Y'all remember this one, I swear on my Bible I did not have sex with her. All right. Deputy Aultman was asking, well, what kind of relationship did you have? We were holding each other, and we cuddled. A 50-year-old man does not hold a 13-year-old, and he does not cuddle with her. We were talking about feelings between them. Here's what he said: I told her I loved her, and I did, and I love her with all my heart. And on his written statement he said, I found myself falling in love with her, a 49- or

— MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926 —

174

50-year-old man does not find himself falling in love with a 13-year-old girl, folks. What about this one: Is it possible that I rolled over and played with her breasts in his sleep? Yes, he told the deputy. What about this one: If I was asleep, and I played with her, I mean, I cannot say that didn't happen. These are pitiful excuses. That is pitiful. That's down right ridiculous. So, really, your statement to the deputy at the Bowie County Sheriff's Office is, yeah, I might have rubbed her between the legs, but if I did, I was asleep. Well, this is what he was saying when the mom called from the hospital. We think she's pregnant. His response is, she better not be. She better not be pregnant? How about, I never had sex with her. She can't be pregnant, she's having her period. How in the world does he know when she's having her period? Y'all remember when he said this at the end: I want it to go back to the way it was. I miss those girls. He had this girl coming over and staying at his house night after night after night. I'm sure he did miss it. You've got a man that's attracted to children, and he's got one that he has access to all the time. And he violates her over and over and over and over. I'm sure he did miss it. I'm sure he did want it back.

Y'all haven't heard any evidence that this

— MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926 —

175

man is a preacher, because he's not. That's a game he plays with this child to manipulate her. Someone that holds themselves out to be a preacher is a false prophet. And in the book of Matthew it tells us, watch out for those false prophets. They will come at you in sheep's clothing, but, in reality, they're ferocious wolves. That's Matthew 7:15. And that's what we have. If this man is not a wolf, and that child is not his prey, if this isn't continual sexual abuse of a child, I can never bring you a clearer case. That testimony is never going to get any better. She is never going to get any clearer. She did not waiver. She told the CAC interviewer. She told those nurses. She told y'all.

Folks, part of the thing that you do with your verdict is you send a message, and what you tell people in Bowie County is we will not tolerate this in our county. We will not have people do this to our children in this county. You are the voice of our county here today. You are the conscience. And what you do here will send a message: We will not have it. You will not abuse a child in Bowie County and get away with it, not today. You told me you would follow your oath. You told me you would do it. I have done my part here today. That child has done her part. Sheriff's office has done their part. The CAC center has done

— MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926 —

176

their part. Now do your part. Go back there and find him guilty. Bring justice to this child. Bring justice to this child for what she has gone through.

Folks, at the end of your jury charge, again, write in guilty. Sometimes Mr. Elliott gives a definition of justice which I think is so beautiful. I'm going to repeat it to you, and, that is, you give somebody something which they have earned and something which they have deserved. This man has earned this guilty verdict if anybody ever has. Do your duty today and do justice for this little girl and find him guilty. Thank you.

THE COURT: All right. Ladies and gentlemen, jurors one through twelve, return to the jury room, elect a presiding juror, and begin your deliberations. Juror No. 13, you're the alternate. I can't let you deliberate with them unless something goes wrong with one of the other jurors, but I also can't release you. So just follow the bailiff's instructions for me, would you?

THE BAILIFF: All rise for the jury, please.

(JURY RETIRED TO DELIBERATE)

(OPEN COURT, DEFENDANT PRESENT, NO JURY PRESENT)

THE COURT: All right. Jeff, Kelley, unless there's anything else, we'll be in recess until we hear

— MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926 —

177

from the jury.

(RECESS FROM 1:57 P.M. TO 3:20 P.M.)

(OPEN COURT, DEFENDANT PRESENT, NO JURY PRESENT)

THE COURT: Everybody keep your seats. State and defense, I understand we've got a verdict. Anything anybody needs on the record before I get the jury back in here?

MS. CRISP: Not from the State, Judge.

THE COURT: Jeff?

MR. HARRELSON: No, Your Honor.

THE COURT: All right. Twister, if you would, go get the jury.

THE BAILIFF: All rise for the jury, please.

(OPEN COURT, DEFENDANT AND JURY PRESENT)

THE COURT: All right. If everyone would please be seated. And if I've got my notes right, is it Mr. Woods?

JUROR WOODS: Yes, sir.

THE COURT: Have y'all reached a verdict, sir?

JUROR WOODS: Yes, sir.

THE COURT: Is it a unanimous verdict?

JUROR WOODS: Yes, sir.

THE COURT: If you would, would you pass it to the bailiff? All right. Mr. Eldred, if you would

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

178

please rise, sir. Says, we, the jury, find the defendant, Zack Eldred, Jr., guilty of continuous sexual abuse of a child as charged in the indictment.

Let me do this: Juror No. 1, Mr. Hawkins, is that your verdict, sir?

JUROR HAWKINS: Yes, sir.

THE COURT: All right. Ms. McGill?

JUROR MCGILL: Yes.

THE COURT: Okay. Again, Mr. Woods?

JUROR WOODS: Yes, sir.

THE COURT: Mr. Barton?

JUROR BARTON: Yes, sir.

THE COURT: Mr. Daniel?

JUROR MCDANIEL: Yes, sir.

THE COURT: Okay. And Mr. Brooks?

JUROR BROOKS: Yes.

THE COURT: Mr. Turner?

JUROR TURNER: Yes, sir.

THE COURT: Anspaugh, am I saying that? Yeah, I got them backwards. Ms. Felps then, right? Is that your verdict, ma'am?

JUROR FELPS: Yes, sir.

JUROR ANSPAUGH: Yes, sir.

THE COURT: And Ms. Steele?

JUROR STEELE: Yes, sir.

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

179

THE COURT: Mr. Sturdivant?

JUROR STURDIVANT: Yes.

THE COURT: And Ms. Smith?

JUROR SMITH: Yes, sir.

THE COURT: All right. Y'all can sit down. Thank you.

(TRIAL ON GUILT/INNOCENCE CONCLUDED AT 3:24 P.M.)

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

180

STATE OF TEXAS )

COUNTY OF BOWIE )

I, MELANIE C. HARRIS, Official Reporter in and for the 102nd Judicial District Court of Bowie County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all proceedings requested in writing by the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correct reflects the exhibits, if any, were admitted by the respective parties.

WITNESS MY OFFICIAL HAND this the _____ day of _____, 2012.

/s/MELANIE C. HARRIS
MELANIE C. HARRIS, CSR #4439
Expiration 12/31/13
Official Court Reporter
102nd Judicial District
Bowie County, Texas
3414 Colonial Circle
Texarkana, TX 75503
(903) 831-6926
FAX (903) 832-7818
harrisrept@aol.com

MELANIE C. HARRIS, CSR, CCR, RPR--(903) 831-6926

Znok Gelvred JP
TDCJ # 1812117
Clements Unit
9601 Spur 591
Amarillo, Texas 79107-9606

RETURN RECEIPT
REQUESTED

Mr. Abel Acosta, Clerk
Office of The Court of
Criminal Appeals Of Texas
P.O. Box 12308
Capitol Station
Austin, Texas 78711

CERTIFIED MAIL



*Legal Mail

Abel Acosta
Clerk of the Court of
Criminal Appeals of Texas
Box 12308
Capitol Station
Texas 78711

9606

RETURN REC[EIPT]
REQUESTED

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

CERTIFIED MAIL

7015 0640 0003 9101 4825

U.S. POSTAGE
PAID
AMARILLO, TX
DEC 21, 15
AMOUNT
79102
$0.00
R2304H108483-03

78711

UNITED STATES
POSTAL SERVICE

1006